THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CENTRAL DIVISION

| | |
|---|---|
| TOWN OF LEICESTER,<br><br>Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG CORPORATION, CARDINAL HEALTH, INC., McKESSON CORPORATION, PURDUE PHARMA L.P.; PURDUE PHARMA, INC.; THE PURDUE FREDERICK COMPANY, INC.; TEVA PHARMACEUTICAL INDUSTRIES, LTD.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; NORAMCO, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; ALLERGAN PLC f/k/a ACTAVIS PLS; WATSON PHARMACEUTICALS, INC. n/k/a ACTAVIS, INC.; WATSON LABORATORIES, INC.; ACTAVIS LLC; ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC.; MALLINCKRODT PLC and MALLINCKRODT LLC.<br><br>Defendants. | CIVIL ACTION NO.: _____<br><br><br>**COMPLAINT**<br><br>Complaint for Public Nuisance; Violations of Racketeer Influenced and Corrupt Organizations Act (RICO) 18 U.S.C. § 1961 *et seq.*; Violations of 18 U.S.C. § 1962 *et seq.*; Negligence and Negligent Misrepresentation; Negligence Per Se; Violations of Massachusetts General Laws, Chapter 93A, Sections 2 and 11; Civil Conspiracy; Fraud and Fraudulent Misrepresentation; Unjust Enrichment; and Aiding and Abetting<br><br><br><br>**JURY TRIAL DEMANDED AND ENDORSED HEREON** |

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................1

II. PARTIES .........................................................................................................3

   A. Plaintiff................................................................................................... 3

   B. Defendants.............................................................................................. 4

      1. Manufacturer Defendants. ...............................................................4

      2. Distributor Defendants......................................................................10

III. JURISDICTION & VENUE ...........................................................................12

IV. FACTUAL BACKGROUND .........................................................................13

   A. THE OPIOID EPIDEMIC. ................................................................... 13

      1. The National Opioid Epidemic. ......................................................13

      2. The Opioid Epidemic in the State and Plaintiff's Community.................................17

   B. THE MANUFACTURER DEFENDANTS' FALSE, DECEPTIVE, AND UNFAIR MARKETING OF OPIOIDS. ......................................................................... 24

      1. Each Manufacturer Defendant Used Multiple Avenues to Disseminate Their False and Deceptive Statements about Opioids. ................................26

         i.     Direct Marketing. ........................................................... 27

         ii.    Indirect Marketing................................................................ 29

      2. The Manufacturer Defendants' Marketing Scheme Misrepresented the Risks and Benefits of Opioids. ...................................................41

         i.     The Manufacturer Defendants embarked upon a campaign of false, deceptive, and unfair assurances grossly understating and misstating the dangerous addiction risks of the opioid drugs. ....................................... 41

         ii.    The Manufacturer Defendants embarked upon a campaign of false, deceptive, and unfair assurances grossly overstating the benefits of the opioid drugs............................................................... 52

**3. The Manufacturer Defendants Targeted Susceptible Prescribers and Vulnerable Patient Populations.** ...................................................................59

**4. The Manufacturer Defendants made Materially Deceptive Statements and Concealed Materials Facts.** .......................................................................60

**5. The Manufacturer Defendants Fraudulently Concealed Their Misconduct**..........67

**C. THE DISTRIBUTOR DEFENDANTS' UNLAWFUL DISTRIBUTION OF OPIOIDS.** ....................................................................................................... 69

**1. Wholesale Drug Distributors Have a Duty under State and Federal Law to Guard Against, and Report, Unlawful Diversion and to Report and Prevent Suspicious Orders.** ....................................................................................70

**2. The Distributor Defendants Breached their Duties.** ...................................................78

**3. The Distributor Defendants Have Sought to Avoid and Have Misrepresented their Compliance with their Legal Duties.** .........................................80

**D. THE MANUFACTURER DEFENDANTS' UNLAWFUL FAILURE TO PREVENT DIVERSION AND MONITOR, REPORT, AND PREVENT SUSPICIOUS ORDERS.** .................................................................................................................... 88

**E. DEFENDANTS' UNLAWFUL CONDUCT AND BREACHES OF LEGAL DUTIES CAUSED THE HARM ALLEGED HEREIN AND SUBSTANTIAL DAMAGES.** ...... 94

**F. STATUTES OF LIMITATIONS ARE TOLLED AND DEFENDANTS ARE ESTOPPED FROM ASSERTED STATUTES OF LIMITATIONS AS DEFENSES.** .. 97

**1. Continuing Conduct.**...................................................................................97

**2. Equitable Estoppel.** ....................................................................................98

**3. Fraudulent Concealment.**...........................................................................101

**V. LEGAL CAUSES OF ACTION** .............................................................................102

**COUNT I – PUBLIC NUISANCE.**...............................................................................102

**COUNT II – RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT 18 U.S.C. 1961, *et seq*** .........................................................................110

**A.     THE OPIOID DIVERSION ENTERPRISE** .............................................. 114

**B.     CONDUCT OF THE OPIOID DIVERSION ENTERPRISE** ........................... 128

**C.     PATTERN OF RACKETEERING ACTIVITY.** ................................................. 134

1. The RICO Defendants Engaged in Mail and Wire Fraud. ....................................134

2. The RICO Defendants Manufactured, Sold and/or Dealt in Controlled Substances and Their Crimes Are Punishable as Felonies. ......................................142

D.     DAMAGES ...................................................................................... 148

COUNT III – RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT 18 U.S.C. 1962(d), *et seq* ...................................................................................148

A.     THE OPIOID DIVERSION ENTERPRISE. ....................................... 149

B.     CONDUCT OF THE OPIOID DIVERSION ENTERPRISE. ........................ 149

C.     PATTERN OF RACKETEERING ACTIVITY. ............................................ 149

D.     DAMAGES. ..................................................................................... 149

COUNT IV – NEGLIGENCE AND NEGLIGENT MISREPRESENTATION ..................150

COUNT V – NEGLIGENCE PER SE ....................................................................155

COUNT VI – VIOLATIONS OF MASSACHUSETTS GENERAL LAWS, CHAPTER 93A, SECTIONS 2 AND 11 ....................................................................158

COUNT VII – CIVIL CONSPIRACY ....................................................................163

COUNT VIII – FRAUD AND FRAUDULENT MISREPRESENTATION ......................165

PUNITIVE DAMAGES ......................................................................................168

Plaintiff, Town of Leicester, ("Plaintiff"), brings this Complaint against Defendants Purdue Pharma L.P.; Purdue Pharma, Inc.; The Purdue Frederick Company, Inc.; Teva Pharmaceutical Industries, LTD.; Teva Pharmaceuticals USA, Inc.; Cephalon, Inc.; Johnson & Johnson; Janssen Pharmaceuticals, Inc.; Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc.; Janssen Pharmaceutica Inc. n/k/a Janssen Pharmaceuticals, Inc.; Noramco, Inc.; Endo Health Solutions Inc.; Endo Pharmaceuticals, Inc.; Allergan PLC f/k/a Actavis PLS; Watson Pharmaceuticals, Inc. n/k/a Actavis, Inc.; Watson Laboratories, Inc.; Actavis, LLC; Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.; Mallinckrodt plc; Mallinckrodt LLC; McKesson Corporation; Cardinal Health, Inc.; and AmerisourceBergen Drug Corporation (collectively "Defendants") and alleges as follows:

## I.  INTRODUCTION

1.     Plaintiff brings this civil action to address, and obtain redress for, the local effects of the nationwide opioid crisis, an epidemic that was created and continues to expand as a direct result of the wrongful and unlawful actions of Defendants, all prescription opioid manufacturers and/or distributors.[1]  Defendants' motivation was simple:  to generate wildly enormous profits for themselves, regardless of the devastating costs (both tangible and intangible) to public health and society.  To do so, they engaged in a highly deceptive and sophisticated marketing campaign aimed at ultimately increasing the use of opioids and/or unlawfully diverted prescription opioids. Plaintiff seeks to eliminate the hazard to public health and safety caused by the Defendant-created opioid epidemic in its community, to abate the public nuisance caused thereby, and to recoup monies that have been spent by Plaintiff because of Defendants' wrongful and illegal

---

[1] As used herein, the term "opioid" refers to the entire family of opiate drugs including natural, synthetic and semi-synthetic opiates.

1

conduct. Such economic damages were foreseeable to Defendants and were sustained because of Defendants' intentional and/or unlawful actions and omissions.

2. The widespread abuse of opioids has resulted in a national epidemic of opioid overdose deaths and addictions.[2]

3. That epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications."[3]

4. The manufacturers and distributors of prescription opioids and their co-conspirators are directly responsible for this devastating epidemic.

5. Plaintiff brings this suit against manufacturers of prescription opioids (the "Manufacturer Defendants"), which engaged in highly deceptive and misleading marketing and promotional activities that aggressively pushed highly addictive, dangerous opioids, falsely representing to doctors that patients would only rarely succumb to drug addiction. These pharmaceutical companies aggressively advertised to and persuaded doctors to prescribe highly addictive, dangerous opioids, which then turned patients into drug addicts for their own corporate profit. Such actions were intentional and/or unlawful.

6. Plaintiff also brings this suit against the wholesale distributors of these highly addictive drugs (the "Distributor Defendants"). The distributors and manufacturers worked in concert, knowingly and substantially assisting each other, and intentionally and/or unlawfully breached their legal duties under federal and state law to monitor, detect, investigate, refuse and report suspicious orders of prescription opiates.

---

[2] *See* Nora D. Volkow & A. Thomas McLellan, *Opioid Abuse in Chronic Pain—Misconceptions and Mitigation Strategies*, 374 N. Eng. J. Med. 1253 (2016).

[3] *See* Robert M. Califf et al., *A Proactive Response to Prescription Opioid Abuse*, 374 N. Eng. J. Med. 1480 (2016).

7.    Plaintiff does not bring product liability claims or claims otherwise arising from allegations that a product was defective.

## II.  PARTIES

### A.  PLAINTIFF.

8.    Plaintiff has declared, *inter alia*, that opioid abuse, addiction, morbidity and mortality has created a serious public health and safety crisis and is a public nuisance, and that the diversion of legally produced controlled substances into the illicit market causes or contributes to this public nuisance.

9.    The distribution and diversion of opioids into Massachusetts ("the State"), the Town of Leicester ("the Town") and into the County in which it is located ("the County") and surrounding areas (collectively, "Plaintiff's Community"), created the foreseeable opioid crisis and opioid public nuisance for which Plaintiff seeks relief.

10.    Plaintiff directly and foreseeably sustained all economic damages alleged herein. Defendants' conduct has exacted a financial burden for which Plaintiff seeks relief.  Categories of past and continuing sustained damages include, *inter alia*,: (1) costs for providing medical care, additional therapeutic treatment, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (2) costs for providing treatment, counseling, and rehabilitation services; (3) costs for providing treatment of infants born with opioid-related medical conditions; (4) costs associated with law enforcement and public safety relating to the opioid epidemic; (5) and costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation. These damages have been suffered, and continue to be suffered directly, by Plaintiff.

11.    Plaintiff also seeks the means to abate the epidemic created by Defendants' wrongful and/or unlawful conduct.

3

12.    Plaintiff has standing to recover damages incurred as a result of Defendants' actions and omissions.   Plaintiff has standing under M.G.L. c.40, §§ 1-2. Plaintiff also has standing to bring all claims pled herein, including, *inter alia*, to bring claims under the federal Racketeer Influenced and Corrupt Organizations Act RICO statute ("RICO"), pursuant to 18 U.S.C. § 1961(3) ("persons" include entities which can hold legal title to property) and 18 U.S.C. § 1964 ("persons" have standing).

**B.  DEFENDANTS.**

**1.  Manufacturer Defendants.**

13.    The Manufacturer Defendants are defined below.   At all relevant times, the Manufacturer Defendants have packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed, advertised, promoted and purported to warn or purported to inform prescribers and users regarding the benefits and risks associated with the use of prescription opioid drugs.   The Manufacturer Defendants, at all relevant times, have engaged in the foregoing conduct without fulfilling their legal duty to prevent diversion[4] and report suspicious orders.

14.    PURDUE PHARMA L.P. is a limited partnership organized under the laws of Delaware with its headquarters in Stamford Connecticut.   PURDUE PHARMA INC. is a New York corporation with its principal place of business in Stamford, Connecticut, and THE PURDUE FREDERICK COMPANY is a Delaware corporation with its principal place of business in Stamford, Connecticut (collectively, "Purdue").

15.    Purdue manufactures, promotes, supplies, labels, describes, markets, promotes, sells, and distributes opioids such as OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans,

---

[4] "Drug diversion" is defined by the Centers for Disease Control and Prevention as occurring "[w]hen prescription medicines are obtained or used illegally."  *See* https://www.cdc.gov/injectionsafety/drugdiversion/index.html.

Hysingla ER, and Targiniq ER in the United States.  OxyContin is Purdue's best-selling opioid. Since 2009, Purdue's annual nationwide sales of OxyContin have fluctuated between $2.47 billion and $2.99 billion, up four-fold from its 2006 sales of $800 million.  OxyContin constitutes roughly 30% of the entire market for analgesic drugs (painkillers).

16.    CEPHALON, INC. is a Delaware corporation with its principal place of business in Frazer, Pennsylvania.  TEVA PHARMACEUTICAL INDUSTRIES, LTD. ("Teva Ltd.") is an Israeli corporation with its principal place of business in Petah Tikva, Israel.  In October 2011, Teva Ltd. acquired Cephalon, Inc.  TEVA PHARMACEUTICALS USA, INC. ("Teva USA") is a Delaware corporation and is a wholly owned subsidiary of Teva Ltd. in Pennsylvania.

17.    Cephalon, Inc. manufactures, promotes, supplies, labels, describes, sells, and distributes opioids such as Actiq and Fentora in the United States.  Actiq has been approved by the Federal Drug Administration (the "FDA") only for the "management of breakthrough cancer pain in patients 16 years and older with malignancies who are already receiving and who are tolerant to around-the-clock opioid therapy for the underlying persistent cancer pain."[5]  Fentora has been approved by the FDA only for the "management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain."[6]  In 2008, Cephalon, Inc. pled guilty to a criminal violation of the Federal Food, Drug and Cosmetic Act for its misleading

---

[5]    *Highlights of Prescribing Information, ACTIQ® (fentanyl citrate) oral transmucosal lozenge, CII* (2009), https://www.accessdata.fda.gov/drugsatfda_docs/label/2009/020747s030lbl.pdf.

[6]    *Highlights of Prescribing Information, FENTORA® (fentanyl citrate) buccal tablet, CII* (2011), https://www.accessdata.fda.gov/drugsatfda_docs/label/2012/021947s015lbl.pdf.

promotion of Actiq and two other drugs, and agreed to pay $425 million in settlements and fines.[7]

18.    Teva Ltd., Teva USA, and Cephalon, Inc. work together closely to supply, label, describe, market, promote, sell and distribute Cephalon, Inc. products in the United States.  Teva Ltd. conducts all sales and marketing activities for Cephalon, Inc. in the United States through Teva USA and has done so since its October 2011 acquisition of Cephalon, Inc.  Teva Ltd. and Teva USA hold out Actiq and Fentora as Teva products to the public.  Teva USA sells all former Cephalon branded products through its "specialty medicines" division.  The FDA-approved prescribing information and medication guide, which is distributed with Cephalon, Inc. opioids, discloses that the guide was submitted by Teva USA, and directs physicians to contact Teva USA to report adverse events.

19.    All of Cephalon, Inc.'s promotional websites, including those for Actiq and Fentora, display Teva Ltd.'s logo.[8]  Teva Ltd.'s financial reports list Cephalon, Inc.'s and Teva USA's sales as its own, and its year-end report for 2012 – the year immediately following the Cephalon, Inc. acquisition – attributed a 22% increase in its specialty medicine sales to "the inclusion of a full year of Cephalon, Inc.'s specialty sales," including *inter alia* sales of Fentora®.[9]  Through interrelated operations like these, Teva Ltd. operates in the United States through its subsidiaries Cephalon, Inc. and Teva USA.  The United States is the largest of Teva Ltd.'s global markets, representing 53% of its global revenue in 2015, and, were it not for the

---

[7]  Press Release, U.S. Dep't of Justice, Biopharmaceutical Company, Cephalon, to Pay $425 Million & Enter Plea to Resolve Allegations of Off-Label Marketing (Sept. 29, 2008), https://www.justice.gov/archive/opa/pr/2008/September/08-civ-860.html.

[8]  *E.g.*, ACTIQ, http://www.actiq.com/ (displaying logo at bottom-left) (last visited Aug. 21, 2017).

[9]  Teva Ltd., Annual Report (Form 20-F) 62 (Feb. 12, 2013), http://annualreports.com/HostedData/AnnualReportArchive/t/NASDAQ_TEVA_2012.pdf.

existence of Teva USA and Cephalon, Inc., Teva Ltd. would conduct those companies' business in the United States itself. Upon information and belief, Teva Ltd. directs the business practices of Cephalon, Inc. and Teva USA, and their profits inure to the benefit of Teva Ltd. as controlling shareholder. Teva Pharmaceutical Industries, Ltd., Teva Pharmaceuticals USA, Inc., and Cephalon, Inc. are referred to as "Cephalon."

20. JANSSEN PHARMACEUTICALS, INC. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly owned subsidiary of JOHNSON & JOHNSON ("J&J"), a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., now known as JANSSEN PHARMACEUTICALS, INC., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. JANSSEN PHARMACEUTICA INC., now known as JANSSEN PHARMACEUTICALS, INC., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. J&J is the only company that owns more than 10% of Janssen Pharmaceuticals, Inc.'s stock, and corresponds with the FDA regarding Janssen's products. NORAMCO, INC. ("Noramco") is a Delaware company headquartered in Wilmington, Delaware and was a wholly owned subsidiary of J&J until July 2016. Upon information and belief, J&J controls the sale and development of Janssen Pharmaceuticals, Inc.'s drugs and Janssen's profits inure to J&J's benefit. Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., Noramco, and J&J are referred to as "Janssen."

21. Janssen manufactures, supplies, labels, describes, markets, promotes, sells, and distributes drugs in the United States, including the opioid Duragesic (fentanyl). Before 2009, Duragesic accounted for at least $1 billion in annual sales. Until January 2015, Janssen

7

developed, marketed, and sold the opioids Nucynta (tapentadol) and Nucynta ER.  Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014.

22.    ENDO HEALTH SOLUTIONS INC. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.  ENDO PHARMACEUTICALS INC. is a wholly owned subsidiary of Endo Health Solutions Inc. and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.  Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. are referred to as "Endo."

23.    Endo develops, manufactures, supplies, labels, describes, markets, promotes and sells prescription drugs, including the opioids Opana/Opana ER, Percodan, Percocet, and Zydone, in the United States.  Opioids made up roughly $403 million of Endo's overall revenues of $3 billion in 2012.  Opana ER yielded $1.15 billion in revenue from 2010 and 2013, and it accounted for 10% of Endo's total revenue in 2012.  Endo also manufactures, supplies, labels, describes, markets, promotes and sells generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products in the United States, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc.

24.    ALLERGAN PLC is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland.  ACTAVIS PLC acquired ALLERGAN PLC in March 2015, and the combined company changed its name to ALLERGAN PLC.  Before that, WATSON PHARMACEUTICALS, INC. acquired ACTAVIS, INC. in October 2012, and the combined company changed its name to Actavis, Inc. as of January 2013 and then ACTAVIS PLC in October 2013.  WATSON LABORATORIES, INC. is a Nevada corporation with its principal place of business in Corona, California, and is a wholly-owned subsidiary of ALLERGAN PLC (f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.).  ACTAVIS

PHARMA, INC. (f/k/a Actavis, Inc.) is a Delaware corporation with its principal place of business in New Jersey and was formerly known as WATSON PHARMA, INC. ACTAVIS LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Each of these defendants is owned by ALLERGAN PLC, which uses them to market and sell its drugs in the United States. Upon information and belief, ALLERGAN PLC exercises control over these marketing and sales efforts and profits from the sale of Allergan/Actavis products ultimately inure to its benefit. ALLERGAN PLC, ACTAVIS PLC, ACTAVIS, INC., ACTAVIS LLC, ACTAVIS PHARMA, INC., WATSON PHARMACEUTICALS, INC., WATSON PHARMA, INC., and WATSON LABORATORIES, INC. are referred to as "Actavis."

25.  Actavis develops, manufactures, supplies, labels, describes, markets, promotes, sells, and distributes opioids, including the branded drugs Kadian and Norco, a generic version of Kadian, and generic versions of Duragesic and Opana, in the United States. Actavis acquired the rights to Kadian from King Pharmaceuticals, Inc. on December 30, 2008, and began marketing and selling Kadian in 2009.

26.  MALLINCKRODT, PLC is an Irish public limited company headquartered in Staines-upon-Thames, United Kingdom, with its U.S. headquarters in St. Louis, Missouri. MALLINCKRODT, LLC is a limited liability company organized and existing under the laws of the State of Delaware. Mallinckrodt, LLC is a wholly owned subsidiary of Mallinckrodt, plc. Mallinckrodt, plc and Mallinckrodt, LLC are referred to as "Mallinckrodt."

27.  Mallinckrodt develops, manufactures, supplies, labels, describes, promotes, markets, sells and distributes drugs in the United States including generic oxycodone, of which it is one of the largest manufacturers. In July 2017, Mallinckrodt agreed to pay $35 million to

settle allegations brought by the Department of Justice that it failed to detect and notify the Drug Enforcement Administration (the "DEA") of suspicious orders of controlled substances.

28.    Perdue, Cephalon, Janssen, Endo, Actavis and Mallinckrodt are referred to as the "Manufacturer Defendants" herein.

### 2. Distributor Defendants.

29.    The Distributor Defendants also are defined below.  At all relevant times, the Distributor Defendants have distributed, supplied, sold, and placed into the stream of commerce prescription opioids without fulfilling the fundamental duty of wholesale drug distributors to detect and warn of diversion of these dangerous drugs for non-medical purposes.  The Distributor Defendants are engaged in "wholesale distribution," as defined under state and federal law.  The Distributor Defendants universally failed to comply with federal and/or state law.  The unlawful conduct by the Distributor Defendants is responsible for the unlawfully excessive volume of prescription opioids plaguing Plaintiff's Community.

30.    McKESSON CORPORATION ("McKesson") at all relevant times, operated as a licensed pharmacy wholesaler in the State.  McKesson is a Delaware corporation.  McKesson has its principal place of business located in San Francisco, California.

31.    CARDINAL HEALTH, INC. ("Cardinal") at all relevant times, operated as a licensed pharmacy wholesaler in the State.  Cardinal's principal office is located in Dublin, Ohio.

32.    AMERISOURCEBERGEN DRUG CORPORATION ("AmerisourceBergen") at all relevant times, operated as a licensed pharmacy wholesaler in the State.  AmerisourceBergen is a Delaware corporation and its principal place of business is located in Chesterbrook, Pennsylvania.

33.    AmerisourceBergen Drug Corporation, Cardinal Health, Inc., and McKesson are referred to as the "Distributor Defendants" herein.

34.     The data which reveals and/or confirms the identity of each wrongful opioid distributor is hidden from public view in the DEA's confidential ARCOS database.  *See Madel v. USDOJ*, 784 F.3d 448 (8th Cir. 2015).  Neither the DEA[10] nor the wholesale distributors[11] will voluntarily disclose the data necessary to identify with specificity the transactions which will form the evidentiary basis for the claims asserted herein.

35.     Consequently, Plaintiff names the three (3) wholesale distributors (i.e., AmerisourceBergen, Cardinal, and McKesson) which dominate 85% of the market share for the distribution of prescription opioids.  The "Big 3" are Fortune 500 corporations listed on the New York Stock Exchange whose principal business is the nationwide wholesale distribution of prescription drugs.  *See Fed. Trade Comm'n v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 37 (D.D.C. 1998) (describing Cardinal, McKesson, and AmerisourceBergen predecessors).  Each has been investigated and/or fined by the DEA for the failure to report suspicious orders. Plaintiff has reason to believe each has engaged in unlawful conduct that resulted in the diversion of prescription opioids into its community and that discovery will likely reveal others who likewise engaged in unlawful conduct.  Plaintiff names each of the "Big 3" herein as defendants and places the industry on notice that Plaintiff is acting to abate the public nuisance plaguing its community.  Plaintiff will request expedited discovery pursuant to Rule 26(d) of the Federal Rules of Civil Procedure to secure the data necessary to reveal and/or confirm the identities of the wholesale distributors, including data from the ARCOS database.

---

[10] *See* Declaration of Katherine L. Myrick, Chief, Freedom of Information (FOI)/Privacy Act Unit ("SARF"), FOI, Records Management Section ("SAR"), Drug Enforcement Administration (DEA), United States Department of Justice (DOJ), *Madel v. USDOJ*, Case 0:13-cv-02832-PAM-FLN, (Document 23) (filed 02/06/14) (noting that ARCOS data is "kept confidential by the DEA").

[11] *See* Declaration of Tina Lantz, Cardinal Health VP of Sales Operation, *Madel v. USDOJ*, Case 0:13-cv-02832-PAM-FLN, (Document 93) (filed 11/02/16) ("Cardinal Health does not customarily release any of the information identified by the DEA notice letter to the public, nor is the information publicly available.  Cardinal Health relies on DEA to protect its confidential business information reported to the Agency.").

## III.  JURISDICTION & VENUE

36.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 based upon the federal claims asserted under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq*. ("RICO").  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to Plaintiff's federal claims that they form part of the same case or controversy.

37.    This Court also has jurisdiction over this action in accordance with 28 U.S.C. § 1332(a) because Plaintiff is a "citizen" of this State, the named Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

38.    This Court has personal jurisdiction over Defendants because they conduct business in the State, purposefully direct or directed their actions toward the State, some or all consented to be sued in the State by registering an agent for service of process, they consensually submitted to the jurisdiction of the State when obtaining a manufacturer or distributor license, and because they have the requisite minimum contacts with the State necessary to constitutionally permit the Court to exercise jurisdiction.

39.    This Court also has personal jurisdiction over all of the Defendants under 18 U.S.C. § 1965(b).  This Court may exercise nationwide jurisdiction over the named Defendants where the "ends of justice" require national service and Plaintiff demonstrates national contacts.  Here, the interests of justice require that Plaintiff be allowed to bring all members of the nationwide RICO enterprise before the court in a single trial.  *See, e.g.*, *Iron Workers Local Union No. 17 Insurance Fund v. Philip Morris Inc.*, 23 F. Supp. 2d 796 (N.D. Ohio 1998) (citing *LaSalle*

*National Bank v. Arroyo Office Plaza, Ltd.,* 1988 WL 23824, *3 (N.D. Ill. Mar 10, 1988); *Butcher's Union Local No. 498 v. SDC Invest., Inc.*, 788 F.2d 535, 539 (9th Cir. 1986).

40.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because a substantial part of the events or omissions giving rise to the claim occurred in this District and each Defendant transacted affairs and conducted activity that gave rise to the claim of relief in this District.  28 U.S.C. § 1391(b); 18 U.S.C. § 1965(a).

## IV.   FACTUAL BACKGROUND

### A.  THE OPIOID EPIDEMIC.

#### 1.  The National Opioid Epidemic.

41.    The past two decades have been characterized by skyrocketing abuse and diversion of prescription drugs, including opioid medications, in the United States.[12]

42.    Prescription opioids have become more widely prescribed than ever before in history.  By 2010, enough prescription opioids were sold to medicate every adult in the United States with a dose of 5 milligrams of hydrocodone every 4 hours for 1 month.[13]

43.    By 2011, the U.S. Department of Health and Human Resources, Centers for Disease Control and Prevention, declared prescription painkiller overdoses at epidemic levels. Its news release noted:

> a.  The death toll from overdoses of prescription painkillers has more than tripled in the past decade.
>
> b.  More than 40 people die every day from overdoses involving narcotic pain relievers like hydrocodone

---

[12] *See* Richard C. Dart et al, *Trends in Opioid Analgesic Abuse and Mortality in the United States*, 372 N. Eng. J. Med. 241 (2015).

[13] Katherine M. Keyes et al., *Understanding the Rural-Urban Differences in Nonmedical Prescription Opioid Use and Abuse in the United States*, 104 Am. J. Pub. Health e52 (2014).

(Vicodin), methadone, oxycodone (OxyContin), and oxymorphone (Opana).

c. Overdoses involving prescription painkillers are at epidemic levels and now kill more Americans than heroin and cocaine combined.

d. The increased use of prescription painkillers for nonmedical reasons, along with growing sales, has contributed to a large number of overdoses and deaths. In 2010, 1 in every 20 people in the United States age 12 and older—a total of 12 million people—reported using prescription painkillers non-medically according to the National Survey on Drug Use and Health. Based on the data from the Drug Enforcement Administration, sales of these drugs to pharmacies and health care providers have increased by more than 300 percent since 1999.

e. Prescription drug abuse is a silent epidemic that is stealing thousands of lives and tearing apart communities and families across America.

f. Almost 5,500 people start to misuse prescription painkillers every day.[14]

44.    The number of annual opioid prescriptions written in the United States is now roughly equal to the number of adults in the population.[15]

45.    Many Americans are currently addicted to prescription opioids.  The number of deaths due to prescription opioid overdose is overwhelming and unacceptable, and it continues to rise significantly each year.

46.    During 1999–2014, drug overdose deaths nearly tripled. Among 47,055 drug overdose deaths that occurred in 2014 in the United States, 28,647 (60.9%) involved an opioid.[16]

---

[14] *See* Press Release, Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., Prescription Painkiller Overdoses at Epidemic Levels (Nov. 1, 2011), https://www.cdc.gov/media/releases/2011/p1101_flu_pain_killer_overdose.html.

[15] *See* Robert M. Califf et al., *A Proactive Response to Prescription Opioid Abuse*, 374 N. Eng. J. Med. 1480 (2016).

[16] *See* Rose A. Rudd et al., *Increases in Drug and Opioid-Involved Overdose Deaths—United States, 2010–2015*, 65 Morbidity & Mortality Wkly. Rep. 1445 (2016).

The U.S. opioid epidemic is continuing and even after the tide of new addicts and deaths is stemmed the problem will continue on for decades.

47. In 2016, drug overdoses killed roughly 64,000 people in the United States, an increase of more than twenty-two percent (22 %) over the 52,404 drug deaths recorded the previous year.[17]

48. Moreover, the CDC has identified addiction to prescription pain medication as the strongest risk factor for heroin addiction. Heroin is pharmacologically similar to prescription opioids. The majority of current heroin users report having used prescription opioids non-medically before they initiated heroin use. Available data indicates that the nonmedical use of prescription opioids is a strong risk factor for heroin use.[18]

49. People who are addicted to prescription opioid painkillers are forty times more likely to be addicted to heroin.[19]

50. The CDC reports that drug overdose deaths involving heroin continued to climb sharply, with heroin overdoses more than tripling in four (4) years. This increase mirrors large increases in heroin use across the country. Heroin use has been shown to be directly tied to opioid pain reliever dependence and misuse.

51. Past dependence upon, including use as prescribed, and misuse of prescription opioids are the strongest risk factors for heroin initiation and use, specifically among persons who report past-year dependence or abuse. The increased availability of heroin, combined with

---

[17] *See* Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., Provisional Counts of Drug Overdose Deaths, (August 8, 2016), https://www.cdc.gov/nchs/data/health_policy/monthly-drug-overdose-death-estimates.pdf.

[18] *See* Wilson M. Compton, *Relationship Between Nonmedical Prescription-Opioid Use and Heroin*, 374 N. Eng. J. Med. 154 (2016).

[19] *See* Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., *Today's Heroin Epidemic*, https://www.cdc.gov/vitalsigns/heroin/index.html (last updated July 7, 2015).

its relatively low price (compared with diverted prescription opioids) and high purity appear to be major drivers of the upward trend in heroin use and overdose.[20]

52. The societal costs of prescription drug abuse are "huge."[21]

53. Across the nation, local governments are struggling with the pernicious, ever-expanding effects of the epidemic of opioid addiction and abuse.

54. The National Institute on Drug Abuse identifies misuse and addiction to opioids as "a serious national crisis that affects public health as well as social and economic welfare."[22] The economic burden of prescription opioid misuse alone is $78.5 billion a year, including the costs of healthcare, lost productivity, addiction treatment, and criminal justice expenditures.[23]

55. During the past fifteen (15) years in the United States, the rate of death from opioid overdose has quadrupled. During that same time period, nonfatal opioid overdoses that require medical care in a hospital or emergency department have increased by a factor of six (6).[24]

56. The U.S. opioid epidemic continues to worsen. Every day, more than 90 Americans lose their lives after overdosing on opioids.[25]

---

[20] *See* Rose A. Rudd et al., *Increases in Drug and Opioid Overdose Deaths—United States, 2000–2014*, 64 Morbidity & Mortality Wkly. Rep. 1378 (2016).

[21] *See* Amicus Curiae Brief of Healthcare Distribution Management Association in Support of Appellant Cardinal Health, Inc., *Cardinal Health, Inc. v. United States Dept. Justice*, No. 12-5061 (D.C. Cir. May 9, 2012), 2012 WL 1637016, at *10 [hereinafter Brief of HDMA].

[22] Opioid Crisis, NIH.

[23] *Id.* (citing at note 2 Florence CS, Zhou C, Luo F, Xu L, The Economic Burden of Prescription Opioid Overdose, Abuse, and Dependence in the United States, 2013, *MED CARE* 2016;54(10):901-906, doi:10.1097/MLR.0000000000000625).

[24] *See* Nora D. Volkow & A. Thomas McLellan, *Opioid Abuse in Chronic Pain—Misconceptions and Mitigation Strategies*, 374 N. Eng. J. Med. 1253 (2016).

[25] Opioid Crisis, NIH, National Institute on Drug Abuse (available at https://www.drugabuse.gov/drugs-abuse/opioids/opioid-crisis, last visited Sept. 19, 2017) ("Opioid Crisis, NIH") (citing at note 1 Rudd RA, Seth P, David F, Scholl L, Increases in Drug and Opioid-Involved Overdose Deaths — United States, 2010–2015, *MMWR MORB MORTAL WKLY REP.* 2016;65, doi:10.15585/mmwr.mm655051e1).

57.     Each day also brings a new revelation regarding the depth of the opioid plague: to name just one example, the New York Times reported in September 2017 that the epidemic, which now claims 60,000 lives a year, is now killing babies and toddlers because ubiquitous, deadly opioids are "everywhere" and mistaken as candy.[26]

58.     In 2016, the President of the United States declared an opioid and heroin epidemic exists in America.[27]

59.     The epidemic of prescription pain medication and heroin deaths is devastating families and communities across the country.[28]  Meanwhile, the manufacturers and distributors of prescription opioids are extracting billions of dollars of revenue from the addicted American public while public entities experience human and economic loss, sometimes in the hundreds of millions of dollars range of injury, caused by the reasonably foreseeable consequences of the prescription opioid addiction epidemic.

60.     The prescription opioid manufacturers and distributors, including Defendants, have continued their wrongful, intentional, and unlawful conduct, despite their knowledge that such conduct is causing and/or deepening the scope of the national, state, and local opioid epidemic.

## 2.  The Opioid Epidemic in the Commonwealth of Massachusetts.

61.     The Commonwealth of Massachusetts has been especially ravaged by the national opioid crisis.

62.     Overdose mortalities in Massachusetts have increased sharply in recent years:

---

[26]  Julie Turkewitz, 'The Pills are Everywhere': How the Opioid Crisis Claims Its Youngest Victims, N.Y. Times, Sept. 20, 2017 ("'It's a cancer,' said [grandmother of dead one-year old], of the nation's opioid problem, 'with tendrils that are going everywhere.'").

[27]  See Proclamation No. 9499, 81 Fed. Reg. 65,173 (Sept. 16, 2016) (proclaiming "Prescription Opioid and Heroin Epidemic Awareness Week").

[28]  See Presidential Memorandum – Addressing Prescription Drug Abuse and Heroin Use, 2015 Daily Comp. Pres. Doc. 743 (Oct. 21, 2015), https://www.gpo.gov/fdsys/pkg/DCPD-201500743/pdf/DCPD-201500743.pdf.



63.    From 2000 to 2015, Massachusetts saw a 372% increase in overdose fatalities.  In 2015 alone, there were 1,724 Massachusetts overdose deaths, up from 463 Massachusetts overdose deaths in 2000.[29]    Drug overdose deaths involving synthetic opioids other than methadone more than doubled in just one year between 2014 and 2015.[30]

64.    Since 2014, the fatal overdose rate in Massachusetts reached more than double the national average.[31]

---

[29] L.M. ROSSEN ET AL., NAT'L C1R. FOR HEALTH STAT., DRUG POISONING MORTAUTY: UNITED STATES, 1999- 2015 (2017), https://www.cdc.gov/nchs/data-visualization/dmg-poisoning-mortality/ (last visited Dec. 12, 2017).

[30] R.A. Rudd et al., Ctr. for Disease Ctrl., Increases in Dmg and Opioid-Involved Overdose Deaths - United States, 2010-2015. MMWR MORBIDITY AND MORTALITY WKLY. REP. 2016;65  :1445- 1452, https://v.rwv.r.cdc.gov/mmwr/volumes/65/wrlrmn655051e1 htm (last visited Dec. 12, 2017).

[31] MASS. DEP'T OF PUB. HEALTH, THE MASSACHUSETTS OPIOID EPIDEMIC: A DATA VISUALIZATION OF FINDINGS FROM THE CHAPTER 55 REPORT, http://www.mass.gov/chapter55/ (last visited Dec. 12, 2017).



65.    Overdoses alone fail to paint the full picture.   According to the Massachusetts governmental officials, "opioid-related deaths in the Commonwealth were more than four times higher in 2015 than in 2000.  This recent rate of increase is several times faster than anything seen here before.  In 2013-2014, opioid-related deaths occurred in two-thirds of the cities and towns in Massachusetts."[32]

---

[32] *Id.*

19

Percentage of Patients in Treatment Listing Heroin as their Primary Substance of Use[11,12,13]

At admission, clients identify a primary substance of use for which they are seeking treatment. Below, view maps at five-year intervals which show the increase in the percentage of admissions identifying heroin as their primary substance of use.



View the dataset powering this visualization.

Sources: Massachusetts Bureau of Substance Abuse Services, Massachusetts Department of Public Health

Primary Substance of Use When Entering Treatment by Town[9,10,11,12,13]

At admission, clients identify a primary substance of use for which they are seeking treatment. Below, view the changes in the percentage of primary substances identified at admission from 2000 to 2015.



View the dataset powering this visualization.

Sources: Massachusetts Bureau of Substance Abuse Services, Massachusetts Department of Public Health

## Growth of Addiction in Massachusetts

Data from the DPH Bureau of Substance Abuse Services (BSAS) shows an increasing need for opioid-related treatment in Massachusetts. In 2000, about one third of admissions to substance abuse treatment centers and programs were opioid-related[5]. By 2015, that figure had increased to more than half, overtaking alcohol as the most prevalent substance recorded by BSAS at treatment intake. The Health Policy Commission (HPC) recorded similar numbers for emergency room visits and hospitalizations during that time.

Along with the rise in demand for opioid use treatment, nationally and in Massachusetts, there has been an increase in opioid-related overdoses, both fatal and nonfatal.

66.     Prescriptions drive the epidemic of addiction and overdose. 8 in 12 people who died from opioids in 2013 and 2014 had an opioid prescription at some point from 2011–2014.[33] In 2016, there were half as many prescriptions as people in Massachusetts, and that only after the State managed to draw down the amount from a peak of 69.2 prescriptions per 100 people in 2008. This compares to the national rate of 66.5 prescriptions per 100 people in 2016.[34] Based on the amount prescribed, Massachusetts had over 473 morphine milligram equivalents of opioids prescribed per capita in 2015,[35] equivalent to over a week's high-dose supply for every person in the state.[36]

67.     Meanwhile, Massachusetts has an opioid prescription rate of 70.8 per 100 persons and a benzodiazepine prescription rate of 48.8 per 100 persons, the latter of which ranks 9th nationally (U.S. median rate: 37.6).[37]  In 2016, there were half as many prescriptions as people in Massachusetts, and that occurred only after the Commonwealth managed to draw down the amount from a peak of 69.2 prescriptions per 100 people in 2008.  Based on the amount prescribed, Massachusetts had over 473 morphine milligram equivalents of opioids prescribed

---

[33] *Id.*

[34] CTR. FOR DISEASE CTRL., U.S. PRESCRIBING RATE MAPS (2017), https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html (last visited Dec. 12, 2017).

[35] AMFAR, OPIOID & HEALTH INDICATORS DATABASE, MASSACHUSETTS OPIOID EPIDEMIC, http://opioid.amfar.org/MA (last visited Dec. 12, 2017).

[36] CTR. FOR DISEASE CTRL., CALCULATING TOTAL DAILY DOSAGE OF OPIOIDS FOR SAFER DOSAGE, https://www.cdc.gov/drugoverdose/pdf/calculating_total_daily_dose-a.pdf (last visited Dec. 12, 2017).

[37] Leonard J. Paulozzi, M.D., et al., Ctr. for Disease Ctrl., Vital Signs: Variation Among States in Prescribing of Opioid Pain Relievers and Benzodiazepines - United States, 2012, MORBIDITY AND MORTALITY WKLY. REP. (Jul. 4, 2014), https://www..cdc.gov/nunwr/preview/nunwrhtml/nun6326a2.htm (last visited Dec. 12, 2017). The combination of hydrocodone, oxycodone, and benzodiazepines is referred to as the "holy trinity" and significantly increases the risk of harm to those that abuse prescription pills.

per capita in 2015,[38] equivalent to over week's high dose supply for every person in the Commonwealth. [39]

68.    The opioid prescription rates in the Commonwealth and in Plaintiff's Community exceeded any legitimate medical, scientific, or industrial purpose.

69.    This high rate of prescriptions only scratches the surface of the full extent of the problem in Massachusetts.  Nine out of ten people in Massachusetts who need addiction treatment do not receive it.  In 2016, 2.86% of people reported drug dependence, higher than the national average of 2.7%, and 3.49% reported non-medical use of pain relievers.[40]  This is after improvement:  Massachusetts' rate of nonmedical use of prescription pain relievers in the nation was at 4% from 2010-2012.[41]

70.    The rate of opioid-related inpatient stays in Massachusetts surged by 41.8% between 2009 and 2014 to reach second in the nation, at 393.7 per 100,000 people, 175% of the national rate of 224.6.  Opioid-related emergency department visits in Massachusetts leaped by 71.2% from 2009 to 2014 and are now the highest in the nation by far, at 450.2 per 100,000 population in 2014, over two and a half times the national rate of 177.7 per 100,000.[42]

---

[38] AMFAR, OPIOID & HEALTH INDICATORS DATABASE, MASSACHUSETTS OPIOID EPIDEMIC, http://opioid.amfar.org/MA (last visited Dec. 12, 2017).

[39] CTR. FOR DISEASE CTRL., CALCULATING TOTAL DAILY DOSE OF OPIOIDS FOR SAFER DOSAGE, https://www.cdc.gov/drugoverdose/pdf/calculating_total_ daily_ dose-a. pdf (last visited Dec. 12, 2017).

[40] AMFAR, supra note 8.

[41] RACHEL N. LIPARI, PH.D., ET AL., SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION, NATIONAL SURVEY ON DRUG USE AND HEALTH (Jul. 13, 2017), https://www.samhsa.gov/data/sites/default/flles/report_3187/ShortRepOit-3187 .html (last visited Dec. 12, 2017).

[42] AGENCY FOR HEAL1HCARE RESEARCH AND QUALITY, HEAL1HCARE COST AND UTILIZATION PROJECT, STATISTICAL BRIEF #219, OPIOID-RELATED INPATIENT STAYS AND EMERGENCY DEPARTMENT VISITS BY STA1E, 2009-2014 (Jan. 20 17), https://www.hcup-us.ahrq.gov/repOitslstatbriefs/sb219-0pioid-Hospital-Stays-ED-Visits-by-State. pdf (last visited Dec. 12, 2017).

### 3.  The Opioid Epidemic in Plaintiff's Community.

71.    Plaintiff's community also has been hit particularly hard by the opioid crisis.

72.    Plaintiff's Community is experiencing an excessive drug overdose rate related to an excessive volume of prescription opiates proximately caused by the wrongful conduct by the Defendants described and named herein.

73.    Excessive numbers of opioid prescriptions have been dispensed in the Plaintiff's Community.[43] Significant numbers of the residents of Plaintiff's Community report drug dependence and non-medical use of pain relievers.[44]  Many residents of Plaintiff's Community who need addiction treatment don't receive it.[45] Drug poisoning and opioid related deaths in Plaintiff's Community have significantly impacted the community in recent years.[46]

74.    The opioid prescription rates in Plaintiff's Community exceeded any legitimate medical, scientific, or industrial purpose.

75.    The opioid epidemic has placed increased budgetary constraints upon, *inter alia*, the public health and medical care expenditures of the Commonwealth and Plaintiff's Community.  Opioid addiction is one of the primary reasons citizens of the Commonwealth and Plaintiff's Community seek substance abuse treatment.

---

[43]    U.S. Prescribing Rate Maps, Centers for Disease Control and Prevention (2017), https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html (last visited Nov 13, 2017).

[44] *See, e.g.,* http://opioid.amfar.org.

[45] *Id.* at View Counties: Healthcare.

[46] L.M. ROSSEN ET AL., NAT'L CTR. FOR HEALTH STAT., DRUG POISONING MORTALITY: UNITED STATES, 1999–2015 (2017), https://www.cdc.gov/nchs/data-visualization/drug-poisoning-mortality/ (last visited Dec. 13, 2017); MASS. DEP'T OF PUB. HEALTH, THE MASSACHUSETTS OPIOID EPIDEMIC: A DATA VISUALIZATION OF FINDINGS FROM THE CHAPTER 55 REPORT, http://www.mass.gov/chapter55/ (last visited Dec. 13, 2017) ; Mass. Dep't of Pub. Health, *Number of Opioid-Related Overdose Deaths, All Intents by City/Town, MA Residents January 2012- December 2016,* 5 (May 2017), https://www.mass.gov/files/documents/2017/08/31/town-by-town-listings-may-2017.pdf (last visited Dec. 13, 2017).

76.     Criminal charges associated with the diversion of opioids have increased.  This has placed increased budgetary costs upon law enforcement expenses in Plaintiff's Community.

77.     Opioid abuse, addiction, morbidity, and mortality are hazards to public health and safety in Plaintiff's Community, and constitute a temporary and continuing public nuisance, which remains unabated.

**B.   THE MANUFACTURER DEFENDANTS' FALSE, DECEPTIVE, AND UNFAIR MARKETING OF OPIOIDS.**

78.     The opioid epidemic did not happen by accident.

79.     Before the 1990s, generally accepted standards of medical practice dictated that opioids should only be used short-term for acute pain, pain relating to recovery from surgery, or for cancer or palliative (end-of-life) care.  Due to the lack of evidence that opioids improved patients' ability to overcome pain and function, coupled with evidence of greater pain complaints as patients developed tolerance to opioids over time and the serious risk of addiction and other side effects, the use of opioids for chronic pain was discouraged or prohibited.  As a result, doctors generally did not prescribe opioids for chronic pain.

80.     Each Manufacturer Defendant has conducted, and continues to conduct, a marketing scheme designed to persuade doctors and patients that opioids can and should be used for chronic pain, resulting in opioid treatment for a far broader group of patients who are much more likely to become addicted and suffer other adverse effects from the long-term use of opioids.  In connection with this scheme, each Manufacturer Defendant spent, and continues to spend, millions of dollars on promotional activities and materials that falsely deny or trivialize the risks of opioids while overstating the benefits of using them for chronic pain.

81.     The Manufacturer Defendants have made false and misleading claims, contrary to the language on their drugs' labels, regarding the risks of using their drugs that: (1) downplayed

the serious risk of addiction; (2) created and promoted the concept of "pseudoaddiction" when signs of actual addiction began appearing and advocated that the signs of addiction should be treated with more opioids; (3) exaggerated the effectiveness of screening tools to prevent addiction; (4) claimed that opioid dependence and withdrawal are easily managed; (5) denied the risks of higher opioid dosages; and (6) exaggerated the effectiveness of "abuse-deterrent" opioid formulations to prevent abuse and addiction. The Manufacturer Defendants have also falsely touted the benefits of long-term opioid use, including the supposed ability of opioids to improve function and quality of life, even though there was and is no scientifically reliable evidence to support those claims.

82.    The Manufacturer Defendants have disseminated these common messages to reverse the popular and the medical understanding of opioids and risks of opioid use. They disseminated these messages directly, through their sales representatives, in speaker groups led by physicians the Manufacturer Defendants recruited for their support of their marketing messages, and through unbranded marketing and industry-funded front groups.

83.    The Manufacturer Defendants' efforts have been wildly successful. Opioids are now the most prescribed class of drugs. Globally, opioid sales generated $11 billion in revenue for drug companies in 2010 alone; sales in the United States have exceeded $8 billion in revenue annually since 2009.[47] In an open letter to the nation's physicians in August 2016, the then-U.S. Surgeon General expressly connected this "urgent health crisis" to "heavy marketing of opioids to doctors . . . [m]any of [whom] were even taught – incorrectly – that opioids are not addictive

---

[47] *See* Katherine Eban, *Oxycontin: Purdue Pharma's Painful Medicine*, Fortune, Nov. 9, 2011, http://fortune.com/2011/11/09/oxycontin-purdue-pharmas-painful-medicine/; David Crow, *Drugmakers Hooked on $10bn Opioid Habit*, Fin. Times, Aug. 10, 2016, https://www.ft.com/content/f6e989a8-5dac-11e6-bb77-a121aa8abd95.

when prescribed for legitimate pain."[48]   This epidemic has resulted in a flood of prescription opioids available for illicit use or sale (the supply), and a population of patients physically and psychologically dependent on them (the demand).   And when those patients can no longer afford or obtain opioids from licensed dispensaries, they often turn to the street to buy prescription opioids or even non-prescription opioids, like heroin.

84.   The Manufacturer Defendants intentionally continued their conduct, as alleged herein, with knowledge that such conduct was creating the opioid nuisance and causing the harms and damages alleged herein.

85.   Moreover, each Manufacturer Defendant knowingly participated in the wrongful coordinated scheme of disinformation and promotion, substantially assisted its creation, expansion and success, and reaped its shared benefits.

### 1. The Manufacturer Defendants Used Multiple Avenues to Disseminate Their False and Deceptive Statements about Opioids.

86.   The Manufacturer Defendants spread their false and deceptive statements by marketing their branded opioids directly to doctors and patients in and around the Commonwealth, including in Plaintiff's Community.   Those Defendants also deployed seemingly unbiased and independent third parties that they actually controlled to spread their false and deceptive statements about the risks and benefits of opioids for the treatment of chronic pain throughout the Commonwealth and Plaintiff's Community.

87.   The Manufacturer Defendants employed the same marketing plans and strategies and deployed the same messages in and around the Commonwealth, including in Plaintiff's Community, as they did nationwide.   Across the pharmaceutical industry, "core message"

---

[48] Letter from Vivek H. Murthy, U.S. Surgeon General (Aug. 2016), http://turnthetiderx.org/.

development is funded and overseen on a national basis by corporate headquarters.  This comprehensive approach ensures that the Manufacturer Defendants' messages are accurately and consistently delivered across marketing channels – including detailing visits, speaker events, and advertising – and in each sales territory.  The Manufacturer Defendants consider this high level of coordination and uniformity crucial to successfully marketing their drugs.

88.    The Manufacturer Defendants ensure marketing consistency nationwide through national and regional sales representative training; national training of local medical liaisons, the company employees who respond to physician inquiries; centralized speaker training; single sets of visual aids, speaker slide decks, and sales training materials; and nationally coordinated advertising. The Manufacturer Defendants' sales representatives and physician speakers were required to stick to prescribed talking points, sales messages, and slide decks, and supervisors rode along with them periodically to both check on their performance and compliance.

### i.    Direct Marketing.

89.    The Manufacturer Defendants' direct marketing of opioids generally proceeded on two tracks.  First, each Manufacturer Defendant conducted and continues to conduct advertising campaigns touting the purported benefits of their branded drugs.  For example, upon information and belief, the Manufacturer Defendants spent more than $14 million on medical journal advertising of opioids in 2011, nearly triple what they spent in 2001.

90.    Many of the Manufacturer Defendants' branded ads deceptively portrayed the benefits of opioids for chronic pain.  For example, Endo distributed and made available on its website opana.com a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs like construction worker, chef, and teacher, misleadingly implying that the drug would provide long-term pain-relief and functional improvement.  Upon information and belief, Purdue also ran a series of ads, called "Pain vignettes," for OxyContin in

2012 in medical journals.  These ads featured chronic pain patients and recommended OxyContin for each.  For example, one ad described a "54-year-old writer with osteoarthritis of the hands" and implied that OxyContin would help the writer work more effectively.

91.    Second, each Manufacturer Defendant promoted the use of opioids for chronic pain through "detailers" – sales representatives who visited individual doctors and medical staff in their offices – and small-group speaker programs.  The Manufacturer Defendants have not corrected this misinformation.  Instead, each Defendant devoted massive resources to direct sales contacts with doctors. Upon information and belief, in 2014 alone, the Manufacturer Defendants spent in excess of $168 million on detailing branded opioids to doctors, more than twice what they spent on detailing in 2000.

92.    The Manufacturer Defendants' detailing to doctors is effective.  Numerous studies indicate that marketing impacts doctors' prescribing habits, with face-to-face detailing having the greatest influence.   Even without such studies, the Manufacturer Defendants purchase, manipulate and analyze some of the most sophisticated data available in any industry, data available from IMS Health Holdings, Inc., to track, precisely, the rates of initial prescribing and renewal by individual doctors, which in turn allows them to target, tailor, and monitor the impact of their core messages.  Thus, the Manufacturer Defendants know their detailing to doctors is effective.

93.    The Manufacturer Defendants' detailers have been reprimanded for their deceptive promotions.  In March 2010, for example, the FDA found that Actavis had been distributing promotional materials that "minimize[] the risks associated with Kadian and misleadingly suggest[] that Kadian is safer than has been demonstrated."  Those materials in particular "fail to

reveal warnings regarding potentially fatal abuse of opioids, use by individuals other than the patient for whom the drug was prescribed."[49]

### ii. Indirect Marketing.

94. The Manufacturer Defendants indirectly marketed their opioids using unbranded advertising, paid speakers and "key opinion leaders" ("KOLs"), and industry-funded organizations posing as neutral and credible professional societies and patient advocacy groups (referred to hereinafter as "Front Groups").

### a. Unbranded Advertising.

95. The Manufacturer Defendants deceptively marketed opioids in the Commonwealth and Plaintiff's Community through unbranded advertising – e.g., advertising that promotes opioid use generally but does not name a specific opioid. This advertising was ostensibly created and disseminated by independent third parties. But by funding, directing, reviewing, editing, and distributing this unbranded advertising, the Manufacturer Defendants controlled the deceptive messages disseminated by these third parties and acted in concert with them to falsely and misleadingly promote opioids for the treatment of chronic pain. Much as Defendants controlled the content and distribution of their "core messages" via their own detailers and speaker programs, the Manufacturer Defendants similarly controlled the content and distribution of these messages in scientific publications, treatment guidelines, Continuing Medical Education ("CME") programs, and medical conferences and seminars. To this end, the Manufacturer Defendants used third-party public relations firms to help control those messages when they originated from third-parties.

---

[49] Letter from Thomas Abrams, Dir., Div. of Drug Mktg., Advert., & Commc'ns, U.S. Food & Drug Admin., to Doug Boothe, CEO, Actavis Elizabeth LLC (Feb. 18, 2010), http://www.fdanews.com/ext/resources/files/archives/a/ActavisElizabethLLC.pdf.

96.    The Manufacturer Defendants marketed through third-party, unbranded advertising to avoid regulatory scrutiny because that advertising is not submitted to and typically is not reviewed by the FDA.   The Manufacturer Defendants also used third-party, unbranded advertising to give the false appearance that the deceptive messages came from an independent and objective source.   Like the tobacco companies, the Manufacturer Defendants used third parties that they funded, directed, and controlled to carry out and conceal their scheme to deceive doctors and patients about the risks and benefits of long term opioid use for chronic pain.

### b.    Key Opinion Leaders.

97.    The Manufacturer Defendants also identified doctors to serve, for payment, on their speakers' bureaus and to attend programs with speakers and meals paid for by Defendants. These speaker programs provided: (1) an incentive for doctors to prescribe a particular opioid (so they might be selected to promote the drug); (2) recognition and compensation for the doctors selected as speakers; and (3) an opportunity to promote the drug through the speaker to his or her peers.  These speakers give the false impression that they are providing unbiased and medically accurate presentations when they are, in fact, presenting a script prepared by Defendants.   On information and belief, these presentations conveyed misleading information, omitted material information, and failed to correct Defendants' prior misrepresentations about the risks and benefits of opioids.

98.    Borrowing a page from Big Tobacco's playbook, the Manufacturer Defendants worked through third parties they controlled by: (a) funding, assisting, encouraging, and directing doctors who served as KOLS, and (b) funding, assisting, directing, and encouraging seemingly neutral and credible Front Groups.   The Manufacturer Defendants then worked together with those KOLs and Front Groups to taint the sources that doctors and patients relied on for ostensibly "neutral" guidance, such as treatment guidelines, CME programs, medical

conferences and seminars, and scientific articles.  Thus, working individually and collectively, and through these Front Groups and KOLs, the Defendant willfully unfairly and deceptively persuaded doctors and patients that what they have long knew – that opioids are addictive drugs, unsafe in most circumstances for long-term use – was untrue, and that the compassionate treatment of pain required opioids.

99.   In 2007, multiple states sued Purdue for engaging in unfair and deceptive practices in its marketing, promotion, and sale of OxyContin.  Certain states settled their claims in a series of Consent Judgments that prohibited Purdue from making misrepresentations in the promotion and marketing of OxyContin in the future.  By using indirect marketing strategies, however, Purdue intentionally circumvented these restrictions.  Such actions include contributing to the creation of misleading publications and prescribing guidelines that lack reliable scientific basis and promote prescribing practices which have worsened the opioid crisis.

100.   Pro-opioid doctors are one of the most important avenues that the Manufacturer Defendants use to spread their false and deceptive statements about the risks and benefits of long-term opioid use.  The Manufacturer Defendants know that doctors rely heavily and less critically on their peers for guidance, and KOLs provide the false appearance of unbiased and reliable support for chronic opioid therapy.  For example, the State of New York found in its settlement with Purdue that the Purdue website "In the Face of Pain" failed to disclose that doctors who provided testimonials on the site were paid by Purdue and concluded that Purdue's failure to disclose these financial connections potentially misled consumers regarding the objectivity of the testimonials.

101.   Defendants utilized many KOLs, including many of the same ones.

31

102.  Dr. Russell Portenoy, former Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York, is one example of a KOL whom the Manufacturer Defendants identified, compensated and promoted to further their deceptive marketing campaign.  Dr. Portenoy received research support, consulting fees, and honoraria from multiple Defendants, such as Cephalon, Endo, Janssen, and Purdue (among others), and was a paid consultant to Cephalon and Purdue.  Dr. Portenoy was instrumental in opening the door for the regular use of opioids to treat chronic pain.  He served on the American Pain Society ("APS") / American Academy of Pain Medicine ("AAPM") Guidelines Committees, which endorsed the use of opioids to treat chronic pain, first in 1996 and again in 2009.  He was also a member of the board of the American Pain Foundation ("APF"), an advocacy organization almost entirely funded by the Manufacturer Defendants.

103.  Dr. Portenoy also made frequent media appearances promoting opioids and spreading misrepresentations, such as his claim that "the likelihood that the treatment of pain using an opioid drug which is prescribed by a doctor will lead to addiction is extremely low." He appeared on Good Morning America in 2010 to discuss the use of opioids long-term to treat chronic pain.  On this widely-watched program, broadcast across the country, Dr. Portenoy claimed: "Addiction, when treating pain, is distinctly uncommon.  If a person does not have a history, a personal history, of substance abuse, and does not have a history in the family of substance abuse, and does not have a very major psychiatric disorder, most doctors can feel very assured that that person is not going to become addicted."[50]

104.  Dr. Portenoy later admitted that he "gave innumerable lectures in the late 1980s and '90s about addiction that weren't true."  These lectures falsely claimed that fewer than 1% of

---

[50] Good Morning America (ABC television broadcast Aug. 30, 2010).

patients would become addicted to opioids. According to Dr. Portenoy, because the primary goal was to "destigmatize" opioids, he and other doctors promoting them overstated their benefits and glossed over their risks. Dr. Portenoy also conceded that "[d]ata about the effectiveness of opioids does not exist."[51] Portenoy candidly stated: "Did I teach about pain management, specifically about opioid therapy, in a way that reflects misinformation? Well, . . . I guess I did."[52]

105. Another KOL, Dr. Lynn Webster, was the co-founder and Chief Medical Director of Lifetree Clinical Research, an otherwise unknown pain clinic in Salt Lake City, Utah. Dr. Webster was President of American Academy of Pain Medicine ("AAPM") in 2013. He is a Senior Editor of Pain Medicine, the same journal that published Endo special advertising supplements touting Opana ER. Dr. Webster was the author of numerous CMEs sponsored by Cephalon, Endo, and Purdue. At the same time, Dr. Webster was receiving significant funding from the Manufacturer Defendants (including nearly $2 million from Cephalon).

106. During a portion of his time as a KOL, Dr. Webster was under investigation for overprescribing by the U.S. Department of Justice's Drug Enforcement Agency, which raided his clinic in 2010. Although the investigation was closed without charges in 2014, more than 20 of Dr. Webster's former patients at the Lifetree Clinic have died of opioid overdoses.

107. Ironically, Dr. Webster created and promoted the Opioid Risk Tool, a five question, one-minute screening tool relying on patient self-reports that purportedly allows doctors to manage the risk that their patients will become addicted to or abuse opioids. The claimed ability to pre-sort patients likely to become addicted is an important tool in giving doctors confidence to

---

[51] Thomas Catan & Evan Perez, *A Pain-Drug Champion Has Second Thoughts*, Wall St. J., Dec. 17, 2012, https://www.wsj.com/articles/SB10001424127887324478304578173342657044604.

[52] *Id.*

33

prescribe opioids long-term, and for this reason, references to screening appear in various industry-supported guidelines.  Versions of Dr. Webster's Opioid Risk Tool appear on, or are linked to, websites run by Endo, Janssen, and Purdue.  Unaware of the flawed science and industry bias underlying this tool, certain states and public entities have incorporated the Opioid Risk Tool into their own guidelines, indicating, also, their reliance on the Manufacturer Defendants and those under their influence and control.

108.  In 2011, Dr. Webster presented, via webinar, a program sponsored by Purdue entitled "Managing Patient's Opioid Use: Balancing the Need and the Risk."  Dr. Webster recommended use of risk screening tools, urine testing, and patient agreements ways to prevent "overuse of prescriptions" and "overdose deaths."  This webinar was available to and was intended to reach doctors in the Commonwealth and doctors treating members of Plaintiff's Community.[53]

109.  Dr. Webster also was a leading proponent of the concept of "pseudoaddiction," the notion that addictive behaviors should be seen not as warnings, but as indications of undertreated pain.  In Dr. Webster's description, the only way to differentiate the two was to increase a patient's dose of opioids.  As he and co-author Beth Dove wrote in their 2007 book *Avoiding Opioid Abuse While Managing Pain*—a book that is still available online—when faced with signs of aberrant behavior, increasing the dose "in most cases . . . should be the clinician's first response."[54]  Upon information and belief, Endo distributed this book to doctors.  Years later, Dr.

---

[53] *See* Emerging Solutions in Pain, *Managing Patient's Opioid Use: Balancing the Need and the Risk*, http://www.emergingsolutionsinpain.com/ce-education/opioid-management?option=com_continued&view=frontmatter&Itemid=303&course=209 (last visited Aug. 22, 2017).

[54] Lynn Webster & Beth Dove, *Avoiding Opioid Abuse While Managing Pain* (2007).

Webster reversed himself, acknowledging that "[pseudoaddiction] obviously became too much of an excuse to give patients more medication."[55]

110.  Dr. Webster is listed on a government website as having received over thirty payments totaling nearly $45,000 in 2016 alone from Teva for a range of activities such as consulting, speaking fees, and related travel and food expenses.[56]

### c.  Front Groups

111.  The Manufacturer Defendants also entered into arrangements with seemingly unbiased and independent patient and professional organizations to promote opioids for the treatment of chronic pain.  Under the direction and control of the Manufacturer Defendants, these "Front Groups" generated treatment guidelines, unbranded materials, and programs that favored chronic opioid therapy.  They also assisted the Manufacturer Defendants by responding to negative articles, by advocating against regulatory changes that would limit opioid prescribing in accordance with the scientific evidence, and by conducting outreach to vulnerable patient populations targeted by the Manufacturer Defendants.

112.  These Front Groups depended on the Manufacturer Defendants for funding and, in some cases, for survival.  The Manufacturer Defendants also exercised control over programs and materials created by these groups by collaborating on, editing, and approving their content, and by funding their dissemination.  In doing so, the Manufacturer Defendants made sure that the Front Groups would generate only the messages that the Manufacturer Defendants wanted to

---

[55] John Fauber, *Painkiller Boom Fueled by Networking*, Milwaukee Wisc. J. Sentinel, Feb. 18, 2012, http://archive.jsonline.com/watchdog/watchdogreports/painkiller-boom-fueled-by-networking-dp3p2rn-139609053.html.

[56] *See* https://openpaymentsdata.cms.gov/physician/1136720/payment-information

distribute.  Despite this, the Front Groups held themselves out as independent and serving the needs of their members – whether patients suffering from pain or doctors treating those patients.

113.  Defendants Cephalon, Endo, Janssen, and Purdue, in particular, utilized many Front Groups, including many of the same ones.  Several of the most prominent are described below, but there are many others, including the American Pain Society ("APS"), American Geriatrics Society ("AGS"), the Federation of State Medical Boards ("FSMB"), American Chronic Pain Association ("ACPA"), the Center for Practical Bioethics ("CPB"), the U.S. Pain Foundation ("USPF") and Pain & Policy Studies Group ("PPSG").[57]

114.  The most prominent of the Manufacturer Defendants' Front Groups was the American Pain Foundation ("APF"), which, upon information and belief, received more than $10 million in funding from opioid manufacturers from 2007 until it closed its doors in May 2012, primarily from Endo and Purdue.  APF issued education guides for patients, reporters, and policymakers that touted the benefits of opioids for chronic pain and trivialized their risks, particularly the risk of addiction.  APF also launched a campaign to promote opioids for returning veterans, which has contributed to high rates of addiction and other adverse outcomes – including death – among returning soldiers.  APF further engaged in a significant multimedia campaign – through radio, television and the internet – to educate patients about their "right" to pain treatment, namely opioids.  All the programs and materials were available nationally and were intended to reach citizens of the Commonwealth and Plaintiff's Community.

115. In 2009 and 2010, more than 80% of APF's operating budget came from pharmaceutical industry sources.  Including industry grants for specific projects, APF received

---

[57] *See generally, e.g.*, Letter from Sen. Ron Wyden, U.S. Senate Comm. on Fin., to Sec. Thomas E. Price, U.S. Dep't of Health and Human Servs., (May 5, 2015), https://www.finance.senate.gov/imo/media/doc/050517%20Senator%20Wyden%20to%20Secretary%20Price%20re%20FDA%20Opioid%20Prescriber%20Working%20Group.pdf.

about $2.3 million from industry sources out of total income of about $2.85 million in 2009; its budget for 2010 projected receipts of roughly $2.9 million from drug companies, out of total income of about $3.5 million.  By 2011, upon information and belief, APF was entirely dependent on incoming grants from Defendants Purdue, Cephalon, Endo, and others to avoid using its line of credit.

116.  APF held itself out as an independent patient advocacy organization.  It often engaged in grassroots lobbying against various legislative initiatives that might limit opioid prescribing, and thus the profitability of its sponsors.  Upon information and belief, it was often called upon to provide "patient representatives" for the Manufacturer Defendants' promotional activities, including for Purdue's Partners Against Pain and Janssen's Let's Talk Pain.  APF functioned largely as an advocate for the interests of the Manufacturer Defendants, not patients.  Indeed, upon information and belief, as early as 2001, Purdue told APF that the basis of a grant was Purdue's desire to "strategically align its investments in nonprofit organizations that share [its] business interests."

117.  Plaintiff is informed, and believes, that on several occasions, representatives of the Manufacturer Defendants, often at informal meetings at conferences, suggested activities and publications for APF to pursue.  APF then submitted grant proposals seeking to fund these activities and publications, knowing that drug companies would support projects conceived as a result of these communications.

118.  The U.S. Senate Finance Committee began looking into APF in May 2012 to determine the links, financial and otherwise, between the organization and the manufacturers of opioid painkillers.  The investigation caused considerable damage to APF's credibility as an objective and neutral third party, and the Manufacturer Defendants stopped funding it.  Within

days of being targeted by Senate investigation, APF's board voted to dissolve the organization "due to irreparable economic circumstances." APF "cease[d] to exist, effective immediately."[58]

119.  Another front group for the Manufacturer Defendants was the American Academy of Pain Medicine ("AAPM").  With the assistance, prompting, involvement, and funding of the Manufacturer Defendants, the AAPM issued purported treatment guidelines and sponsored and hosted medical education programs essential to the Manufacturer Defendants' deceptive marketing of chronic opioid therapy.

120.  AAPM received substantial funding from opioid manufacturers.  For example, AAPM maintained a corporate relations council, whose members paid $25,000 per year (on top of other funding) to participate.  The benefits included allowing members to present educational programs at off-site dinner symposia in connection with AAPM's marquee event – its annual meeting held in Palm Springs, California, or other resort locations.  AAPM describes the annual event as an "exclusive venue" for offering education programs to doctors.  Membership in the corporate relations council also allows drug company executives and marketing staff to meet with AAPM executive committee members in small settings.  Defendants Endo, Purdue, and Cephalon were members of the council and presented deceptive programs to doctors who attended this annual event.

121.  Upon information and belief, AAPM is viewed internally by Endo as "industry friendly," with Endo advisors and speakers among its active members.  Endo attended AAPM conferences, funded its CMEs, and distributed its publications.  The conferences sponsored by AAPM heavily emphasized sessions on opioids – 37 out of roughly 40 at one conference alone.

---

[58] Charles Ornstein & Tracy Weber, *Senate Panel Investigates Drug Companies' Ties to Pain Groups*, Wash. Post, May 8, 2012, https://www.washingtonpost.com/national/health-science/senate-panel-investigates-drug-companies-ties-to-pain-groups/2012/05/08/gIQA2X4qBU_story.html.

AAPM's presidents have included top industry-supported KOLs Perry Fine and Lynn Webster. Dr. Webster was even elected president of AAPM while under a DEA investigation.

122.  The Manufacturer Defendants were able to influence and control AAPM through both their significant and regular funding and the leadership of pro-opioid KOLs within the organization.

123.  In 1996, AAPM and APS jointly issued a consensus statement, "The Use of Opioids for the Treatment of Chronic Pain," which endorsed opioids to treat chronic pain and claimed that the risk of a patient's addiction to opioids was low.  Dr. Haddox, who co-authored the AAPM/APS statement, was a paid speaker for Purdue at the time.  Dr. Portenoy was the sole consultant.  The consensus statement remained on AAPM's website until 2011, and, upon information and belief, was taken down from AAPM's website only after a doctor complained.[59]

124.  AAPM and APS issued their own guidelines in 2009 ("AAPM/APS Guidelines") and continued to recommend the use of opioids to treat chronic pain.[60]  Treatment guidelines have been relied upon by doctors, especially the general practitioners and family doctors targeted by the Manufacturer Defendants.  Treatment guidelines not only directly inform doctors' prescribing practices, but are cited throughout the scientific literature and referenced by third-party payors in determining whether they should cover treatments for specific indications. Pharmaceutical sales representatives employed by Endo, Actavis, and Purdue discussed treatment guidelines with doctors during individual sales visits.

---

[59] *The Use of Opioids for the Treatment of Chronic Pain: A Consensus Statement From the American Academy of Pain Medicine and the American Pain Society*, 13 Clinical J. Pain 6 (1997).

[60] Roger Chou et al., *Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Non-Cancer Pain*, 10 J. Pain 113 (2009).

125. At least 14 of the 21 panel members who drafted the AAPM/APS Guidelines, including KOLs Dr. Portenoy and Dr. Perry Fine of the University of Utah, received support from Defendants Janssen, Cephalon, Endo, and Purdue. The 2009 Guidelines promote opioids as "safe and effective" for treating chronic pain, despite acknowledging limited evidence, and conclude that the risk of addiction is manageable for patients regardless of past abuse histories.[61] One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the Michigan Headache & Neurological Institute, resigned from the panel because of his concerns that the AAPM/APS Guidelines were influenced by contributions that drug companies, including Manufacturer Defendants, made to the sponsoring organizations and committee members. These AAPM/APS Guidelines have been a particularly effective channel of deception and have influenced not only treating physicians, but also the body of scientific evidence on opioids; the Guidelines have been cited hundreds of times in academic literature, were disseminated in the Commonwealth and/or Plaintiff's Community during the relevant time period, are still available online, and were reprinted in the Journal of Pain. The Manufacturer Defendants widely referenced and promoted the 2009 Guidelines without disclosing the lack of evidence to support them or the Manufacturer Defendants' financial support to members of the panel who drafted them.

126. The Manufacturer Defendants unfairly, deceptively and knowingly worked together and substantially assisted each other, in part through Front Groups, to spread their deceptive messages about the risks and benefits of long-term opioid therapy. For example, Defendants combined their efforts through the Pain Care Forum ("PCF"), which began in 2004 as an APF project. PCF is comprised of representatives from opioid manufacturers (including Cephalon,

---

[61] *Id.*

Endo, Janssen, and Purdue) and various Front Groups, almost all of which received substantial funding from the Manufacturer Defendants.  Among other projects, PCF worked to ensure that an FDA-mandated education project on opioids was not unacceptably negative and did not require mandatory participation by prescribers, which the Manufacturer Defendants determined would reduce prescribing.

### 2. The Manufacturer Defendants' Marketing Scheme Misrepresented the Risks and Benefits of Opioids.

#### i. The Manufacturer Defendants embarked upon a campaign of false, deceptive, and unfair assurances grossly understating and misstating the dangerous addiction risks of the opioid drugs.

127.  To falsely assure physicians and patients that opioids are safe, the Manufacturer Defendants deceptively trivialized and failed to disclose the risks of long-term opioid use, particularly the risk of addiction, through a series of misrepresentations that have been conclusively debunked by the FDA and CDC.  These misrepresentations – which are described below – reinforced each other and created the dangerously misleading impression that: (1) starting patients on opioids was low risk because most patients would not become addicted, and because those at greatest risk for addiction could be identified and managed; (2) patients who displayed signs of addiction probably were not addicted and, in any event, could easily be weaned from the drugs; (3) the use of higher opioid doses, which many patients need to sustain pain relief as they develop tolerance to the drugs, do not pose special risks; and (4) abuse-deterrent opioids both prevent abuse and overdose and are inherently less addictive.  The Manufacturer Defendants have not only failed to correct these misrepresentations, they continue to make them today.

128. Opioid manufacturers, including Defendants Endo Pharmaceuticals, Inc. and Purdue Pharma L.P., have entered into settlement agreements with public entities that prohibit

them from making many of the misrepresentations identified in this Complaint. Yet even afterward, each Manufacturer Defendant continued to misrepresent the risks and benefits of long-term opioid use in the Commonwealth and Plaintiff's Community and each continues to fail to correct its past misrepresentations. They also continue to support, fund and control those misrepresentations through the direct and indirect marketing methods identified above.

129. Some illustrative examples of the Manufacturer Defendants' false, deceptive, and unfair claims about the purportedly low risk of addiction include the following:

    a.  Actavis's predecessor caused a patient education brochure, *Managing Chronic Back Pain*, to be distributed beginning in 2003 that admitted that opioid addiction is possible, but falsely claimed that it is "less likely if you have never had an addiction problem." Based on Actavis's acquisition of its predecessor's marketing materials along with the rights to Kadian, it appears that Actavis continued to use this brochure in 2009 and beyond.

    b.  Cephalon and Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which suggested that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining duplicative opioid prescriptions from multiple sources, or theft. This publication is still available today online.[62]

    c.  Endo sponsored a website, "PainKnowledge," which, upon information and belief, claimed in 2009 that "[p]eople who take opioids as prescribed usually do not become addicted." Upon information and belief, another Endo website, PainAction.com, stated "Did you know? Most chronic pain patients do not become addicted to the opioid medications that are prescribed for them." Endo also distributed an "Informed Consent" document on PainAction.com that misleadingly suggested that only people who "have problems with substance abuse and addiction" are likely to become addicted to opioid medications.

    d.  Upon information and belief, Endo distributed a pamphlet with the Endo logo entitled *Living with Someone with Chronic Pain*, which stated, "Most health care providers who treat people with pain agree that most people do not develop an addiction problem."

---

[62] Am. Pain Found., *Treatment Options: A Guide for People Living in Pain* (2007) [hereinafter APF, *Treatment Options*], https://assets.documentcloud.org/documents/277605/apf-treatmentoptions.pdf.

e.  Janssen reviewed, edited, approved, and distributed a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which described as "myth" the claim that opioids are addictive, and asserted as fact that "[m]any studies show that opioids are rarely addictive when used properly for the management of chronic pain."

f.  Janssen currently runs a website, Prescriberesponsibly.com (last updated July 2, 2015), which claims that concerns about opioid addiction are "overestimated."

g.  Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which claims that less than 1% of children prescribed opioids will become addicted and that pain is undertreated due to "[m]isconceptions about opioid addiction."[63]

h.  In 2010, Mallinckrodt sponsored an initiative "Collaborating and Acting Responsibly to Ensure Safety (C.A.R.E.S.), through which it published and promoted the book "Defeat Chronic Pain Now!" aimed at chronic pain patients. The book, which is still available for sale in New Mexico and elsewhere, and is promoted online at www.defeatchronicpainnow.com, advises laypeople who are considering taking opioid drugs that "[o]nly rarely does opioid medication cause a true addiction."[64] Further, the book advises that even the issue of tolerance is "overblown," because "[o]nly a minority of chronic pain patients who are taking long-term opioids develop tolerance." In response to a hypothetical question from a chronic back pain patient who expresses a fear of becoming addicted, the book advises that "[i]t is very uncommon for a person with chronic pain to become 'addicted' to narcotics IF (1) he doesn't have a prior history of any addiction and (2) he only takes the medication to treat pain."

i.  Upon information and belief, consistent with the Manufacturer Defendants' published marketing materials, upon information and belief, detailers for Purdue, Endo, Janssen, Cephalon, and Mallinckrodt in the Commonwealth and Plaintiff's Community minimized or omitted any discussion with doctors of the risk of addiction; misrepresented the potential for abuse of opioids with purportedly abuse-deterrent formulations; and routinely did not correct the misrepresentations noted above.

j.  Seeking to overturn the criminal conviction of a doctor for illegally prescribing opioids, the Manufacturer Defendants' Front Groups APF and NFP argued in an *amicus* brief to the United States Fourth Circuit Court of Appeals that "patients

---

[63] Am. Pain Found., *A Policymaker's Guide to Understanding Pain and Its Management* 6 (2011) [hereinafter APF, *Policymaker's Guide*], http://s3.documentcloud.org/documents/277603/apf-policymakers-guide.pdf.

[64] Charles E. Argoff & Bradley S. Galer, *Defeat Chronic Pain Now!* (2010).

rarely become addicted to prescribed opioids," citing research by their KOL, Dr. Portenoy.[65]

130.  These claims are contrary to longstanding scientific evidence.  A 2016 opioid-prescription guideline issued by the CDC (the "2016 CDC Guideline") explains that there is "[e]xtensive evidence" of the "possible harms of opioids (including opioid use disorder [an alternative term for opioid addiction], [and] overdose . . .)."[66]  The 2016 CDC Guideline further explains that "[o]pioid pain medication use presents serious risks, including overdose and opioid use disorder" and that "continuing opioid therapy for 3 months substantially increases risk for opioid use disorder."[67]

131.  The FDA further exposed the falsity of Defendants' claims about the low risk of addiction when it announced changes to the labels for extended-release and long-acting ("ER/LA") opioids in 2013 and for immediate release ("IR") opioids in 2016.  In its announcements, the FDA found that "most opioid drugs have 'high potential for abuse'" and that opioids "are associated with a substantial risk of misuse, abuse, NOWS [neonatal opioid withdrawal syndrome], addiction, overdose, and death."  According to the FDA, because of the "known serious risks" associated with long-term opioid use, including "risks of addiction, abuse, and misuse, even at recommended doses, and because of the greater risks of overdose and

---

[65] Brief of the American Pain Foundation, the National Pain Foundation, and the National Foundation for the Treatment of Pain in Support of Appellant and Reversal of the Conviction, *United States v. Hurowitz*, No. 05-4474 (4th Cir. Sept. 8, 2005) [hereinafter Brief of APF] at 9.

[66] Deborah Dowell et al., *CDC Guideline for Prescribing Opioids for Chronic Pain—United States, 2016*, Morbidity & Mortality Wkly. Rep., Mar. 18, 2016, at 15 [hereinafter 2016 CDC Guideline], https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm.

[67] *Id.* at 2, 25.

death," opioids should be used only "in patients for whom alternative treatment options" like non-opioid drugs have failed.[68]

132. The State of New York, in a 2016 settlement agreement with Endo, found that opioid "use disorders appear to be highly prevalent in chronic pain patients treated with opioids, with up to 40% of chronic pain patients treated in specialty and primary care outpatient centers meeting the clinical criteria for an opioid use disorder."[69] Endo had claimed on its www.opana.com website that "[m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted," but the State of New York found that Endo had no evidence for that statement. Consistent with this, Endo agreed not to "make statements that . . . opioids generally are non-addictive" or "that most patients who take opioids do not become addicted" in New York. Endo remains free, however, to make those statements in this Commonwealth.

133. In addition to mischaracterizing the highly addictive nature of the drugs they were pushing, the Manufacturer Defendants also fostered a fundamental misunderstanding of the signs of addiction. Specifically, the Manufacturer Defendants misrepresented, to doctors and patients, that warning signs and/or symptoms of addiction were, instead, signs of undertreated pain (i.e. pseudoaddiction) – and instructed doctors to increase the opioid prescription dose for patients who were already in danger.

---

[68] Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Evaluation and Research, U.S. Food and Drug Admin., U.S. Dep't of Health and Human Servs., to Andrew Koldny, M.D., President, Physicians for Responsible Opioid Prescribing (Sept. 10, 2013), https://www.regulations.gov/contentStreamer?documentId=FDA-2012-P-0818-0793&attachmentNumber=1&contentType=pdf.; Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Evaluation and Research, U.S. Food and Drug Admin., U.S. Dep't of Health and Human Servs., to Peter R. Mathers & Jennifer A. Davidson, Kleinfeld, Kaplan and Becker, LLP (Mar. 22, 2016), https://www.regulations.gov/contentStreamer?documentId=FDA-2014-P-0205-0006&attachmentNumber=1&contentType=pdf.

[69] Assurance of Discontinuance, *In re Endo Health Solutions Inc. and Endo Pharm. Inc. (*Assurance No. 15-228), at 16, https://ag.ny.gov/pdfs/Endo_AOD_030116-Fully_Executed.pdf.

134. To this end, one of Purdue's employees, Dr. David Haddox, invented a phenomenon called "pseudoaddiction."  Upon information and belief, KOL Dr. Portenoy popularized the term.  Examples of the false, misleading, deceptive, and unfair statements regarding pseudoaddiction include:

a. Cephalon and Purdue sponsored *Responsible Opioid Prescribing* (2007), which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, are all signs of pseudoaddiction, rather than true addiction.[70]  The 2012 edition, which remains available for sale online, continues to teach that pseudoaddiction is real.[71]

b. Janssen sponsored, funded, and edited the Let's Talk Pain website, which in 2009 stated: "pseudoaddiction . . . refers to patient behaviors that may occur when pain is under-treated . . . . Pseudoaddiction is different from true addiction because such behaviors can be resolved with effective pain management."

c. Endo sponsored a National Initiative on Pain Control ("NIPC") CME program in 2009 entitled "Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia," which, upon information and belief, promoted pseudoaddiction by teaching that a patient's aberrant behavior was the result of untreated pain.  Endo appears to have substantially controlled NIPC by funding NIPC projects; developing, specifying, and reviewing content; and distributing NIPC materials.

d. Purdue published a pamphlet in 2011 entitled *Providing Relief, Preventing Abuse*, which, upon information and belief, described pseudoaddiction as a concept that "emerged in the literature" to describe the inaccurate interpretation of [drug-seeking behaviors] in patients who have pain that has not been effectively treated."

e. Upon information and belief, Purdue sponsored a CME program titled "Path of the Patient, Managing Chronic Pain in Younger Adults at Risk for Abuse".  In a role play, a chronic pain patient with a history of drug abuse tells his doctor that he is taking twice as many hydrocodone pills as directed.  The narrator notes that because of pseudoaddiction, the doctor should not assume the patient is addicted even if he persistently asks for a specific drug, seems desperate, hoards medicine, or "overindulges in unapproved escalating doses."  The doctor treats this patient by prescribing a high-dose, long-acting opioid.

---

[70] Scott M. Fishman, M.D., *Responsible Opioid Prescribing: A Physician's Guide* (2007) at 62.

[71] *See* Scott M. Fishman, M.D., *Responsible Opioid Prescribing: A Physician's Guide* (2d ed. 2012).

f.  In 2010, Mallinckrodt sponsored an initiative "Collaborating and Acting Responsibly to Ensure Safety (C.A.R.E.S.), through which it published and promoted the book "Defeat Chronic Pain Now!" aimed at chronic pain patients. The book, which is still available for sale in New Mexico and elsewhere, and is promoted online at www.defeatchronicpainnow.com, teaches laypeople that "pseudoaddiction" is "caused by their doctor not appropriately prescribing the opioid medication." It teaches that "[p]seudoaddiction happens when a patient's opioid medication is not being prescribed in doses strong enough to provide good pain relief, or if the drug is not being prescribed often enough throughout the day. . . When a pseudoaddicted patient is prescribed the proper amount of opioid medication, he or she doesn't take any extra pills because his or her pain is relieved."

135.  In the 2016 CDC Guideline, the CDC rejects the validity of the pseudoaddiction fallacy invented by a Purdue employee as a reason to push more opioid drugs onto already addicted patients.

136.  In addition to misstating the addiction risk and inventing the pseudoaddiction falsehood, a third category of false, deceptive, and unfair practice is the Manufacturer Defendants' false instructions that addiction risk screening tools, patient contracts, urine drug screens, and similar strategies allow them to reliably identify and safely prescribe opioids to patients predisposed to addiction.  These misrepresentations were especially insidious because the Manufacturer Defendants aimed them at general practitioners and family doctors who lack the time and expertise to closely manage higher-risk patients on opioids.  The Manufacturer Defendants' misrepresentations made these doctors feel more comfortable prescribing opioids to their patients, and patients more comfortable starting on opioid therapy for chronic pain. Illustrative examples include:

a.  Endo paid for a 2007 supplement in the *Journal of Family Practice* written by a doctor who became a member of Endo's speakers bureau in 2010.  The supplement, entitled *Pain Management Dilemmas in Primary Care: Use of Opioids*, emphasized the effectiveness of screening tools, claiming that patients at high risk of addiction could safely receive chronic opioid therapy using a "maximally structured approach" involving toxicology screens and pill counts.

47

b. Purdue, upon information and belief, sponsored a 2011 webinar, *Managing Patient's Opioid Use: Balancing the Need and Risk*, which claimed that screening tools, urine tests, and patient agreements prevent "overuse of prescriptions" and "overdose deaths."

c. As recently as 2015, upon information and belief, Purdue has represented in scientific conferences that "bad apple" patients – and not opioids – are the source of the addiction crisis and that once those "bad apples" are identified, doctors can safely prescribe opioids without causing addiction.

137. The 2016 CDC Guideline confirms the falsity of these claims.  The Guideline explains that there are no studies assessing the effectiveness of risk mitigation strategies "for improving outcomes related to overdose, addiction, abuse or misuse."[72]

138. A fourth category of deceptive messaging regarding dangerous opioids is the Manufacturer Defendants' false assurances regarding the alleged ease of eliminating opioid dependence.  The Manufacturer Defendants falsely claimed that opioid dependence can easily be addressed by tapering and that opioid withdrawal is not a problem, but they failed to disclose the increased difficulty of stopping opioids after long-term use.  In truth, the 2016 CDC Guideline explains that the symptoms of opioid withdrawal include abdominal pain, vomiting, diarrhea, sweating, tremor, tachycardia, drug cravings, anxiety, insomnia, spontaneous abortion and premature labor in pregnant women.[73]

139. The Manufacturer Defendants nonetheless downplayed the severity of opioid detoxification.  For example, upon information and belief, a CME sponsored by Endo, entitled *Persistent Pain in the Older Adult*, claimed that withdrawal symptoms can be avoided by tapering a patient's opioid dose by 10%-20% for 10 days.  And Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which claimed that

---

[72] 2016 CDC Guideline at 11.

[73] *Id.* at 26.

"[s]ymptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation" without mentioning any hardships that might occur.[74] Similarly, in the 2010 Mallinckrodt/C.A.R.E.S. publication "Defeat Chronic Pain Now!", potential opioid users are advised that tolerance to opioids is "easily remedied," and that "[a]ll patients can be safely taken off opioid medication if the dose is slowly tapered down by their doctor."

140. A fifth category of false, deceptive, and unfair statements the Manufacturer Defendants made to sell more drugs is that opioid dosages could be increased indefinitely without added risk. The ability to escalate dosages was critical to Defendants' efforts to market opioids for long-term use to treat chronic pain because, absent this misrepresentation, doctors would have abandoned treatment when patients built up tolerance and lower dosages did not provide pain relief. The Manufacturer Defendants' deceptive claims include:

   a. Upon information and belief, Actavis's predecessor created a patient brochure for Kadian in 2007 that stated, "Over time, your body may become tolerant of your current dose. You may require a dose adjustment to get the right amount of pain relief. This is not addiction." Based on Actavis's acquisition of its predecessor's marketing materials along with the rights to Kadian, Actavis appears to have continued to use these materials in 2009 and beyond.

   b. Cephalon and Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which claims that some patients "need" a larger dose of an opioid, regardless of the dose currently prescribed. The guide stated that opioids have "no ceiling dose" and insinuated that they are therefore the most appropriate treatment for severe pain.[75] This publication is still available online.

   c. Endo sponsored a website, "PainKnowledge," which, upon information and belief, claimed in 2009 that opioid dosages may be increased until "you are on the right dose of medication for your pain."

---

[74] Am. Pain Found., *A Policymaker's Guide to Understanding Pain and Its Management* 6 (2011) [hereinafter APF, *Policymaker's Guide*], http://s3.documentcloud.org/documents/277603/apf-policymakers-guide.pdf., at 32.

[75] Am. Pain Found., *Treatment Options: A Guide for People Living in Pain* (2007) [hereinafter APF, *Treatment Options*], https://assets.documentcloud.org/documents/277605/apf-treatmentoptions.pdf., at 12.

d.  Endo distributed a pamphlet edited by a KOL entitled *Understanding Your Pain: Taking Oral Opioid Analgesics* (2004 Endo Pharmaceuticals PM-0120).  In Q&A format, it asked "If I take the opioid now, will it work later when I really need it?"  The response is, "The dose can be increased. . . . You won't 'run out' of pain relief."[76]

e.  Janssen sponsored a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which was distributed by its sales force.  This guide listed dosage limitations as "disadvantages" of other pain medicines but omitted any discussion of risks of increased opioid dosages.

f.  Upon information and belief, Purdue's In the Face of Pain website promoted the notion that if a patient's doctor does not prescribe what, in the patient's view, is a sufficient dosage of opioids, he or she should find another doctor who will.

g.  Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which taught that dosage escalations are "sometimes necessary," and that "the need for higher doses of medication is not necessarily indicative of addiction," but inaccurately downplayed the risks from high opioid dosages.[77]

h.  In 2007, Purdue sponsored a CME entitled "Overview of Management Options" that was available for CME credit and available until at least 2012.  The CME was edited by a KOL and taught that nonsteroidal anti-inflammatory drugs ("NSAIDs") and other drugs, but not opioids, are unsafe at high dosages.

i.  Purdue presented a 2015 paper at the College on the Problems of Drug Dependence, "the oldest and largest organization in the US dedicated to advancing a scientific approach to substance use and addictive disorders," challenging the correlation between opioid dosage and overdose.[78]

j.  Seeking to overturn the criminal conviction of a doctor for illegally prescribing opioids, the Manufacturer Defendants' Front Groups APF and NFP argued in an *amicus* brief to the United States Fourth Circuit Court of Appeals that "there is no 'ceiling dose'" for opioids.[79]

---

[76] Margo McCaffery & Chris Pasero, Endo Pharm., *Understanding Your Pain: Taking Oral Opioid Analgesics* (Russell K Portenoy, M.D., ed., 2004).

[77] Am. Pain Found., *A Policymaker's Guide to Understanding Pain and Its Management* 6 (2011) [hereinafter APF, *Policymaker's Guide*], http://s3.documentcloud.org/documents/277603/apf-policymakers-guide.pdf., at 32.

[78] The College on Problems of Drug Dependence, *About the College*, http://cpdd.org (last visited Aug. 21, 2017).

[79] Brief of APF, at 9.

k. In the 2010 Mallinckrodt/C.A.R.E.S. publication "Defeat Chronic Pain Now!", potential opioid users are warned about the risk of "[p]seudoaddiction [b]ecause of a [l]ow [d]ose," and advised that this condition may be corrected through the prescription of a higher dose. Similarly, the book recommends that for chronic pain patients, the opioid dose should be "gradually increased to find the best daily dose, as is done with all the other oral drugs." The book discusses the risks of NSAIDs and other drugs at higher doses, but not explain this risk for opioids.

141. Once again, the 2016 CDC Guideline reveals that the Manufacturer Defendants' representations regarding opioids were lacking in scientific evidence. The 2016 CDC Guideline clarifies that the "[b]enefits of high-dose opioids for chronic pain are not established" while the "risks for serious harms related to opioid therapy increase at higher opioid dosage."[80] More specifically, the CDC explains that "there is now an established body of scientific evidence showing that overdose risk is increased at higher opioid dosages."[81] The CDC also states that there is an increased risk "for opioid use disorder, respiratory depression, and death at higher dosages."[82] That is why the CDC advises doctors to "avoid increasing dosage" to above 90 morphine milligram equivalents per day.[83]

142. As a sixth category of misrepresentation, Defendants' deceptive marketing of the so-called abuse-deterrent properties of some of their opioids has created false impressions that these opioids can cure addiction and abuse.

143. The Manufacturer Defendants made misleading claims about the ability of their so-called abuse-deterrent opioid formulations to deter abuse. For example, Endo's advertisements for the 2012 reformulation of Opana ER claimed that it was designed to be crush resistant, in a way that suggested it was more difficult to abuse. This claim was false. The FDA warned in a

---

[80] 2016 CDC Guideline at 22–23.

[81] *Id.* at 23–24.

[82] *Id.* at 21.

[83] *Id.* at 16.

2013 letter that Opana ER Extended-Release Tablets' "extended-release features can be compromised, causing the medication to 'dose dump,' when subject to . . . forms of manipulation such as cutting, grinding, or chewing, followed by swallowing."[84]  Also troubling, Opana ER can be prepared for snorting using commonly available methods and "readily prepared for injection."[85]  The letter discussed "the troubling possibility that a higher (and rising) percentage of [Opana ER Extended-Release Tablet] abuse is occurring via injection."[86]  Endo's own studies, which it failed to disclose, showed that Opana ER could still be ground and chewed.  In June 2017, the FDA requested that Opana ER be removed from the market.

> ii.  **The Manufacturer Defendants embarked upon a campaign of false, deceptive, and unfair assurances grossly overstating the benefits of the opioid drugs.**

144.  To convince doctors and patients that opioids should be used to treat chronic pain, the Manufacturer Defendants also had to persuade them that there was a significant upside to long-term opioid use.  But as the CDC Guideline makes clear, "[n]o evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later (with most placebo-controlled randomized trials ≤ 6 weeks in duration)" and that other treatments were more or equally beneficial and less harmful than long-term opioid use.[87]  The FDA, too, has recognized the lack of evidence to support long-term opioid use.  Despite this, Defendants falsely and misleadingly touted the benefits of long-term

---

[84] Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Evaluation and Research, U.S. Food and Drug Admin., U.S. Dep't of Health and Human Servs., to Robert Barto, Vice President, Reg. Affairs, Endo Pharm. Inc. (May 10, 2013), at 5.

[85] *Id*. at 6.

[86] *Id*. at 6 n.21.

[87] *Id*. at 15.

opioid use and falsely and misleadingly suggested that these benefits were supported by scientific evidence.

145. Some illustrative examples of the Manufacturer Defendants' false claims are:

    a. Upon information and belief, Actavis distributed an advertisement claiming that the use of Kadian to treat chronic pain would allow patients to return to work, relieve "stress on your body and your mental health," and help patients enjoy their lives.

    b. Endo distributed advertisements that claimed that the use of Opana ER for chronic pain would allow patients to perform demanding tasks like construction work or work as a chef and portrayed seemingly healthy, unimpaired subjects.

    c. Janssen sponsored and edited a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009) – which states as "a fact" that "opioids may make it easier for people to live normally." The guide lists expected functional improvements from opioid use, including sleeping through the night, returning to work, recreation, sex, walking, and climbing stairs.

    d. Janssen promoted Ultracet for everyday chronic pain and distributed posters, for display in doctors' offices, of presumed patients in active professions; the caption read, "Pain doesn't fit into their schedules."

    e. Upon information and belief, Purdue ran a series of advertisements for OxyContin in 2012 in medical journals entitled "Pain vignettes," which were case studies featuring patients with pain conditions persisting over several months and recommending OxyContin for them. The ads knowingly, unfairly and deceptively sought to create the impression that OxyContin improves patients' function.

    f. *Responsible Opioid Prescribing* (2007), sponsored and distributed by Cephalon, Endo and Purdue, taught that relief of pain by opioids, by itself, improved patients' function.

    g. Cephalon and Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which counseled patients that opioids "give [pain patients] a quality of life we deserve."[88] This publication is still available online.

    h. Endo's NIPC website "PainKnowledge" claimed in 2009, upon information and belief, that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and

---

[88] Am. Pain Found., *Treatment Options: A Guide for People Living in Pain* (2007) [hereinafter APF, *Treatment Options*], https://assets.documentcloud.org/documents/277605/apf-treatmentoptions.pdf.

hobbies, that you were not able to enjoy when your pain was worse."  Elsewhere, the website touted improved quality of life (as well as "improved function") as benefits of opioid therapy.  The grant request that Endo approved for this project specifically indicated NIPC's intent to make misleading claims about function, and Endo closely tracked visits to the site.

i.  Endo was the sole sponsor, through NIPC, of a series of CMEs entitled "Persistent Pain in the Older Patient."[89]  Upon information and belief, a CME disseminated via webcast claimed that chronic opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning."

j.  Janssen sponsored and funded a multimedia patient education campaign called "Let's Talk Pain."  One feature of the campaign was to complain that patients were under-treated.  In 2009, upon information and belief, a Janssen-sponsored website, part of the "Let's Talk Pain" campaign, featured an interview edited by Janssen claiming that opioids allowed a patient to "continue to function."

k.  Purdue sponsored the development and distribution of APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which claimed that "[m]ultiple clinical studies" have shown that opioids are effective in improving "[d]aily function," "[p]sychological health," and "[o]verall health-related quality of life for chronic pain."[90]  The Policymaker's Guide was originally published in 2011.

l.  Purdue's, Cephalon's, Endo's, and Janssen's sales representatives have conveyed and continue to convey the message that opioids will improve patient function.

146.  As the FDA and other agencies have made clear for years, these claims have no support in the scientific literature.

147.  In 2010, the FDA warned Actavis, in response to its advertising of Kadian described above, that "we are not aware of substantial evidence or substantial clinical experience demonstrating that the magnitude of the effect of the drug [Kadian] has in alleviating pain, taken together with any drug-related side effects patients may experience . . . results in any overall positive impact on a patient's work, physical and mental functioning, daily activities, or

---

[89]  *E.g.*, NIPC, *Persistent Pain and the Older Patient* (2007), https://www.painedu.org/Downloads/NIPC/Activities/B173_Providence_RI_%20Invite.pdf.

[90]  Am. Pain Found., *A Policymaker's Guide to Understanding Pain and Its Management* 6 (2011) [hereinafter APF, *Policymaker's Guide*], http://s3.documentcloud.org/documents/277603/apf-policymakers-guide.pdf., at 29.

enjoyment of life."[91]  And in 2008, upon information and belief, the FDA sent a warning letter to an opioid manufacturer, making it clear "that [the claim that] patients who are treated with the drug experience an improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience."

148.  The Manufacturer Defendants also falsely and misleadingly emphasized or exaggerated the risks of competing medications like NSAIDs, so that doctors and patients would look to opioids first for the treatment of chronic pain.  Once again, these misrepresentations by the Manufacturer Defendants contravene pronouncements by and guidance from the FDA and CDC based on the scientific evidence.  Indeed, the FDA changed the labels for ER/LA opioids in 2013 and IR opioids in 2016 to state that opioids should only be used as a last resort "in patients for which alternative treatment options" like non-opioid drugs "are inadequate."  And the 2016 CDC Guideline states that NSAIDs, not opioids, should be the first-line treatment for chronic pain, particularly arthritis and lower back pain.[92]

149.  Purdue misleadingly promoted OxyContin as being unique among opioids in providing the benefit of 12 continuous hours of pain relief with one dose.  In fact, OxyContin does not last for 12 hours – a fact that Purdue has known at all times relevant to this action.  Upon information and belief, Purdue's own research shows that OxyContin wears off in under six hours in one quarter of patients and in under 10 hours in more than half.  This is because OxyContin tablets release approximately 40% of their active medicine immediately, after which

---

[91] Letter from Thomas Abrams, Dir., Div. of Drug Mktg., Advert., & Commc'ns, U.S. Food & Drug Admin., to Doug Boothe, CEO, Actavis Elizabeth LLC (Feb. 18, 2010), http://www.fdanews.com/ext/resources/files/archives/a/ActavisElizabethLLC.pdf.

[92] 2016 CDC Guideline at 12.

release tapers.  This triggers a powerful initial response, but provides little or no pain relief at the end of the dosing period, when less medicine is released.  This phenomenon is known as "end of dose" failure, and the FDA found in 2008 that a "substantial proportion" of chronic pain patients taking OxyContin experience it.  This not only renders Purdue's promise of 12 hours of relief false and deceptive, it also makes OxyContin more dangerous because the declining pain relief patients experience toward the end of each dosing period drives them to take more OxyContin before the next dosing period begins, quickly increasing the amount of drug they are taking and spurring growing dependence.

150.  Purdue's competitors were aware of this problem.  For example, upon information and belief, Endo ran advertisements for Opana ER referring to "real" 12-hour dosing. Nevertheless, Purdue falsely promoted OxyContin as if it were effective for a full 12 hours. Upon information and belief, Purdue's sales representatives continue to tell doctors that OxyContin lasts a full 12 hours.

151. Front Groups supported by Purdue likewise echoed these representations.  For example, in an amicus brief submitted to the Supreme Court of Ohio by the American Pain Foundation, the National Foundation for the Treatment of Pain and the Ohio Pain Initiative in support of Purdue, those amici represented:

> OxyContin is particularly useful for sustained long-term pain because it comes in higher, compact pills with a slow release coating. OxyContin pills can work for 12 hours.  This makes it easier for patients to comply with dosing requirements without experiencing a roller-coaster of pain relief followed quickly by pain renewal that can occur with shorter acting medications.  It also helps the patient sleep through the night, which is often impossible with short-acting medications.

For many of those serviced by Pain Care Amici, OxyContin has been a miracle medication.[93]

152.  Cephalon also deceptively marketed its opioids Actiq and Fentora as beneficial to treat chronic pain even though the FDA has expressly limited their use to the treatment of cancer pain in opioid tolerant individuals.  Both Actiq and Fentora are extremely powerful fentanyl-based IR opioids. Neither is approved for or has been shown to be safe or effective for chronic pain.  Indeed, the FDA expressly prohibited Cephalon from marketing Actiq for anything but cancer pain, and refused to approve Fentora for the treatment of chronic pain because of the potential harm, including the high risk of "serious and life-threatening adverse events" and abuse – which are greatest in non-cancer patients.  The FDA also issued a Public Health Advisory in 2007 emphasizing that Fentora should only be used for cancer patients who are opioid-tolerant and should not be used for any other conditions, such as migraines, post-operative pain, or pain due to injury.[94]  Specifically, the FDA advised that Fentora "is only approved for breakthrough cancer pain in patients who are *opioid-tolerant,* meaning those patients who take a regular, daily, around-the-clock narcotic pain medication."[95]

153.  Despite this, Cephalon conducted and continues to conduct a well-funded campaign to promote Actiq and Fentora for chronic pain and other non-cancer conditions for which it was not approved, appropriate, and for which it is not safe.  As part of this campaign, Cephalon used CMEs, speaker programs, KOLs, journal supplements, and detailing by its sales representatives

---

[93]  Reply Brief of Amicus Curiae of the American Pain Foundation, The National Foundation for the Treatment of Pain and the Ohio Pain Initiative Supporting Appellants, *Howland v. Purdue Pharma L.P.*, No. 2003-1538 (Ohio Apr. 13, 2004), 2004 WL 1637768, at *4 (footnote omitted).

[94]  *See* U.S. Food & Drug Admin., *Public Health Advisory: Important Information for the Safe Use of Fentora (fentanyl buccal tablets)* (Sept. 26, 2007), https://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm051273.htm.

[95]  *Id.*

to give doctors the false impression that Actiq and Fentora are safe and effective for treating non-cancer pain.  For example:

      a.   Cephalon paid to have a CME it sponsored, *Opioid-Based Management of Persistent and Breakthrough Pain*, published in a supplement of Pain Medicine News in 2009.  The CME instructed doctors that "[c]linically, broad classification of pain syndromes as either cancer- or non-cancer-related has limited utility" and recommended Actiq and Fentora for patients with chronic pain.

      b.   Upon information and belief, Cephalon's sales representatives set up hundreds of speaker programs for doctors, including many non-oncologists, which promoted Actiq and Fentora for the treatment of non-cancer pain.

      c.   In December 2011, Cephalon widely disseminated a journal supplement entitled "Special Report: An Integrated Risk Evaluation and Mitigation Strategy for Fentanyl Buccal Tablet (FENTORA) and Oral Transmucosal Fentanyl Citrate (ACTIQ)" to Anesthesiology News, Clinical Oncology News, and Pain Medicine News – three publications that are sent to thousands of anesthesiologists and other medical professionals. The Special Report openly promotes Fentora for "multiple causes of pain" – and not just cancer.

154.  Cephalon's deceptive marketing gave doctors and patients the false impression that Actiq and Fentora were not only safe and effective for treating chronic pain, but were also approved by the FDA for such uses.

155.  Purdue also unlawfully and unfairly failed to report or address illicit and unlawful prescribing of its drugs, despite knowing about it for years.  Purdue's sales representatives have maintained a database since 2002 of doctors suspected of inappropriately prescribing its drugs. Rather than report these doctors to state medical boards or law enforcement authorities (as Purdue is legally obligated to do) or cease marketing to them, Purdue used the list to demonstrate the high rate of diversion of OxyContin – the same OxyContin that Purdue had promoted as less addictive – in order to persuade the FDA to bar the manufacture and sale of generic copies of the drug because the drug was too likely to be abused.  In an interview with the Los Angeles Times, Purdue's senior compliance officer acknowledged that in five years of investigating suspicious

58

pharmacies, Purdue failed to take action – even where Purdue employees personally witnessed the diversion of its drugs.  The same was true of prescribers; despite its knowledge of illegal prescribing, Purdue did not report that a Los Angeles clinic prescribed more than 1.1 million OxyContin tablets and that Purdue's district manager described it internally as "an organized drug ring" years after law enforcement shut it down.  In doing so, Purdue protected its own profits at the expense of public health and safety.[96]

156.  Like Purdue, Endo has been cited for its failure to set up an effective system for identifying and reporting suspicious prescribing.  In its settlement agreement with Endo, the State of New York found that Endo failed to require sales representatives to report signs of abuse, diversion, and inappropriate prescribing; paid bonuses to sales representatives for detailing prescribers who were subsequently arrested or convicted for illegal prescribing; and failed to prevent sales representatives from visiting prescribers whose suspicious conduct had caused them to be placed on a no-call list.

### 3.  The Manufacturer Defendants Targeted Susceptible Prescribers and Vulnerable Patient Populations.

157.  As a part of their illegal and deceptive marketing scheme, the Manufacturer Defendants identified and targeted susceptible prescribers and vulnerable patient populations in the U.S., including this Commonwealth and Plaintiff's Community.  For example, the Manufacturer Defendants focused their deceptive marketing on primary care doctors, who were more likely to treat chronic pain patients and prescribe them drugs, but were less likely to be educated about treating pain and the risks and benefits of opioids and therefore more likely to accept the Manufacturer Defendants' misrepresentations.

---

[96] Harriet Ryan et al., *More Than 1 Million Oxycontin Pills Ended Up in the Hands of Criminals and Addicts. What the Drugmaker Knew*, L.A. Times, July 10, 2016, http://www.latimes.com/projects/la-me-oxycontin-part2/.

158.   The Manufacturer Defendants also targeted vulnerable patient populations like the elderly and veterans, who tend to suffer from chronic pain.   The Manufacturer Defendants targeted these vulnerable patients even though the risks of long-term opioid use were significantly greater for them.   For example, the 2016 CDC Guideline observes that existing evidence confirms that elderly patients taking opioids suffer from elevated fall and fracture risks, reduced renal function and medication clearance, and a smaller window between safe and unsafe dosages.[97]   The 2016 CDC Guideline concludes that there must be "additional caution and increased monitoring" to minimize the risks of opioid use in elderly patients.  *Id*. at 27.   The same is true for veterans, who are more likely to use anti-anxiety drugs (benzodiazepines) for post-traumatic stress disorder, which interact dangerously with opioids.

### 4.  The Manufacturer Defendants Made Materially Deceptive Statements and Concealed Materials Facts.

159.   As alleged herein, the Manufacturer Defendants made, directed, controlled and/or disseminated deceptive statements regarding material facts and further concealed material facts, in the course of manufacturing, marketing, supplying and selling prescription opioids.   The Manufacturer Defendants' actions were intentional and/or unlawful.   Such actions include, but are not limited to, those set out below and alleged throughout this Complaint.

160.   Defendant Purdue made and/or disseminated deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

a.   Creating, contributing to, sponsoring, and/or assisting in the distribution of patient education materials distributed to consumers that contained deceptive statements;

---

[97] 2016 CDC Guideline at 13.

b. Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

c. Disseminating misleading statements concealing the true risk of addiction and promoting the deceptive concept of pseudoaddiction through Purdue's own unbranded publications and on internet sites Purdue operated that were marketed to and accessible by consumers;

d. Distributing brochures to doctors, patients, and law enforcement officials that included deceptive statements concerning the indicators of possible opioid abuse;

e. Sponsoring, directly distributing, and assisting in the distribution of publications that promoted the deceptive concept of pseudoaddiction, even for high-risk patients;

f. Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

g. Providing significant financial support to pro-opioid KOL doctors who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

h. Providing needed financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

i. Assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction;

j. Sponsoring, endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

k. Developing, sponsoring, funding and disseminating scientific studies that misleadingly concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

l.  Assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic noncancer pain;

m.  Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;

n.  Targeting veterans by sponsoring and disseminating patient education marketing materials that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

o.  Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

p.  Exclusively disseminating misleading statements in education materials to hospital doctors and staff while purportedly educating them on new pain standards;

q.  Making deceptive statements concerning the use of opioids to treat chronic noncancer pain to prescribers through in-person detailing; and

r.  Withholding from law enforcement the names of prescribers Purdue believed to be facilitating the diversion of its opioid, while simultaneously marketing opioids to these doctors by disseminating patient and prescriber education materials and advertisements and CMEs they knew would reach these same prescribers.

161.  Defendant Endo made and/or disseminated deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

a.  Creating, contributing to, sponsoring, and/or assisting in the distribution of patient education materials that contained deceptive statements;

b.  Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

c.  Creating and disseminating paid advertisement supplements in academic journals promoting chronic opioid therapy as safe and effective for long term use for high risk patients;

d.  Creating and disseminating advertisements that falsely and inaccurately conveyed the impression that Endo's opioids would provide a reduction in oral, intranasal, or intravenous abuse;

e.  Disseminating misleading statements concealing the true risk of addiction and promoting the misleading concept of pseudoaddiction through Endo's own unbranded publications and on internet sites Endo sponsored or operated;

f.  Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

g.  Providing significant financial support to pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

h.  Providing needed financial support to pro-opioid pain organizations – including over $5 million to the organization responsible for many of the most egregious misrepresentations – that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

i.  Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

j.  Sponsoring, endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

k.  Developing, sponsoring, funding and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

l.  Directly distributing and assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudoaddiction;

63

m. Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy; and

n. Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing.

162. Defendant Janssen made and/or disseminated deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

a. Creating, sponsoring, contributing to and/or assisting in the distribution of patient education materials that contained deceptive statements;

b. Directly disseminating deceptive statements through internet sites over which Janssen exercised final editorial control and approval stating that opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

c. Disseminating deceptive statements concealing the true risk of addiction and promoting the deceptive concept of pseudoaddiction through internet sites over which Janssen exercised final editorial control and approval;

d. Promoting opioids for the treatment of conditions for which Janssen knew, due to the scientific studies it conducted, that opioids were not efficacious and concealing this information;

e. Sponsoring, directly distributing, and assisting in the dissemination of patient education publications over which Janssen exercised final editorial control and approval, which presented an unbalanced treatment of the long-term and dose dependent risks of opioids versus NSAIDs;

f. Providing significant financial support to pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

g. Providing necessary financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

64

h.  Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

i.  Targeting the elderly by sponsoring, directly distributing, and assisting in the dissemination of patient education publications targeting this population that contained deceptive statements about the risks of addiction and the adverse effects of opioids, and made false statements that opioids are safe and effective for the long-term treatment of chronic non-cancer pain and improve quality of life, while concealing contrary data;

j.  Sponsoring, endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

k.  Directly distributing and assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudoaddiction;

l.  Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;

m.  Targeting veterans by sponsoring and disseminating patient education marketing materials that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain; and

n.  Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing.

163.  Defendant Cephalon made and/or disseminated untrue, false and deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

a.  Creating, sponsoring, contributing to and/or assisting in the distribution of patient education materials that contained deceptive statements;

b.  Sponsoring and assisting in the distribution of publications that promoted the deceptive concept of pseudoaddiction, even for high-risk patients;

65

c. Providing significant financial support to pro-opioid KOL doctors who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain and breakthrough chronic non-cancer pain;

d. Developing, sponsoring, funding and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain in conjunction with Cephalon's potent rapid-onset opioids;

e. Providing needed financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

f. Sponsoring, endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

g. Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of Cephalon's rapid-onset opioids;

h. Directing its marketing of Cephalon's rapid-onset opioids to a wide range of doctors, including general practitioners, neurologists, sports medicine specialists, and workers' compensation programs, serving chronic pain patients;

i. Making deceptive statements concerning the use of Cephalon's opioids to treat chronic non-cancer pain to prescribers through in-person detailing and speakers' bureau events, when such uses are unapproved and unsafe; and

j. Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing and speakers' bureau events.

164. Defendant Actavis made and/or disseminated deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

a. Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing;

b. Creating and disseminating advertisements that contained deceptive statements that opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life;

66

    c.   Creating and disseminating advertisements that concealed the risk of addiction in the long-term treatment of chronic, non-cancer pain; and

    d.   Developing, sponsoring, funding and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life while concealing contrary data.

165. Defendant Mallinckrodt made and/or disseminated deceptive statements, including, but not limited to, the following:

    a.   Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

    b.   Sponsoring and assisting in the distribution of publications that promoted the deceptive concept of pseudoaddiction, even for high-risk patients;

    c.   Providing significant financial support to pro-opioid KOL doctors who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain and breakthrough chronic non-cancer pain; and

    d.   Providing needed financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain.

### 5. The Manufacturer Defendants Fraudulently Concealed Their Misconduct.

166. The Manufacturer Defendants, both individually and collectively, made, promoted, and profited from the misrepresentations about the risks and benefits of opioids for chronic pain even though they knew that the misrepresentations were false and deceptive. The history of opioids, as well as research and clinical experience establish that opioids are highly addictive and are responsible for a long list of very serious adverse outcomes. The FDA warned Defendants of this, and Defendants had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and death – all of which clearly described the harm from long-term opioid use and that patients were suffering from addiction, overdose, and death in alarming numbers. More recently, the FDA and CDC have issued

pronouncements, based on medical evidence, that conclusively expose the falsity of Defendants' misrepresentations, and Endo and Purdue have recently entered agreements in New York prohibiting them from making some of the same misrepresentations described in this Complaint.

167.   At all times relevant to this Complaint, the Manufacturer Defendants took steps to avoid detection of and to fraudulently conceal their deceptive marketing and unlawful, unfair, and fraudulent conduct.  For example, the Manufacturer Defendants disguised their role in the deceptive marketing of chronic opioid therapy by funding and working through third parties like Front Groups and KOLs.  The Manufacturer Defendants purposefully hid behind the assumed credibility of these individuals and organizations and relied on them to vouch for the accuracy and integrity of the Manufacturer Defendants' false and deceptive statements about the risks and benefits of long-term opioid use for chronic pain.  Defendants also never disclosed their role in shaping, editing, and approving the content of information and materials disseminated by these third parties.  The Manufacturer Defendants exerted considerable influence on these promotional and "educational" materials in emails, correspondence, and meetings with KOLs, Front Groups, and public relations companies that were not, and have not yet become, public.  For example, PainKnowledge.org, which is run by the NIPC, did not disclose Endo's involvement.   Other Manufacturer Defendants, such as Purdue and Janssen, ran similar websites that masked their own role.

168.   Finally, the Manufacturer Defendants manipulated their promotional materials and the scientific literature to make it appear that those documents were accurate, truthful, and supported by objective evidence when they were not.  The Manufacturer Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support.   The Manufacturer Defendants also invented "pseudoaddiction" and

promoted it to an unsuspecting medical community. The Manufacturer Defendants provided the medical community with false and misleading information about ineffectual strategies to avoid or control opioid addiction. The Manufacturer Defendants recommended to the medical community that dosages be increased, without disclosing the risks.

169. The Manufacturer Defendants spent millions of dollars over a period of years on a misinformation campaign aimed at highlighting opioids' alleged benefits, disguising the risks, and promoting sales. The lack of support for the Manufacturer Defendants' deceptive messages was not apparent to medical professionals who relied upon them in making treatment decisions, nor could it have been detected by the Plaintiff or Plaintiff's Community. The Plaintiff did not know of the existence or scope of the Manufacturer Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

170. The lack of support for the Manufacturer Defendants' deceptive messages was not apparent to medical professionals who relied upon them in making treatment decisions, nor could Plaintiff or Plaintiff's Community have detected it. Thus, the Manufacturer Defendants successfully concealed from the medical community, patients, and health care payors facts sufficient to arouse suspicion of the claims that Plaintiff now asserts. Plaintiff did not know of the existence or scope of the Manufacturer Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

## C. THE DISTRIBUTOR DEFENDANTS' UNLAWFUL DISTRIBUTION OF OPIOIDS.

171. The Distributor Defendants owe a duty under both federal law (21 U.S.C. § 823, 21 CFR 1301.74) and Commonwealth law to monitor, detect, investigate, refuse to fill, and report suspicious orders of prescription opioids originating from Plaintiff's Community as well as those

orders which the Distributor Defendants knew or should have known were likely to be diverted into Plaintiff's Community.

172.   The foreseeable harm from a breach of these duties is the diversion of prescription opioids for nonmedical purposes.

173.   Each Distributor Defendant repeatedly and purposefully breached its duties under Commonwealth and federal law.  Such breaches are direct and proximate causes of the widespread misuse and diversion of prescription opioids for nonmedical purposes into Plaintiff's Community and the opioid epidemic devastating that Community.

174.   The Distributor Defendants' illegal actions are a direct and proximate cause and/or substantial contributing factor to the opioid epidemic, prescription opioid abuse, addiction, morbidity and mortality in the Commonwealth and in Plaintiff's Community.  Those actions are direct causes of harms for which Plaintiff seeks to recover here.

175.   The opioid epidemic in the Commonwealth, including *inter alia* in Plaintiff's Community, remains an immediate ***hazard to public health and safety***.

176.   The opioid epidemic in Plaintiff's Community is a temporary and continuous ***public nuisance*** and remains unabated.

177.   The Distributor Defendants' intentionally continued their conduct, as alleged herein, with knowledge that such conduct was creating the opioid nuisance and causing the harms and damages alleged herein.

   **1.  Wholesale Drug Distributors Have a Duty under State and Federal Law to Guard Against, and Report, Unlawful Diversion and to Report and Prevent Suspicious Orders.**

178.   As under federal law, opioids are a Schedule II controlled substance under State law.  Opioids are categorized as "Schedule II" drugs because they have a "high potential for

abuse" and the potential to cause "severe psychic or physical dependence" and/or "severe psychological . . . dependence."  21 U.S.C. § 812(b)(2)(A, C).

179.  As wholesale drug distributors, each Defendant was required under state law to first be licensed and/or registered.  To receive and maintain this license, each of the Defendant Wholesale Distributors assumed a duty to comply with all applicable local, state and federal laws and regulations.

180.  Under the laws of the Commonwealth of Massachusetts, all distributors and manufacturers of controlled substances must be registered with the Commonwealth.  *See, e.g.*, M.G.L. c. 94C, § 7.  Registration requirements for manufacturers and distributors of controlled substances in Massachusetts mandate operation in accordance with "the public interest," "maintenance of effective controls against diversion," and "compliance with applicable federal, state, and local law."  M.G.L. c. 94C, § 12.

181.  Each Distributor Defendant was further required to register with the DEA, pursuant to the federal Controlled Substance Act.  *See* 21 U.S.C. § 823(b), (e); 28 C.F.R. § 0.100.  Each Distributor Defendant is a "registrant" as a wholesale distributor in the chain of distribution of Schedule II controlled substances with a duty to comply with all security requirements imposed under that statutory scheme.

182.  Each Distributor Defendant has an affirmative duty under federal and state law to act as a gatekeeper guarding against the diversion of the highly addictive, dangerous opioid drugs.  Federal law requires that Distributors of Schedule II drugs, including opioids, must maintain "effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels."  21 U.S.C. §§ 823(b)(1).  Those requirements are adopted and incorporated into state law.

71

183.  Federal regulations, incorporated by state law, impose a non-delegable duty upon wholesale drug distributors to "design and operate a system to disclose to the registrant suspicious orders of controlled substances.  The registrant [distributor] shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant.

184.  "Suspicious orders" include orders of an unusual size, orders of unusual frequency or orders deviating substantially from a normal pattern.  *See* 21 CFR 1301.74(b).  These criteria are disjunctive and are not all inclusive.  For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious.  Likewise, a wholesale distributor need not wait for a normal pattern to develop over time before determining whether a particular order is suspicious.  The size of an order alone, regardless of whether it deviates from a normal pattern, is enough to trigger the wholesale distributor's responsibility to report the order as suspicious.  The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer but also on the patterns of the entirety of the wholesale distributor's customer base and the patterns throughout the relevant segment of the wholesale distributor industry.

185.  In addition to reporting all suspicious orders, distributors must also stop shipment on any order which is flagged as suspicious and only ship orders which were flagged as potentially suspicious if, after conducting due diligence, the distributor can determine that the order is not likely to be diverted into illegal channels.  *See Southwood Pharm., Inc.*, 72 Fed. Reg. 36,487, 36,501 (Drug Enf't Admin. July 3, 2007); *Masters Pharmaceutical, Inc. v. Drug Enf't Admin.*, No. 15-11355 (D.C. Cir. June 30, 2017).  Regardless, all flagged orders must be reported.  *Id.*

186. These prescription drugs are regulated for the purpose of providing a "closed" system **intended to reduce the widespread diversion of these drugs out of legitimate channels into the illicit market**, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control.[98]

187. Different entities supervise the discrete links in the chain that separate a consumer from a controlled substance. Statutes and regulations define each participant's role and responsibilities.[99]

188. As the DEA advised the Distributor Defendants in a letter to them dated September 27, 2006, wholesale distributors are "one of the key components of the distribution chain. If the closed system is to function properly … distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes. This responsibility is critical, as … the illegal distribution of controlled substances has a substantial and detrimental effect on the health and general welfare of the American people."[100]

---

[98] *See* 1970 U.S.C.C.A.N. 4566, 4571-72.

[99] Brief for Healthcare Distribution Management Association and National Association of Chain Drug Stores as Amici Curiae in Support of Neither Party, *Masters Pharm., Inc. v. U.S. Drug Enf't Admin.* (No. 15-1335) (D.C. Cir. Apr. 4, 2016), 2016 WL 1321983, at *22 [hereinafter Brief for HDMA and NACDS]. The Healthcare Distribution Management Association (HDMA or HMA)—now known as the Healthcare Distribution Alliance (HDA)—is a national, not-for-profit trade association that represents the nation's primary, full-service healthcare distributors whose membership includes, among others: AmerisourceBergen Drug Corporation, Cardinal Health, Inc., and McKesson Corporation. *See generally* HDA, *About*, https://www.healthcaredistribution.org/about (last visited Aug. 21, 2017). The National Association of Chain Drug Stores (NACDS) is a national, not-for-profit trade association that represents traditional drug stores and supermarkets and mass merchants with pharmacies whose membership includes, among others: Walgreen Company, CVS Health, Rite Aid Corporation and Walmart. *See generally* NACDS, *Mission*, https://www.nacds.org/ about/mission/ (last visited Aug. 21, 2017).

[100] *See* Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug. Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Sept. 27, 2006) [hereinafter Rannazzisi Letter] ("This letter is being sent to every commercial entity in the United States registered with the Drug Enforcement Agency (DEA) to distribute controlled substances. The purpose of this letter is to reiterate the responsibilities of controlled substance distributors in view of the prescription drug abuse problem our nation currently faces."), *filed in Cardinal Health, Inc. v. Holder*, No. 1:12-cv-00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-51.

189.  The Distributor Defendants have admitted that they are responsible for reporting suspicious orders.[101]

190.  The DEA sent a letter to each of the Distributor Defendants on September 27, 2006, warning that it would use its authority to revoke and suspend registrations when appropriate.  The letter expressly states that a distributor, ***in addition*** to reporting suspicious orders, has a "statutory responsibility to exercise due diligence to avoid filling suspicious orders that might be diverted into other than legitimate medical, scientific, and industrial channels."[102] The letter also instructs that "distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes."[103]  The DEA warns that "even just one distributor that uses its DEA registration to facilitate diversion can cause enormous harm."[104]

191.  The DEA sent a second letter to each of the Distributor Defendants on December 27, 2007.[105]  This letter reminds the Defendants of their statutory and regulatory duties to "maintain effective controls against diversion" and "design and operate a system to disclose to the registrant suspicious orders of controlled substances."[106]  The letter further explains:

> The regulation also requires that the registrant inform the local DEA Division Office of suspicious orders <u>when discovered</u> by the registrant.  Filing a monthly report of completed transactions (e.g., "excessive purchase report" or "high unity

---

[101] *See* Brief for HDMA and NACDS, 2016 WL 1321983, at *4 ("[R]egulations . . . in place for more than 40 years require distributors to report suspicious orders of controlled substances to DEA based on information readily available to them (e.g., a pharmacy's placement of unusually frequent or large orders).").

[102] Rannazzisi Letter, at 2.

[103] *Id.* at 1.

[104] *Id.* at 2.

[105] *See* Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug. Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Dec. 27, 2007), filed in *Cardinal Health, Inc. v. Holder*, No. 1:12-cv-00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-8.

[106] *Id.*

purchases") does not meet the regulatory requirement to report suspicious orders. Registrants are reminded that their responsibility does not end merely with the filing of a suspicious order report.  Registrants must conduct an independent analysis of suspicious orders prior to completing a sale to determine whether the controlled substances are likely to be diverted from legitimate channels. Reporting an order as suspicious will not absolve the registrant of responsibility if the registrant knew, or should have known, that the controlled substances were being diverted.

The regulation specifically states that suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of an unusual frequency.  These criteria are disjunctive and are not all inclusive.  For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious.  Likewise, a registrant need not wait for a "normal pattern" to develop over time before determining whether a particular order is suspicious.  The size of an order alone, whether or not it deviates from a normal pattern, is enough to trigger the registrant's responsibility to report the order as suspicious.  The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer, but also on the patterns of the registrant's customer base and the patterns throughout the segment of the regulated industry.

Registrants that rely on rigid formulas to define whether an order is suspicious may be failing to detect suspicious orders.  For example, a system that identifies orders as suspicious only if the total amount of a controlled substance ordered during one month exceeds the amount ordered the previous month by a certain percentage or more is insufficient.  This system fails to identify orders placed by a pharmacy if the pharmacy placed unusually large orders from the beginning of its relationship with the distributor.  Also, this system would not identify orders as suspicious if the order were solely for one highly abused controlled substance if the orders never grew substantially.  Nevertheless, ordering one highly abused controlled substance and little or nothing else deviates from the normal pattern of what pharmacies generally order.

When reporting an order as suspicious, registrants must be clear in their communication with DEA that the registrant is actually characterizing an order as suspicious.  Daily, weekly, or monthly reports submitted by registrant indicating "excessive purchases" do not comply with the requirement to report suspicious orders, even if the registrant calls such reports "suspicious order reports."

Lastly, registrants that routinely report suspicious orders, yet fill these orders without first determining that order is not being diverted into other than legitimate medical, scientific, and industrial channels, may be failing to maintain effective controls against diversion.  Failure to maintain effective controls against diversion is inconsistent with the public interest as that term is used in 21 USC 823 and 824,

and may result in the revocation of the registrant's DEA Certificate of Registration.[107]

Finally, the DEA letter references the Revocation of Registration issued in *Southwood Pharmaceuticals, Inc.*, 72 Fed. Reg. 36,487-01 (July 3, 2007), which discusses the obligation to report suspicious orders and "some criteria to use when determining whether an order is suspicious."[108]

192.  The Distributor Defendants admit that they "have not only statutory and regulatory responsibilities to detect and prevent diversion of controlled prescription drugs, but undertake such efforts as responsible members of society."[109]

193.  The Distributor Defendants knew they were required to monitor, detect, and halt suspicious orders.  Industry compliance guidelines established by the Healthcare Distribution Management Association, the trade association of pharmaceutical distributors, explain that distributors are "[a]t the center of a sophisticated supply chain" and therefore "are uniquely situated to perform due diligence in order to help support the security of the controlled substances they deliver to their customers."  The guidelines set forth recommended steps in the "due diligence" process, and note in particular: If an order meets or exceeds a distributor's threshold, as defined in the distributor's monitoring system, or is otherwise characterized by the distributor as an order of interest, the distributor should not ship to the customer, in fulfillment of

---

[107] *Id*.

[108] *Id*.

[109] *See* Brief of HDMA, 2012 WL 1637016, at *2.

that order, any units of the specific drug code product as to which the order met or exceeded a threshold or as to which the order was otherwise characterized as an order of interest.[110]

194.  Each of the Distributor Defendants sold prescription opioids, including hydrocodone and/or oxycodone, to retailers in Plaintiff's Community and/or to retailers from which Defendants knew prescription opioids were likely to be diverted to Plaintiff's Community.

195.  Each Distributor Defendant owes a duty to monitor and detect suspicious orders of prescription opioids.

196.  Each Distributor Defendant owes a duty under federal and state law to investigate and refuse suspicious orders of prescription opioids.

197.  Each Distributor Defendant owes a duty under federal and state law to report suspicious orders of prescription opioids.

198.  Each Distributor Defendant owes a duty under federal and state law to prevent the diversion of prescription opioids into illicit markets in the Commonwealth and Plaintiff's Community.

199.  The foreseeable harm resulting from a breach of these duties is the diversion of prescription opioids for nonmedical purposes and subsequent plague of opioid addiction.

200.  The foreseeable harm resulting from the diversion of prescription opioids for nonmedical purposes is abuse, addiction, morbidity and mortality in Plaintiff's Community and the damages caused thereby.

---

[110]  Healthcare Distribution Management Association (HDMA) *Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances*, filed in *Cardinal Health, Inc. v. Holder*, No. 12-5061 (D.C. Cir. Mar. 7, 2012), Doc. No. 1362415 (App'x B).

## 2.  The Distributor Defendants Breached their Duties.

201.  Because distributors handle such large volumes of controlled substances, and are the first major line of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market, it is incumbent on distributors to maintain effective controls to prevent diversion of controlled substances.  Should a distributor deviate from these checks and balances, the closed system collapses.[111]

202.  The sheer volume of prescription opioids distributed to pharmacies in the Plaintiff's Community, and/or to pharmacies from which the Distributor Defendants knew the opioids were likely to be diverted into Plaintiff's Community, is excessive for the medical need of the community and facially suspicious.  Some red flags are so obvious that no one who engages in the legitimate distribution of controlled substances can reasonably claim ignorance of them.[112]

203.  The Distributor Defendants failed to report "suspicious orders" originating from Plaintiff's Community, or which the Distributor Defendants knew were likely to be diverted to Plaintiff's Community, to the federal and Commonwealth authorities, including the DEA and/or the Commonwealth Board of Registration of Pharmacy.

204.  The Distributor Defendants unlawfully filled suspicious orders of unusual size, orders deviating substantially from a normal pattern and/or orders of unusual frequency in Plaintiff's Community, and/or in areas from which the Distributor Defendants knew opioids were likely to be diverted to Plaintiff's Community.

---

[111]  *See* Rannazzisi Decl. ¶ 10, filed in *Cardinal Health, Inc. v. Holder*, No. 1:12-cv-00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-2.

[112]  *Masters Pharmaceuticals, Inc.*, 80 Fed. Reg. 55,418-01, 55,482 (Sept. 15, 2015) (citing *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195*, 77 Fed. Reg. 62,316, 62,322 (2012)).

205.  The Distributor Defendants breached their duty to monitor, detect, investigate, refuse and report suspicious orders of prescription opiates originating from Plaintiff's Community, and/or in areas from which the Distributor Defendants knew opioids were likely to be diverted to Plaintiff's Community.

206.  The Distributor Defendants breached their duty to maintain effective controls against diversion of prescription opiates into other than legitimate medical, scientific, and industrial channels.

207.  The Distributor Defendants breached their duty to "design and operate a system to disclose to the registrant suspicious orders of controlled substances" and failed to inform the authorities including the DEA of suspicious orders when discovered, in violation of their duties under federal and state law.

208.  The Distributor Defendants breached their duty to exercise due diligence to avoid filling suspicious orders that might be diverted into channels other than legitimate medical, scientific and industrial channels.[113]

209.  The federal and state laws at issue here are public safety laws.

210.  The Distributor Defendants' violations of public safety statutes constitute prima facie evidence of negligence under state law.

211.  The Distributor Defendants supplied prescription opioids to obviously suspicious physicians and pharmacies, enabled the illegal diversion of opioids, aided criminal activity, and disseminated massive quantities of prescription opioids into the black market.

212.  The unlawful conduct by the Distributor Defendants was and is purposeful and intentional.  The Distributor Defendants refuse to abide by the duties imposed by federal and

---

[113] *See Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 206 (D.D.C. 2012).

state law which are required to legally acquire and maintain a license to distribute prescription opiates.

213.  The Distributor Defendants acted with actual malice in breaching their duties, *i.e.*, they have acted with a conscious disregard for the rights and safety of other persons, and said actions have a great probability of causing substantial harm.

214.  The Distributor Defendants' repeated shipments of suspicious orders, over an extended period of time, in violation of public safety statutes, and without reporting the suspicious orders to the relevant authorities demonstrates wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others and justifies an award of punitive damages.

### 3.   The Distributor Defendants Have Sought to Avoid and Have Misrepresented their Compliance with their Legal Duties.

215.  The Distributor Defendants have repeatedly misrepresented their compliance with their legal duties under Commonwealth and federal law and have wrongfully and repeatedly disavowed those duties in an effort to mislead regulators and the public regarding the Distributor Defendants' compliance with their legal duties.

216.  Distributor Defendants have refused to recognize any duty beyond *reporting* suspicious orders.  In *Masters Pharmaceuticals*, the HDMA, a trade association run the Distributor Defendants, and the NACDS submitted amicus briefs regarding the legal duty of wholesale distributors.  Inaccurately denying the legal duties that the wholesale drug industry has been tragically recalcitrant in performing, they argued as follows:

> a.  The Associations complained that the "DEA has required distributors not only to report suspicious orders, but to *investigate* orders (e.g., by

interrogating pharmacies and physicians) and take action to *halt* suspicious orders before they are filled."[114]

b.  The Associations argued that, "DEA now appears to have changed its position to require that distributors not only *report* suspicious orders, but *investigate* and *halt* suspicious orders.  Such a change in agency position must be accompanied by an acknowledgment of the change and a reasoned explanation for it.  In other words, an agency must display awareness that it *is* changing position and show that there are good reasons for the new policy.  This is especially important here, because imposing intrusive obligation on distributors threatens to disrupt patient access to needed prescription medications."[115]

c.  The Associations alleged (inaccurately) that nothing "requires distributors to investigate the legitimacy of orders, or to halt shipment of any orders deemed to be suspicious."[116]

d.  The Association complained that the purported "practical infeasibility of requiring distributors to investigate and halt suspicious orders (as well as report them) underscores the importance of ensuring that DEA has complied with the APA before attempting to impose such duties."[117]

e.  The Associations alleged (inaccurately) that "DEA's regulations [] sensibly impose[] a duty on distributors simply to *report* suspicious orders, but left it to DEA and its agents to investigate and halt suspicious orders."[118]

f.  Also inaccurately, the Associations argued that, "[i]mposing a duty on distributors – which lack the patient information and the necessary medical expertise – to investigate and halt orders may force distributors to take a shot-in-the-dark approach to complying with DEA's demands."[119]

---

[114] Brief for HDMA and NACDS, 2016 WL 1321983, at *4–5.

[115] *Id.* at *8 (citations and quotation marks omitted).

[116] *Id.* at *14.

[117] *Id.* at *22.

[118] *Id.* at *24–25.

[119] *Id.* at 26.

217.   The positions taken by the trade groups is emblematic of the position taken by the Distributor Defendants in a futile attempt to deny their legal obligations to prevent diversion of the dangerous drugs.[120]

218.   The Court of Appeals for the District of Columbia recently issued its opinion affirming that a wholesale drug distributor does, in fact, have duties beyond reporting.  *Masters Pharm., Inc. v. Drug Enf't Admin.*, 861 F.3d 206 (D.C. Cir. 2017).   The D.C. Circuit Court upheld the revocation of Master Pharmaceutical's license and determined that DEA regulations require that in addition to reporting suspicious orders, distributors must "decline to ship the order, or conduct some 'due diligence' and—if it is able to determine that the order is not likely to be diverted into illegal channels—ship the order." *Id*. at 212.  Master Pharmaceutical was in violation of legal requirements because it failed to conduct necessary investigations and filled suspicious orders.  *Id.* at 218–19, 226.  A distributor's investigation must dispel all the red flags giving rise to suspicious circumstance prior to shipping a suspicious order.  *Id*. at 226.  The Circuit Court also rejected the argument made by the HDMA and NACDS (quoted above), that, allegedly, the DEA had created or imposed new duties.  *Id*. at 220.

219.   Wholesale Distributor McKesson has recently been forced to specifically admit to breach of its duties to monitor, report, and prevent suspicious orders.   Pursuant to an Administrative Memorandum of Agreement ("2017 Agreement") entered into between McKesson and the DEA in January 2017, McKesson admitted that, at various times during the period from January 1, 2009 through the effective date of the Agreement (January 17, 2017) it "did not identify or report to [the] DEA certain orders placed by certain pharmacies which

---

[120]   *See* Brief of HDMA, 2012 WL 1637016, at *3 (arguing the wholesale distributor industry "does not know the rules of the road because" they claim (inaccurately) that the "DEA has not adequately explained them").

should have been detected by McKesson as suspicious based on the guidance contained in the DEA Letters."[121]  Further, the 2017 Agreement specifically finds that McKesson "distributed controlled substances to pharmacies even though those McKesson Distribution Centers should have known that the pharmacists practicing within those pharmacies had failed to fulfill their corresponding responsibility to ensure that controlled substances were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners acting in the usual course of their professional practice, as required by 21 C.F.R § 1306.04(a)."[122]  McKesson admitted that, during this time period, it "failed to maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific and industrial channels by sales to certain of its customers in violation of the CSA and the CSA's implementing regulations, 21 C.F.R. Part 1300 *et seq*., at the McKesson Distribution Centers" including the McKesson Distribution Center located in "Washington Courthouse, Ohio."[123]  Due to these violations, McKesson agreed that its authority to distribute controlled substances from the Washington Courthouse, Ohio facility (among other facilities) would be partially suspended.[124]

220.  The 2017 Memorandum of Agreement followed a 2008 Settlement Agreement in which McKesson also admitted failure to report suspicious orders of controlled substances to the DEA.[125]  In the 2008 Settlement Agreement, McKesson "recognized that it had a duty to monitor its sales of all controlled substances and report suspicious orders to DEA," but had failed to do

---

[121] *See* Administrative Memorandum of Agreement between the U.S. Dep't of Justice, the Drug Enf't Admin., and the McKesson Corp. (Jan. 17, 2017), https://www.justice.gov/opa/press-release/file/928476/download.

[122] *Id.* at 4.

[123] *Id.*

[124] *Id.* at 6.

[125] *Id.* at 4.

so.[126]  The 2017 Memorandum of Agreement documents that McKesson continued to breach its admitted duties by "fail[ing] to properly monitor its sales of controlled substances and/or report suspicious orders to DEA, in accordance with McKesson's obligations."[127]  As a result of these violations, McKesson was fined and required to pay $150,000,000 to the United States.[128]

221.  Even though McKesson had been sanctioned in 2008 for failure to comply with its legal obligations regarding controlling diversion and reporting suspicious orders, and even though McKesson had specifically agreed in 2008 that it would no longer violate those obligations, McKesson continued to violate the laws in contrast to its written agreement not to do so.

222.  Because of the Distributor Defendants' refusal to abide by their legal obligations, the DEA has repeatedly taken administrative action to attempt to force compliance.  For example, in May 2014, the United States Department of Justice, Office of the Inspector General, Evaluation and Inspections Divisions, reported that the DEA issued final decisions in 178 registrant actions between 2008 and 2012.[129]  The Office of Administrative Law Judges issued a recommended decision in a total of 117 registrant actions before the DEA issued its final decision, including 76 actions involving orders to show cause and 41 actions involving immediate suspension orders.[130]  These actions include the following:

---

[126] *Id.*

[127] *Id.*; *see also* Settlement Agreement and Release between the U.S. and McKesson Corp., at 5 (Jan. 17, 2017) [hereinafter 2017 Settlement Agreement and Release] ("McKesson acknowledges that, at various times during the Covered Time Period [2009-2017], it did not identify or report to DEA certain orders placed by certain pharmacies, which should have been detected by McKesson as suspicious, in a manner fully consistent with the requirements set forth in the 2008 MOA."), https://www.justice.gov/opa/press-release/file/928471/download.

[128] *See* 2017 Settlement Agreement and Release, at 6.

[129] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, *The Drug Enforcement Administration's Adjudication of Registrant Actions* 6 (2014), https://oig.justice.gov/reports/2014/e1403.pdf.

[130] *Id.*

a. On April 24, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the AmerisourceBergen Orlando, Florida distribution center ("Orlando Facility") alleging failure to maintain effective controls against diversion of controlled substances. On June 22, 2007, AmerisourceBergen entered into a settlement that resulted in the suspension of its DEA registration;

b. On November 28, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Auburn, Washington Distribution Center ("Auburn Facility") for failure to maintain effective controls against diversion of hydrocodone;

c. On December 5, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of hydrocodone;

d. On December 7, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Swedesboro, New Jersey Distribution Center ("Swedesboro Facility") for failure to maintain effective controls against diversion of hydrocodone;

e. On January 30, 2008, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Stafford, Texas Distribution Center ("Stafford Facility") for failure to maintain effective controls against diversion of hydrocodone;

f. On May 2, 2008, McKesson Corporation entered into an *Administrative Memorandum of Agreement* ("2008 MOA") with the DEA which provided that McKesson would "maintain a compliance program designed to detect and prevent the diversion of controlled substances, inform DEA of suspicious orders required by 21 C.F.R. § 1301.74(b), and follow the procedures established by its Controlled Substance Monitoring Program";

g. On September 30, 2008, Cardinal Health entered into a *Settlement and Release Agreement and Administrative Memorandum of Agreement* with the DEA related to its Auburn Facility, Lakeland Facility, Swedesboro Facility and Stafford Facility. The document also referenced allegations by the DEA that Cardinal failed to maintain effective controls against the diversion of controlled substances at its distribution facilities located in McDonough, Georgia ("McDonough Facility"), Valencia, California ("Valencia Facility") and Denver, Colorado ("Denver Facility");

85

h. On February 2, 2012, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of oxycodone;

i. On December 23, 2016, Cardinal Health agreed to pay a $44 million fine to the DEA to resolve the civil penalty portion of the administrative action taken against its Lakeland, Florida Distribution Center; and

j. On January 5, 2017, McKesson Corporation entered into an *Administrative Memorandum Agreement* with the DEA wherein it agreed to pay a $150 million civil penalty for violation of the 2008 MOA as well as failure to identify and report suspicious orders at its facilities in Aurora CO, Aurora IL, Delran NJ, LaCrosse WI, Lakeland FL, Landover MD, La Vista NE, Livonia MI, Methuen MA, Santa Fe Springs CA, Washington Courthouse OH and West Sacramento CA.

223. Rather than abide by their non-delegable duties under public safety laws, the Distributor Defendants, individually and collectively through trade groups in the industry, pressured the U.S. Department of Justice to "halt" prosecutions and lobbied Congress to strip the DEA of its ability to immediately suspend distributor registrations. The result was a "sharp drop in enforcement actions" and the passage of the "Ensuring Patient Access and Effective Drug Enforcement Act" which, ironically, raised the burden for the DEA to revoke a distributor's license from "imminent harm" to "immediate harm" and provided the industry the right to "cure" any violations of law before a suspension order can be issued.[131]

---

[131] *See* Lenny Bernstein & Scott Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control*, Wash. Post, Oct. 22, 2016, https://www.washingtonpost.com/investigations/the-dea-slowed-enforcement-while-the-opioid-epidemic-grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-d7c704ef9fd9_story.html; Lenny Bernstein & Scott Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis*, Wash. Post, Mar. 6, 2017, https://www.washingtonpost.com/investigations/us-senator-calls-for-investigation-of-dea-enforcement-slowdown/2017/03/06/5846ee60-028b-11e7-b1e9-a05d3c21f7cf_story.html; Eric Eyre, *DEA Agent: "We Had No Leadership" in WV Amid Flood of Pain Pills*, Charleston Gazette-Mail, Feb. 18, 2017, http://www.wvgazettemail.com/news/20170218/dea-agent-we-had-no-leadership-in-wv-amid-flood-of-pain-pills-.

224.  In addition to taking actions to limit regulatory prosecutions and suspensions, the Distributor Defendants undertook to fraudulently convince the public that they were complying with their legal obligations, including those imposed by licensing regulations.  Through such statements, the Distributor Defendants attempted to assure the public they were working to curb the opioid epidemic.

225.  For example, a Cardinal Health executive claimed that it uses "advanced analytics" to monitor its supply chain, and represented that it was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity."[132] Given the sales volumes and the company's history of violations, this executive was either not telling the truth, or, if Cardinal Health had such a system, it ignored the results.

226.  Similarly, Defendant McKesson publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders," and claimed it is "deeply passionate about curbing the opioid epidemic in our country."[133]   Again, given McKesson's historical conduct, this statement is either false, or the company ignored outputs of the monitoring program.

227.  By misleading the public about the effectiveness of their controlled substance monitoring programs, the Distributor Defendants successfully concealed the facts sufficient to arouse suspicion of the claims that Plaintiff now asserts.  Plaintiff did not know of the existence

---

[132] Lenny Bernstein et al., *How Drugs Intended for Patients Ended Up in the Hands of Illegal Users: "No One Was Doing Their Job,"* Wash. Post, Oct. 22, 2016, https://www.washingtonpost.com/investigations/how-drugs-intended-for-patients-ended-up-in-the-hands-of-illegal-users-no-one-was-doing-their-job/2016/10/22/10e79396-30a7-11e6-8ff7-7b6c1998b7a0_story.html.

[133] Scott Higham et al., *Drug Industry Hired Dozens of Officials from the DEA as the Agency Tried to Curb Opioid Abuse*, Wash. Post, Dec. 22, 2016, https://www.washingtonpost.com/investigations/key-officials-switch-sides-from-dea-to-pharmaceutical-industry/2016/12/22/55d2e938-c07b-11e6-b527-949c5893595e_story.html.

or scope of Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

228.  Meanwhile, the opioid epidemic rages unabated in the Nation, the Commonwealth, and in Plaintiff's Community.

229.  The epidemic still rages because the fines and suspensions imposed by the DEA do not change the conduct of the industry.  The distributors, including the Distributor Defendants, pay fines as a cost of doing business in an industry that generates billions of dollars in annual revenue.  They hold multiple DEA registration numbers and when one facility is suspended, they simply ship from another facility.

230.  The wrongful actions and omissions of the Distributor Defendants which have caused the diversion of opioids and which have been a substantial contributing factor to and/or proximate cause of the opioid crisis are alleged in greater detail in Plaintiff's racketeering allegations below.

231.  The Distributor Defendants have abandoned their duties imposed under federal and Commonwealth law, taken advantage of a lack of DEA law enforcement, and abused the privilege of distributing controlled substances in the Commonwealth and Plaintiff's Community.

**D.  THE MANUFACTURER DEFENDANTS' UNLAWFUL FAILURE TO PREVENT DIVERSION AND MONITOR, REPORT, AND PREVENT SUSPICIOUS ORDERS.**

232.  The same legal duties to prevent diversion, and to monitor, report, and prevent suspicious orders of prescription opioids that were incumbent upon the Distributor Defendants were also legally required of the Manufacturer Defendants under federal and Commonwealth law.

233.  The Manufacturing Defendants were required to comply with substantially the same licensing and permitting requirements as the Distributor Defendants.

234.    Under the laws of the Commonwealth of Massachusetts, all distributors and manufacturers of controlled substances must be registered with the state.  *See, e.g.*, M.G.L. c. 94C, § 7.  Registration requirements for manufacturers and distributors of controlled substances in Massachusetts mandate operation in accordance with "the public interest," "maintenance of effective controls against diversion," and "compliance with applicable federal, state, and local law." M.G.L. c. 94C, § 12.

235.  Like the Distributor Defendants, the Manufacturer Defendants were required to register with the DEA to manufacture schedule II controlled substances, like prescription opioids.  *See* 21 U.S.C. § 823(a).  A requirement of such registration is the:

> maintenance of effective controls against diversion of particular controlled substances and any controlled substance in schedule I or II compounded therefrom into other than legitimate medical, scientific, research, or industrial channels, by limiting the importation and bulk manufacture of such controlled substances to a number of establishments which can produce an adequate and uninterrupted supply of these substances under adequately competitive conditions for legitimate medical, scientific, research, and industrial purposes . . . .

21 USCA § 823(a)(1) (emphasis added).

236.  Additionally, as "registrants" under Section 823, the Manufacturer Defendants were also required to monitor, report, and prevent suspicious orders of controlled substances:

> The registrant shall design and operate a system to disclose to the registrant suspicious orders of controlled substances.  The registrant shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.

21 C.F.R. § 1301.74.  *See also* 21 C.F.R. § 1301.02 ("Any term used in this part shall have the definition set forth in section 102 of the Act (21 U.S.C. 802) or part 1300 of this chapter."); 21 C.F.R. § 1300.01 ("Registrant means any person who is registered pursuant to either section 303

89

or section 1008 of the Act (21 U.S.C. 823 or 958)."  Like the Distributor Defendants, the Manufacture Defendants breached these duties.

237.   The Manufacturer Defendants had access to and possession of the information necessary to monitor, report, and prevent suspicious orders and to prevent diversion.   The Manufacturer Defendants engaged in the practice of paying "chargebacks" to opioid distributors. A chargeback is a payment made by a manufacturer to a distributor after the distributor sells the manufacturer's product at a price below a specified rate.   After a distributor sells a manufacturer's product to a pharmacy, for example, the distributor requests a chargeback from the manufacturer and, in exchange for the payment, the distributor identifies to the manufacturer the product, volume and the pharmacy to which it sold the product.   Thus, the Manufacturer Defendants knew – just as the Distributor Defendants knew – the volume, frequency, and pattern of opioid orders being placed and filled.   The Manufacturer Defendants built receipt of this information into the payment structure for the opioids provided to the opioid distributors.

238.   Federal statutes and regulations – and Commonwealth law incorporating those requirements -   are clear: just like opioid distributors, opioid manufacturers are required to "design and operate a system to disclose . . . suspicious orders of controlled substances" and to maintain "effective controls against diversion."   21 C.F.R. § 1301.74; 21 U.S.C.A. § 823(a)(1).

239.  The Department of Justice has recently confirmed the suspicious order obligations clearly imposed by federal law upon opioid manufacturers, fining Mallinckrodt $35 million for failure to report suspicious orders of controlled substances, including opioids, and for violating recordkeeping requirements.[134]

---

[134] *See* Press Release, U.S. Dep't of Justice, Mallinckrodt Agrees to Pay Record $35 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs and for Recordkeeping Violations (July 11, 2017),

240. In the press release accompanying the settlement, the Department of Justice stated: Mallinckrodt did not meet its obligations to detect and notify DEA of suspicious orders of controlled substances such as oxycodone, the abuse of which is part of the current opioid epidemic. These suspicious order monitoring requirements exist to prevent excessive sales of controlled substances, like oxycodone . . . . Mallinckrodt's actions and omissions formed a link in the chain of supply that resulted in millions of oxycodone pills being sold on the street. . . . "Manufacturers and distributors have a crucial responsibility to ensure that controlled substances do not get into the wrong hands. . . ."[135]

241. Among the allegations resolved by the settlement, the government alleged "Mallinckrodt failed to design and implement an effective system to detect and report 'suspicious orders' for controlled substances – orders that are unusual in their frequency, size, or other patterns . . . [and] Mallinckrodt supplied distributors, and the distributors then supplied various U.S. pharmacies and pain clinics, an increasingly excessive quantity of oxycodone pills without notifying DEA of these suspicious orders."[136]

242. The Memorandum of Agreement entered into by Mallinckrodt ("2017 Mallinckrodt MOA") avers "[a]s a registrant under the CSA, Mallinckrodt had a responsibility to maintain effective controls against diversion, including a requirement that it review and monitor these sales and report suspicious orders to DEA."[137]

---

https://www.justice.gov/opa/pr/mallinckrodt-agrees-pay-record-35-million-settlement-failure-report-suspicious-orders

[135] Id.

[136] Id.

[137] Administrative Memorandum of Agreement between the United States Department of Justice, the Drug Enforcement Agency, and Mallinckrodt, plc. and its subsidiary Mallinckrodt, LLC (July 10, 2017), https://www.justice.gov/usao-edmi/press-release/file/986026/download. ("2017 Mallinckrodt MOA").

243.  The 2017 Mallinckrodt MOA further details the DEA's allegations regarding

Mallinckrodt's failures to fulfill its legal duties as an opioid manufacturer:

> With respect to its distribution of oxycodone and hydrocodone products, Mallinckrodt's alleged failure to distribute these controlled substances in a manner authorized by its registration and Mallinckrodt's alleged failure to operate an effective suspicious order monitoring system and to report suspicious orders to the DEA when discovered as required by and in violation of 21 C,F.R. § 1301.74(b).  The above includes, but is not limited to Mallinckrodt's alleged failure to:
>
> > i. conduct adequate due diligence of its customers;
> >
> > ii. detect and report to the DEA orders of unusual size and frequency;
> >
> > iii. detect and report to the DEA orders deviating substantially from normal patterns including, but not limited to, those identified in letters from the DEA Deputy Assistant Administrator, Office of Diversion Control, to registrants dated September 27, 2006 and December 27, 2007:
> >
> > > 1. orders that resulted in a disproportionate amount of a substance which is most often abused going to a particular geographic region where there was known diversion,
> > >
> > > 2. orders that purchased a disproportionate amount of a substance which is most often abused compared to other products, and
> > >
> > > 3. orders from downstream customers to distributors who were purchasing from multiple different distributors, of which Mallinckrodt was aware;
> >
> > iv. use "chargeback" information from its distributors to evaluate suspicious orders.  Chargebacks include downstream purchasing information tied to certain discounts, providing Mallinckrodt with data on buying patterns for Mallinckrodt products; and
> >
> > v. take sufficient action to prevent recurrence of diversion by downstream customers after receiving concrete information of diversion of Mallinckrodt product by those downstream customers.[138]

---

[138] 2017 Mallinckrodt MOA at p. 2-3.

244.  Mallinckrodt agreed that its "system to monitor and detect suspicious orders did not meet the standards outlined in letters from the DEA Deputy Administrator, Office of Diversion Control, to registrants dated September 27, 2006 and December 27, 2007."  Mallinckrodt further agreed that it "recognizes the importance of the prevention of diversion of the controlled substances they manufacture" and would "design and operate a system that meets the requirements of 21 CFR 1301.74(b) . . . [such that it would] utilize all available transaction information to identify suspicious orders of any Mallinckrodt product.  Further, Mallinckrodt agrees to notify DEA of any diversion and/or suspicious circumstances involving any Mallinckrodt controlled substances that Mallinckrodt discovers."[139]

245.  Mallinckrodt acknowledged that "[a]s part of their business model Mallinckrodt collects transaction information, referred to as chargeback data, from their direct customers (distributors).  The transaction information contains data relating to the direct customer sales of controlled substances to "downstream" registrants."  Mallinckrodt agreed that, from this data, it would "report to the DEA when Mallinckrodt concludes that the chargeback data or other information indicates that a downstream registrant poses a risk of diversion."[140]

246.  The same duties imposed by federal law on Mallinckrodt were imposed upon all Manufacturer Defendants.

247.  The same business practices utilized by Mallinckrodt regarding "charge backs" and receipt and review of data from opioid distributors regarding orders of opioids were utilized industry-wide among opioid manufacturers and distributors, including, upon information and belief, the other Manufacturer Defendants.

---

[139] *Id.* at 3-4.

[140] *Id.* at p.5.

248. Through, *inter alia*, the charge back data, the Manufacturer Defendants could monitor suspicious orders of opioids.

249. The Manufacturer Defendants failed to monitor, report, and halt suspicious orders of opioids as required by federal law.

250. The Manufacturer Defendants' failures to monitor, report, and halt suspicious orders of opioids were intentional and unlawful.

251. The Manufacturer Defendants have misrepresented their compliance with federal law.

252. The Manufacturer Defendants enabled the supply of prescription opioids to obviously suspicious physicians and pharmacies, enabled the illegal diversion of opioids, aided criminal activity, and disseminated massive quantities of prescription opioids into the black market.

253. The wrongful actions and omissions of the Manufacturer Defendants which have caused the diversion of opioids and which have been a substantial contributing factor to and/or proximate cause of the opioid crisis are alleged in greater detail in Plaintiff's racketeering allegations below.

254. The Manufacturer Defendants' actions and omissions in failing to effective prevent diversion and failing to monitor, report, and prevent suspicious orders have enabled the unlawful diversion of opioids into Plaintiff's Community.

**E. DEFENDANTS' UNLAWFUL CONDUCT AND BREACHES OF LEGAL DUTIES CAUSED THE HARM ALLEGED HEREIN AND SUBSTANTIAL DAMAGES.**

255. As the Manufacturer Defendants' efforts to expand the market for opioids increased so have the rates of prescription, distribution and sale of their products — as have the rates of opioid-related substance abuse, hospitalization, and death among the people of the

Commonwealth and the Plaintiff's Community.  The Distributor Defendants have continued to unlawfully ship these massive quantities of opioids into communities like the Plaintiff's Community, fueling the epidemic.

256.   There is a "parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associated adverse outcomes."[141]

257.   Opioid analgesics are widely diverted and improperly used, and the widespread use of the drugs has resulted in a national epidemic of opioid overdose deaths and addictions.[142]

258.   The epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications."[143]

259.   The increased abuse of prescription painkillers along with growing sales has contributed to a large number of overdoses and deaths.[144]

260.   As shown above, the opioid epidemic has escalated in Plaintiff's Community with devastating effects.  Substantial opiate-related substance abuse, hospitalization and death mirrors Defendants' increased distribution of opiates.

261.   Because of the well-established relationship between the use of prescription opiates and the use of non-prescription opioids, like heroin, the massive distribution of opioids to Plaintiffs' Community and areas from which such opioids are being diverted into Plaintiff's

---

[141] *See* Richard C. Dart et al, *Trends in Opioid Analgesic Abuse and Mortality in the United States*, 372 N. Eng. J. Med. 241 (2015).

[142] *See* Nora D. Volkow & A. Thomas McLellan, *Opioid Abuse in Chronic Pain—Misconceptions and Mitigation Strategies*, 374 N. Eng. J. Med. 1253 (2016).

[143] *See* Robert M. Califf et al., A Proactive Response to Prescription Opioid Abuse, 374 N. Eng. J. Med. 1480 (2016).

[144] *See* Press Release, Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., Prescription Painkiller Overdoses at Epidemic Levels (Nov. 1, 2011), https://www.cdc.gov/media/releases/2011/p1101_flu_pain_killer_overdose.html.

Community has caused the Defendant-caused opioid epidemic to include heroin addiction, abuse, and death.

262.  Prescription opioid abuse, addiction, morbidity, and mortality are hazards to public health and safety in the Commonwealth and in Plaintiff's Community.

263.  Heroin abuse, addiction, morbidity, and mortality are hazards to public health and safety in the Commonwealth and in Plaintiff's Community.

264. Defendants repeatedly and purposefully breached their duties under Commonwealth and federal law, and such breaches are direct and proximate causes of, and/or substantial factors leading to, the widespread diversion of prescription opioids for nonmedical purposes into the Plaintiff's Community.

265.  The unlawful diversion of prescription opioids is a direct and proximate cause of, and/or substantial factor leading to, the opioid epidemic, prescription opioid abuse, addiction, morbidity and mortality in the Commonwealth and Plaintiff's Community.  This diversion and the epidemic are direct causes of foreseeable harms incurred by Plaintiff and Plaintiff's Community.

266.  Defendants' intentional and/or unlawful conduct resulted in direct and foreseeable, past and continuing, economic damages for which Plaintiff seeks relief, as alleged herein. Plaintiff also seeks the means to abate the epidemic created by Defendants' wrongful and/or unlawful conduct.

267.  Plaintiff seeks economic damages from Defendants as reimbursement for the costs association with past efforts to eliminate the hazards to public health and safety.

268.  Plaintiff seeks economic damages from Defendants to pay for the cost to permanently eliminate the hazards to public health and safety and abate the temporary public nuisance.

269.  To eliminate the hazard to public health and safety, and abate the public nuisance, a "multifaceted, collaborative public health and law enforcement approach is urgently needed."[145]

270.  A comprehensive response to this crisis must focus on preventing new cases of opioid addiction, identifying early opioid-addicted individuals, and ensuring access to effective opioid addiction treatment while safely meeting the needs of patients experiencing pain.[146]

271.  These community-based problems require community-based solutions that have been limited by "budgetary constraints at the state and Federal levels."[147]

272.  Having profited enormously through the aggressive sale, misleading promotion, and irresponsible distribution of opiates, Defendants should be required to take responsibility for the financial burdens their conduct has inflicted upon Plaintiff and Plaintiff's Community.

## F.  STATUTES OF LIMITATIONS ARE TOLLED AND DEFENDANTS ARE ESTOPPED FROM ASSERTED STATUTES OF LIMITATIONS AS DEFENSES.

### 1.  Continuing Conduct.

273.  Plaintiff contends it continues to suffer harm from the unlawful actions by Defendants.

---

[145]  *See* Rose A. Rudd et al., *Increases in Drug and Opioid Overdose Deaths—United States, 2000–2014*, 64 Morbidity & Mortality Wkly. Rep. 1378 (2016), at 1145.

[146]  *See* Johns Hopkins Bloomberg School of Public Health, *The Prescription Opioid Epidemic: An Evidence-Based Approach* (G. Caleb Alexander et al. eds., 2015), http://www.jhsph.edu/research/centers-and-institutes/center-for-drug-safety-and-effectiveness/research/prescription-opioids/JHSPH_OPIOID_EPIDEMIC_REPORT.pdf.

[147]  *See* Office of Nat'l Drug Control Policy, Exec. Office of the President, *Epidemic: Responding to America's Prescription Drug Abuse Crisis* (2011), https://www.ncjrs.gov/pdffiles1/ondcp/rx_abuse_plan.pdf.

274.  The continued tortious and unlawful conduct by Defendants causes a repeated or continuous injury.  The damages have not occurred all at once but have continued to occur and have increased as time progresses.  The tort is not completed nor have all the damages been incurred until the wrongdoing ceases.  The wrongdoing and unlawful activity by Defendants has not ceased.  The public nuisance remains unabated.

### 2.  Equitable Estoppel.

275.  Defendants are equitably estopped from relying upon a statute of limitations defense because they undertook efforts to purposefully conceal their unlawful conduct and fraudulently assure the public, including the Commonwealth, Plaintiff, and Plaintiff's Community, that they were undertaking efforts to comply with their obligations under the Commonwealth and federal controlled substances laws, all with the goal of protecting their registered manufacturer or distributor status in the Commonwealth  and to continue generating profits.  Notwithstanding the allegations set forth above, Defendants affirmatively assured the public, including the Commonwealth, Plaintiff, and Plaintiff's Community, that they are working to curb the opioid epidemic.

276.  For example, a Cardinal Health executive claimed that it uses "advanced analytics" to monitor its supply chain, and assured the public it was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity."[148]

277.  Similarly, McKesson publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders," and claimed it is "deeply passionate about curbing the opioid epidemic in our country."[149]

---

[148] Bernstein et al., *supra*.

278.  Moreover, in furtherance of their effort to affirmatively conceal their conduct and avoid detection, the Distributor Defendants, through their trade associations, HDMA and NACDS, filed an *amicus* brief in *Masters Pharmaceuticals*, which made the following statements:[150]

    a.   "HDMA and NACDS members not only have statutory and regulatory responsibilities to guard against diversion of controlled prescription drugs, but undertake such efforts as responsible members of society."

    b.   "DEA regulations that have been in place for more than 40 years require distributors to *report* suspicious orders of controlled substances to DEA based on information readily available to them (e.g., a pharmacy's placement of unusually frequent or large orders)."

    c.   "Distributors take seriously their duty to report suspicious orders, utilizing both computer algorithms and human review to detect suspicious orders based on the generalized information that *is* available to them in the ordering process."

    d.   "A particular order or series of orders can raise red flags because of its unusual size, frequency, or departure from typical patterns with a given pharmacy."

    e.   "Distributors also monitor for and report abnormal behavior by pharmacies placing orders, such as refusing to provide business contact information or insisting on paying in cash."

---

[149] Scott Higham et al., *Drug Industry Hired Dozens of Officials from the DEA as the Agency Tried to Curb Opioid Abuse*, Wash. Post, Dec. 22, 2016, https://www.washingtonpost.com/investigations/key-officials-switch-sides-from-dea-to-pharmaceutical-industry/2016/12/22/55d2e938-c07b-11e6-b527-949c5893595e_story.html.

[150] Brief for HDMA and NACDS, 2016 WL 1321983, at *3-4, *25.

Through the above statements made on their behalf by their trade associations, and other similar statements assuring their continued compliance with their legal obligations, the Distributor Defendants not only acknowledged that they understood their obligations under the law, but they further affirmed that their conduct was in compliance with those obligations.

279.  The Distributor Defendants have also concealed and prevented discovery of information, including data from the ARCOS database, that will confirm their identities and the extent of their wrongful and illegal activities.

280.  The Manufacturer Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support.  The Manufacturer Defendants invented "pseudoaddiction" and promoted it to an unsuspecting medical community. The Manufacturer Defendants provided the medical community with false and misleading information about ineffectual strategies to avoid or control opioid addiction.  The Manufacturer Defendants recommended to the medical community that dosages be increased, without disclosing the risks.  The Manufacturer Defendants spent millions of dollars over a period of years on a misinformation campaign aimed at highlighting opioids' alleged benefits, disguising the risks, and promoting sales.  The medical community, consumers, the Commonwealth, and Plaintiff, Plaintiff's Community were duped by the Manufacturer Defendants' campaign to misrepresent and conceal the truth about the opioid drugs that they were aggressively pushing in the Commonwealth and in Plaintiff's Community.

281.  Defendants intended that their actions and omissions would be relied upon, including by Plaintiff and Plaintiff's Community.  Plaintiff and Plaintiff's Community did not know, and did not have the means to know, the truth due to Defendants' actions and omissions.

100

282.  Plaintiff and Plaintiff's Community reasonably relied on Defendants' affirmative statements regarding their purported compliance with their obligations under the law and consent orders.

### 3. Fraudulent Concealment.

283.  Plaintiff's claims are further subject to equitable tolling, stemming from Defendants' knowingly and fraudulently concealing the facts alleged herein.  As alleged herein, Defendants knew of the wrongful acts set forth above, and had material information pertinent to their discovery, and concealed them from the Plaintiff and Plaintiff's community.  Plaintiff did not know, or could not have known through the exercise of reasonable diligence, of its cause of action, as a result of Defendants' conduct.

284.  The purposes of the statutes of limitations period are satisfied because Defendants cannot claim prejudice due to a late filing where Plaintiff filed suit promptly upon discovering the facts essential to its claims, described herein, which Defendants knowingly concealed.

285.  In light of their statements to the media, in legal filings, and settlements, it is clear that Defendants had actual or constructive knowledge that their conduct was deceptive, in that they consciously concealed the schemes set forth herein

286.  Defendants continually and secretly engaged in their scheme to avoid compliance with their legal obligations.  Only Defendants and their agents knew or could have known about Defendants' unlawful actions because Defendants made deliberate efforts to conceal their conduct.  As a result of the above, Plaintiff was unable to obtain vital information bearing on its claims absent any fault or lack of diligence on its part.

## V.  LEGAL CAUSES OF ACTION

### COUNT I
### PUBLIC NUISANCE
### (Against all Defendants)

287.  Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth here, and further alleges as follows.

288.  Each Defendant is liable for public nuisance because its conduct at issue has caused an unreasonable and substantial interference with a right common to the general public, which is the proximate cause of, and/or substantial factor leading to, Plaintiff's injury.  *See* Restatement Second, Torts § 821B.

289.  By causing dangerously addictive drugs to flood the community, and to be diverted for illicit purposes, in contravention of federal and State law, each Defendant has injuriously affected rights common to the general public, specifically including the rights of the people of the Plaintiff's Community to public health, safety, peace, comfort, and convenience.  The public nuisance caused by Defendants' actions has caused substantial annoyance, inconvenience, and injury to the public.

290.  Each Manufacturing Defendant unreasonably and substantially interfered with the public health, safety, peace, comfort and convenience of the Plaintiff's Community by, *inter alia*, promoting and marketing the use of opioids in a misleading and fraudulent manner, and circulating false and misleading information concerning their safety and efficacy and/or minimizing or omitting the risk of addiction from their use.

291.  By distributing and selling dangerously addictive opioid drugs not connected to a legitimate medical, scientific, or industrial purpose, all Defendants have committed a course of conduct that injuriously affects the safety, health, and morals of the people of the Plaintiff's Community.

102

292.  By failing to maintain a closed system that guards against diversion of dangerously addictive drugs for illicit purposes and by failing to report suspicious orders of opioids, Defendants injuriously affected public rights, including the right to public health, public safety, public peace, and public comfort of the people of the Plaintiff's Community.

293.  Defendants' wrongful and illegal actions have created a public nuisance.  Each Defendant is liable for public nuisance because its conduct at issue has caused an unreasonable interference with a right common to the general public.

294.  Defendants have intentionally and/or unlawfully created a nuisance.

295.  The residents of Plaintiff's Community have a common right to be free from conduct that creates an unreasonable jeopardy to the public health, welfare and safety, and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and property.

296.  Defendants intentionally, unlawfully, and recklessly manufacture, market, distribute, and sell prescription opioids that Defendants know, or reasonably should know, will produce widespread distribution of prescription opioids in and/or to Plaintiff's Community, resulting in addiction and abuse, an elevated level of crime, death and injuries to the residents of Plaintiff's Community, a higher level of fear, discomfort and inconvenience to the residents of Plaintiff's Community, and direct costs to Plaintiff's Community.

297.  Defendants have unlawfully and/or intentionally caused and permitted dangerous drugs under their control to be distributed and/or sold such as to injure the Plaintiff's Community and its residents.

298.  Defendants have unlawfully and/or intentionally distributed opioids or caused opioids to be distributed without maintaining effective controls against diversion.  Such conduct

103

was illegal.  Defendants' failures to maintain effective controls against diversion include Defendants' failure to effectively monitor for suspicious orders, report suspicious orders, and/or stop shipment of suspicious orders.

299.  Defendants have caused a significant and unreasonable interference with the public health, safety, welfare, peace, comfort and convenience, and ability to be free from disturbance and reasonable apprehension of danger to person or property.

300.  Defendants' conduct in illegally marketing, promoting, distributing and/or selling prescription opioids, or causing such opioids to be distributed and sold, where Defendants know, or reasonably should know, such opioids will be diverted and possessed and/or used illegally Plaintiff's Community is of a continuing nature.

301.  Defendants' intentional and unlawful actions and omissions and unreasonable interference with a right common to the public are of a continuing nature and have produced a significant effect upon the public's rights, including the public's right to health and safety.

302.  A violation of any rule or law controlling the distribution of a drug of abuse in Plaintiff's Community and the State is a public nuisance.

303.  Defendants' distribution of opioids while failing to report suspicious orders and maintain effective controls against diversion was proscribed by statute and regulation.

304.  Defendants' ongoing conduct produces an ongoing nuisance, as the prescription opioids that they allow and/or cause to be illegally distributed and possessed in Plaintiff's Community lead to abuse, addiction, crime, and public health costs.

305.  Because of the continued use and addiction caused by these illegally distributed opioids, the public will continue to fear for its health, safety and welfare, and will be subjected to conduct that creates a disturbance and reasonable apprehension of danger to person and property.

306.  Defendants know, or reasonably should know, that their conduct will have an ongoing detrimental effect upon the public health, safety and welfare, and the public's ability to be free from disturbance and reasonable apprehension of danger to person and property.

307.  Defendants know, or reasonably should know, that their conduct causes an unreasonable invasion of the public right to health, safety and welfare and the public's ability to be free from disturbance and reasonable apprehension of danger to person and property.

308.  Defendants are aware, and at a bare minimum certainly should be aware, of the unreasonable interference that their conduct has caused in Plaintiff's Community.  Defendants are in the business of manufacturing, marketing, selling, and distributing prescription drugs, including opioids, which are specifically known to Defendants to be dangerous under federal law.  *See*, *e.g.*, 21 U.S.C. § 812 (b)(2).

309.  Defendants' conduct in marketing, distributing, and selling prescription opioids which the defendants know, or reasonably should know, will likely be diverted for non-legitimate, non-medical use, creates a strong likelihood that these illegal distributions of opioids will cause death and injuries to residents in Plaintiff's Community and otherwise significantly and unreasonably interfere with public health, safety and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

310.  It is, or should be, reasonably foreseeable to Defendants that their conduct will cause deaths and injuries to residents in Plaintiff's Community, and will otherwise significantly and unreasonably interfere with public health, safety and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

311.  The prevalence and availability of diverted prescription opioids in the hands of irresponsible persons and persons with criminal purposes in Plaintiff's Community not only

causes deaths and injuries, but also creates a palpable climate of fear among residents in Plaintiff's Community where opioid diversion, abuse, and addiction are prevalent and where opioids tend to be misused frequently.

312.  Defendants' conduct makes it easier for persons to misuse and divert prescription opioids, constituting a dangerous threat to the public.

313.  Defendants' actions were, at the least, a substantial factor in opioids becoming widely available and widely used for non-medical purposes.  Because of Defendants' special positions within the closed system of opioid distribution, without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of prescription opioid and heroin overuse, abuse, and addiction that now exists would have been averted.

314.  The presence of diverted prescription opioids in Plaintiff's Community, and the consequence of prescription opioids having been diverted in Plaintiff's Community, proximately results in and/or substantially contributes to the creation of significant costs to the Plaintiff and to Plaintiff's Community in order to enforce the law, equip its police force and treat the victims of opioid abuse and addiction.

315.  Stemming the flow of illegally distributed prescription opioids, and abating the nuisance caused by the illegal flow of opioids, will help to alleviate this problem, save lives, prevent injuries and make Plaintiff's Community a safer place to live.

316.  Defendants' conduct is a direct and proximate cause of and/or a substantial contributing factor to opioid addiction and abuse in Plaintiff's Community, costs borne by Plaintiff's Community and the Plaintiff, and a significant and unreasonable interference with public health, safety and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

317.  Defendants' conduct constitutes a public nuisance and, if unabated, will continue to threaten the health, safety and welfare of the residents of Plaintiff's Community, creating an atmosphere of fear and addiction that tears at the residents' sense of well-being and security. Plaintiff has a clearly ascertainable right to abate conduct that perpetuates this nuisance.

318.  Defendants created an intentional nuisance.  Defendants' actions created and expanded the abuse of opioids, which are dangerously addictive, and the ensuing associated plague of prescription opioid and heroin addiction.  Defendants knew the dangers to public health and safety that misuse and diversion of opioids would create in Plaintiff's Community, however, Defendants intentionally and/or unlawfully failed to maintain effective controls through proper monitoring, reporting and refusal to fill suspicious orders of opioids.  Defendants intentionally and/or unlawfully distributed opioids or caused opioids to be distributed without reporting or refusing to fill suspicious orders or taking other measures to maintain effective controls.  Defendants intentionally and/or unlawfully continued to ship and failed to halt suspicious orders of opioids, or caused such orders to be shipped.  Defendants intentionally and/or unlawfully marketed opioids in manners they knew to be false and misleading.  Such actions were inherently dangerous.

319.  Defendants knew the prescription opioids have a high likelihood of being misused and/or diverted.  It was foreseeable to Defendants that where Defendants distributed prescription opioids or caused such opioids to be distributed without maintaining effective controls, including monitoring, reporting, and refusing shipment of suspicious orders, that the opioids would be misused and/or diverted, and create an opioid abuse nuisance in Plaintiff's Community.

320.   Defendants' actions also created a nuisance by acting recklessly, negligently and/or carelessly, in breach of their duties to maintain effective controls against diversion, thereby creating an unreasonable risk of harm.

321.   Defendants are aware, and at a bare minimum certainly should be aware, of the unreasonable interference that their conduct has caused in the Plaintiff's community. Defendants are in the business of manufacturing or distributing prescription drugs, including opioids, which are specifically known to Defendants to be dangerous because, *inter alia*, these drugs are defined under federal and state law as substances posing a high potential for abuse and severe addiction. Defendants created an intentional nuisance. Defendants' actions created and expanded the abuse of opioids, drugs specifically codified as constituting severely harmful substances.

322.   The public nuisance created by Defendants' actions is substantial and unreasonable – it has caused and continues to cause significant harm to the community, and the harm inflicted outweighs any offsetting benefit. The staggering rates of opioid and heroin use resulting from Defendants' abdication of their gate-keeping and diversion prevention duties, and the Manufacturer Defendants' fraudulent marketing activities, have caused harm to the entire community that includes, but is not limited to the following:

   a. The high rates of use leading to unnecessary opioid abuse, addiction, overdose, injuries, and deaths.

   b. Even children have fallen victim to the opioid epidemic. Easy access to prescription opioids made opioids a recreational drug of choice among teenagers. Even infants have been born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts.

   c. Even those residents of Plaintiff's Community who have never taken opioids have suffered from the public nuisance arising from Defendants' abdication of their gate-keeper duties and fraudulent promotions. Many residents have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other support from family

members who have used, abused, become addicted to, overdosed on, or been killed by opioids.

d.  The opioid epidemic has increased health care costs.

e.  Employers have lost the value of productive and healthy employees.

f.  Defendants' conduct created an abundance of drugs available for criminal use and fueled a new wave of addiction, abuse, and injury.

g.  Defendants' dereliction of duties and/or fraudulent misinformation campaign pushing dangerous drugs resulted in a diverted supply of narcotics to sell, and the ensuing demand of addicts to buy them.  More prescription opioids sold by Defendants led to more addiction, with many addicts turning from prescription opioids to heroin.  People addicted to opioids frequently require increasing levels of opioids, and many turned to heroin as a foreseeable result.

h.  The diversion of opioids into the secondary, criminal market and the increased number of individuals who abuse or are addicted to opioids increased the demands on health care services and law enforcement.

i.  The significant and unreasonable interference with the public rights caused by Defendants' conduct taxed the human, medical, public health, law enforcement, and financial resources of the Plaintiff's Community.

j.  Defendants' interference with the comfortable enjoyment of life in the Plaintiff's Community is unreasonable because there is little social utility to opioid diversion and abuse, and any potential value is outweighed by the gravity of the harm inflicted by Defendants' actions.

323.  Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions have a great probability of causing substantial harm.

324.  The damages available to Plaintiff include, *inter alia*, recoupment of governmental costs, flowing from an ongoing and persistent public nuisance which the government seeks to abate.  Defendants' conduct is ongoing and persistent, and Plaintiff seeks all damages flowing from Defendants' conduct.  Plaintiff further seeks to abate the nuisance and harm created by Defendants' conduct.

325.  As a direct result of Defendants' conduct, Plaintiff and Plaintiff's Community have suffered actual injury and damages including, but not limited to, significant expenses for police, emergency, health, prosecution, corrections and other services.  Plaintiff here seeks recovery for its own harm.

326.  Plaintiff and Plaintiff's Community have sustained specific and special injuries because its damages include, *inter alia*, health services and law enforcement expenditures, as described in this Complaint.

327.  Plaintiff seeks economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' fraudulent activity and fraudulent misrepresentations. Plaintiff does not seek damages for physical personal injury or any physical damage to property caused by Defendants' actions.

328.  Plaintiff seeks all legal and equitable relief as allowed by law, other than such damages disavowed herein, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by Defendants, attorney fees and costs, and pre- and post-judgment interest.

## COUNT II
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### 18 U.S.C. 1961, *et seq.*
### (Against All Defendants)

329.  Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows.

330.  Plaintiff brings this Count on behalf of itself against the following Defendants, as defined above: Purdue, Cephalon, Janssen, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, and AmerisourceBergen (collectively, for purposes of this Count, the "RICO Defendants").

110

331.  Defendants (also referred to herein as the "RICO Defendants") conducted and continue to conduct their business through legitimate and illegitimate means in the form of an association-in-fact enterprise and/or a legal entity enterprise.  At all relevant times, the RICO Defendants were "persons" under 18 U.S.C. § 1961(3) because they are entities capable of holding, and do hold, "a legal or beneficial interest in property."

332.  Section 1962(c) of RICO makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c); *United State v. Turkette*, 452 U.S. 576, 580 (1981).

333.  The term "enterprise" is defined as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *Turkette*, 452 U.S. at 580; *Boyle v. U.S.*, 556 U.S. 938, 944 (2009). The definition of "enterprise" in Section 1961(4) includes legitimate and illegitimate enterprises within its scope.  Specifically, the section "describes two separate categories of associations that come within the purview of an 'enterprise' -- the first encompassing organizations such as corporations, partnerships, and other 'legal entities,' and the second covering 'any union or group of individuals associated in fact although not a legal entity.'" *Turkette*, 452 U.S. at 577.  The second category is not a more generalized description of the first.  *Id*.

334.  For over a decade, the RICO Defendants aggressively sought to bolster their revenue, increase profit, and grow their share of the prescription painkiller market by unlawfully and surreptitiously increasing the volume of opioids they sold.  However, the RICO Defendants

are not permitted to engage in a limitless expansion of their market through the unlawful sales of regulated painkillers.  As "registrants," the RICO Defendants operated and continue to operate within the "closed-system" created under the Controlled Substances Act, 21 U.S.C. § 821, *et seq.* (the "CSA").  The CSA restricts the RICO Defendants' ability to manufacture or distribute Schedule II substances like opioids by requiring them to: (1) register to manufacture or distribute opioids; (2) maintain effective controls against diversion of the controlled substances that they manufacturer or distribute; (3) design and operate a system to identify suspicious orders of controlled substances, halt such unlawful sales, and report them to the DEA; and (4) make sales within a limited quota set by the DEA for the overall production of Schedule II substances like opioids.

335.  The closed-system created by the CSA, including the establishment of quotas, was specifically intended to reduce or eliminate the diversion of Schedule II substances like opioids from "legitimate channels of trade" to the illicit market by controlling the quantities of the basic ingredients needed for the manufacture of [controlled substances]."[151]

336.  Finding it impossible to legally achieve their ever-increasing sales ambitions, members of the Opioid Diversion Enterprise (as defined below) systematically and fraudulently violated their statutory duty to maintain effective controls against diversion of their drugs, to design and operate a system to identify suspicious orders of their drugs, to halt unlawful sales of suspicious orders, and to notify the DEA of suspicious orders.[152]  As discussed in detail below, through the RICO Defendants' scheme, members of the Opioid Diversion Enterprise repeatedly

---

[151] 1970 U.S.C.C.A.N. 4566 at 5490; *see also* Testimony of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United States Senate, May 5, 2015 (available at https://www.drugcaucus.senate.gov/sites/default/files/Rannazzisi%20Testimony_0.pdf).

[152] 21 U.S.C. § 823(a)(1), (b)(1); 21 C.F.R. § 1301.74(b)-(c).

engaged in unlawful sales of painkillers which, in turn, artificially and illegally increased the annual production quotas for opioids allowed by the DEA. [153]  In doing so, the RICO Defendants allowed hundreds of millions of pills to enter the illicit market which allowed them to generate obscene profits.

337.  Defendants' illegal scheme was hatched by an association-in-fact enterprise between the Manufacturer Defendants and the Distributor Defendants, and executed in perfect harmony by each of them.  In particular, each of the RICO Defendants were associated with, and conducted or participated in, the affairs of the Opioid Diversion Enterprise, whose purpose was to engage in the unlawful sales of opioids, to deceive the public and federal and state regulators into believing that the RICO Defendants were faithfully fulfilling their statutory obligations.  The RICO Defendants' scheme allowed them to make billions in unlawful sales of opioids and, in turn, increase and/or maintain high production quotas with the purpose of ensuring unlawfully increasing revenues, profits, and market share.  As a direct result of the RICO Defendants' fraudulent scheme, course of conduct, and pattern of racketeering activity, they were able to extract billions of dollars of revenue from the addicted American public, while entities like Plaintiff experienced tens of millions of dollars of injury caused by the reasonably foreseeable consequences of the prescription opioid addiction epidemic.  As explained in detail below, the RICO Defendants' misconduct violated Section 1962(c) and Plaintiff is entitled to treble damages for its injuries under 18 U.S.C. § 1964(c).

338.  Alternatively, the RICO Defendants were members of a legal entity enterprise within the meaning of 18 U.S.C. § 1961(4), through which the RICO Defendants conducted their pattern of racketeering activity in this jurisdiction and throughout the United States.

---

[153] 21 C.F.R. § 1303.11(b); 21 C.F.R. § 1303.23.

Specifically, the Healthcare Distribution Alliance (the "HDA")[154] is a distinct legal entity that satisfies the definition of a RICO enterprise.  The HDA is a non-profit corporation formed under the laws of the District of Columbia and doing business in Virginia.  As a non-profit corporation, HDA qualifies as an "enterprise" within the definition set out in 18 U.S.C. § 1961(4) because it is a corporation and a legal entity.

339.  On information and belief, each of the RICO Defendants is a member, participant, and/or sponsor of the HDA and utilized the HDA to conduct the Opioid Diversion Enterprise and to engage in the pattern of racketeering activity that gives rise to the Count.

340.  Each of the RICO Defendants is a legal entity separate and distinct from the HDA.  And, the HDA serves the interests of distributors and manufacturers beyond the RICO Defendants.  Therefore, the HDA exists separately from the Opioid Diversion Enterprise, and each of the RICO Defendants exists separately from the HDA.  Therefore, the HDA may serve as a RICO enterprise.

341.  The legal and association-in-fact enterprises alleged in the previous and subsequent paragraphs were each used by the RICO Defendants to conduct the Opioid Diversion Enterprise by engaging in a pattern of racketeering activity.   Therefore, the legal and association-in-fact enterprises alleged in the previous and subsequent paragraphs are pleaded in the alternative and are collectively referred to as the "Opioid Diversion Enterprise."

## A.  THE OPIOID DIVERSION ENTERPRISE

342.  Recognizing that there is a need for greater scrutiny over controlled substances due to their potential for abuse and danger to public health and safety, the United States Congress

---

[154] Health Distribution Alliance, <u>History</u>, Health Distribution Alliance, (last accessed on September 15, 2017), https://www.healthcaredistribution.org/about/hda-history.

enacted the Controlled Substances Act in 1970.[155]  The CSA and its implementing regulations created a closed-system of distribution for all controlled substances and listed chemicals.[156] Congress specifically designed the closed chain of distribution to prevent the diversion of legally produced controlled substances into the illicit market.[157]  As reflected in comments from United States Senators during deliberation on the CSA, the "[CSA] is designed to crack down hard on the narcotics pusher and the illegal diverters of pep pills and goof balls."[158]  Congress was concerned with the diversion of drugs out of legitimate channels of distribution when it enacted the CSA and acted to halt the "widespread diversion of [controlled substances] out of legitimate channels into the illegal market."[159] Moreover, the closed-system was specifically designed to ensure that there are multiple ways of identifying and preventing diversion through active participation by registrants within the drug delivery chain.[160]  All registrants -- manufacturers and distributors alike -- must adhere to the specific security, recordkeeping, monitoring and reporting requirements that are designed to identify or prevent diversion.[161]  When registrants at

---

[155] Joseph T. Rannazzisi Decl. ¶ 4, *Cardinal Health, Inc. v. Eric Holder, Jr., Attorney General*, D.D.C. Case No. 12-cv-185 (Document 14-2 February 10, 2012).

[156] *See* H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. at 4566.

[157] *Gonzalez v. Raich*, 545 U.S. 1, 12-14 (2005); 21 U.S.C. § 801(20; 21 U.S.C. §§ 821-824, 827, 880; H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. 4566, 4572 (Sept. 10, 1970).

[158] *See* H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. at 4566; 116 Cong. Rec. 977-78 (Comments of Sen. Dodd, Jan 23, 1970).

[159] See Testimony of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United State Senate, May 5, 2015 (available at https://www.drugcaucus.senate.gov/sites/default/files/Rannazzisi%20Testimony_0.pdf).

[160] See Statement of Joseph T. Rannazzisi before the Caucus on International Narcotics Control United States Senate, July 18, 2012 (available at https://www.justice.gov/sites/default/files/testimonies/witnesses/attachments/07/18/12/07-18-12-dea-rannazzisi.pdf).

[161] *Id.*

115

any level fail to fulfill their obligations, the necessary checks and balances collapse.[162]  The result is the scourge of addiction like the opioid epidemic that has occurred.

343.  In 2006 and 2007, the DEA issued multiple letters to the Distributor Defendants reminding them of their obligation to maintain effective controls against diversion of particular controlled substances, to design and operate a system to disclose suspicious orders, and to inform the DEA of any suspicious orders.[163]  The DEA also published suggested questions that a distributor should ask prior to shipping controlled substances, in order to "know their customers."[164]

344.  Central to the closed-system created by the CSA was the directive that the DEA determine quotas of each basic class of Schedule I and II controlled substances each year.  The quota system was intended to reduce or eliminate diversion from "legitimate channels of trade" by controlling the "quantities of the basic ingredients needed for the manufacture of [controlled substances], and the requirement of order forms for all transfers of these drugs."[165]  When evaluating production quotas, the DEA was instructed to consider the following information:

  a.  Information provided by the Department of Health and Human Services;

  b.  Total net disposal of the basic class by all manufacturers;

  c.  Trends in the national rate of disposal of the basic class;

---

[162] Joseph T. Rannazzisi Decl. ¶ 10, *Cardinal Health, Inc. v. Eric Holder, Jr., Attorney General*, D.D.C. Case No. 12-cv-185 (Document 14-2 February 10, 2012).

[163] Joseph T. Rannazzisi, In Reference to Registration # RC0183080 (September 27, 2006); Joseph T. Rannazzisi, In Reference to Registration # RC0183080 (December 27, 2007).

[164] Suggested Questions a Distributor should ask prior to shipping controlled substances, Drug Enforcement Administration (available at https://www.deadiversion.usdoj.gov/mtgs/pharm_industry/14th_pharm/levinl_ques.pdf).

[165] 1970 U.S.C.C.A.N. 4566 at 5490; *see also* Testimony of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United States Senate, May 5, 2015 (available at https://www.drugcaucus.senate.gov/sites/default/files/Rannazzisi%20Testimony_0.pdf).

d.  An applicant's production cycle and current inventory position;

e.  Total actual or estimated inventories of the class and of all substances manufactured from the class and trends in inventory accumulation; and

f.  Other factors such as: changes in the currently accepted medical use of substances manufactured for a basic class; the economic and physical availability of raw materials; yield and sustainability issues; potential disruptions to production; and unforeseen emergencies.[166]

345.  It is unlawful for a registrant to manufacture a controlled substance in Schedule II, like prescription opioids, that is (1) not expressly authorized by its registration and by a quota assigned to it by DEA, or (2) in excess of a quota assigned to it by the DEA.[167]

346.  At all relevant times, the RICO Defendants operated as an association-in-fact enterprise formed for the purpose of unlawfully increasing sales, revenues and profits by disregarding their statutory duty to identify, investigate, halt and report suspicious orders of opioids and diversion of their drugs into the illicit market, in order to unlawfully increase the quotas set by the DEA and allow them to collectively benefit from the unlawful formation of a greater pool of prescription opioids from which to profit.  The RICO Defendants conducted their pattern of racketeering activity in this jurisdiction and throughout the United States through this enterprise.

347.  The opioid epidemic has its origins in the mid-1990s when, between 1997 and 2007, per capita purchase of methadone, hydrocodone, and oxycodone increased 13-fold, 4-fold,

---

[166] See Testimony of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United State Senate, May 5, 2015 (available at https://www.drugcaucus.senate.gov/sites/default/files/Rannazzisi%20Testimony_0.pdf).

[167] *Id.* (citing 21 U.S.C. 842(b)).

and 9-fold, respectively.  By 2010, enough prescription opioids were sold in the United States to medicate every adult in the county with a dose of 5 milligrams of hydrocodone every 4 hours for 1 month.[168]  On information and belief, the Opioid Diversion Enterprise has been ongoing for at least the last decade.[169]

348.  The Opioid Diversion Enterprise was and is a shockingly successful endeavor.  It has been conducting business uninterrupted since its genesis.  But, it was not until recently that United States and State regulators finally began to unravel the extent of the enterprise and the toll that it exacted on the American public.

349.  At all relevant times, the Opioid Diversion Enterprise (a) had an existence separate and distinct from each RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the RICO Defendants engaged; (c) was an ongoing and continuing organization consisting of legal entities, including each of the RICO Defendants; (d) characterized by interpersonal relationships among the RICO Defendants; (e) had sufficient longevity for the enterprise to pursue its purpose; and (f) functioned as a continuing unit. *Turkette*, 452 U.S. at 580; *Boyle*, 556 U.S. at 944 (2009). Each member of the Opioid Diversion Enterprise participated in the conduct of the enterprise, including patterns of racketeering activity, and shared in the astounding growth of profits supplied by fraudulently inflating opioid sales generated as a result of the Opioid Diversion Enterprise's disregard for their duty to prevent diversion of their drugs into the illicit market and then requesting the DEA increase production

---

[168] Keyes KM, Cerdá M, Brady JE, Havens JR, Galea S. *Understanding the rural-urban differences in nonmedical prescription opioid use and abuse in the United States.* Am J Public Health. 2014;104(2):e52-9.

[169] Matthew Perrone, Pro-Painkiller echo chamber shaped policy amid drug epidemic, The Center for Public Integrity (September 19, 2017, 12:01 a.m.), https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy-amid-drug-epidemic.

quotas, all so that the RICO Defendants would have a larger pool of prescription opioids from which to profit.

350. The Opioid Diversion Enterprise also engaged in efforts to lobby against the DEA's authority to hold the RICO Defendants liable for disregarding their duty to prevent diversion.  Members of the Pain Care Forum (described in greater detail below) and the Healthcare Distribution Alliance lobbied for the passage of legislation to weaken the DEA's enforcement authority.  The Ensuring Patient Access and Effective Drug Enforcement Act significantly reduced the DEA's ability to issue orders to show cause and to suspend and/or revoke registrations[170]  The HDA and other members of the Pain Care Forum contributed substantial amounts of money to political campaigns for federal candidates, state candidates, political action committees and political parties.  Plaintiff is informed and believes that the Pain Care Forum and its members, and the HAD, poured millions into lobbying efforts.

351. The Opioid Diversion Enterprise functioned by selling prescription opioids.  While there are some legitimate uses and/or needs for prescription opioids, the RICO Defendants, through their illegal enterprise, engaged in a pattern of racketeering activity, that involves a fraudulent scheme to increase revenue by violating State and Federal laws requiring the maintenance of effective controls against diversion of prescription opioids, and the identification, investigation, and reporting of suspicious orders of prescription opioids destined for the illicit

---

[170] *See* <u>HDMA is now the Healthcare Distribution Alliance</u>, Pharmaceutical Commerce, (June 13, 2016, updated July 6, 2016), http://pharmaceuticalcommerce.com/business-and-finance/hdma-now-healthcare-distribution-alliance/; Lenny Bernstein & Scott Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control*, Wash. Post, Oct. 22, 2016, https://www.washingtonpost.com/investigations/the-dea-slowed-enforcement-while-the-opioid-epidemic-grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-d7c704ef9fd9_story.html; Lenny Bernstein & Scott Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis*, Wash. Post, Mar. 6, 2017, https://www.washingtonpost.com/investigations/us-senator-calls-for-investigation-of-dea-enforcement-slowdown/2017/03/06/5846ee60-028b-11e7-b1e9-a05d3c21f7cf_story.html; Eric Eyre, *DEA Agent: "We Had no Leadership" in WV Amid Flood of Pain Pills*, Charleston Gazette-Mail, Feb. 18, 2017, http://www.wvgazettemail.com/news/20170218/dea-agent-we-had-no-leadership-in-wv-amid-flood-of-pain-pills-.

drug market.  The goal of Defendants' scheme was to increase profits from opioid sales.  But, Defendants' profits were limited by the production quotas set by the DEA, so Defendants refused to identify, investigate and/or report suspicious orders of their prescription opioids being diverted into the illicit drug market.  The end result of this strategy was to increase and maintain artificially high production quotas of opioids so that there was a larger pool of opioids for Defendants to manufacture and distribute for public consumption.

352.  The Opioid Diversion Enterprise engaged in, and its activities affected, interstate and foreign commerce because the enterprise involved commercial activities across states lines, such as manufacture, sale, distribution, and shipment of prescription opioids throughout the County and this jurisdiction, and the corresponding payment and/or receipt of money from the sale of the same.

353.  Within the Opioid Diversion Enterprise, there were interpersonal relationships and common communication by which the RICO Defendants shared information on a regular basis. These interpersonal relationships also formed the organization of the Opioid Diversion Enterprise.  The Opioid Diversion Enterprise used their interpersonal relationships and communication network for the purpose of conducting the enterprise through a pattern of racketeering activity.

354.  Each of the RICO Defendants had a systematic link to each other through joint participation in lobbying groups, trade industry organizations, contractual relationships and continuing coordination of activities.  The RICO Defendants participated in the operation and management of the Opioid Diversion Enterprise by directing its affairs, as described herein. While the RICO Defendants participated in, and are members of, the enterprise, they each have a separate existence from the enterprise, including distinct legal statuses, different offices and

roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

355. The RICO Defendants exerted substantial control over the Opioid Diversion Enterprise by their membership in the Pain Care Forum, the HDA, and through their contractual relationships.

356. The Pain Care Forum ("PCF") has been described as a coalition of drugmakers, trade groups and dozens of non-profit organizations supported by industry funding. The PCF recently became a national news story when it was discovered that lobbyists for members of the PCF quietly shaped federal and state policies regarding the use of prescription opioids for more than a decade.

357. The Center for Public Integrity and The Associated Press obtained "internal documents shed[ding] new light on how drugmakers and their allies shaped the national response to the ongoing wave of prescription opioid abuse."[171] Specifically, PCF members spent over $740 million lobbying in the nation's capital and in all 50 statehouses on an array of issues, including opioid-related measures.[172]

358. Not surprisingly, each of the RICO Defendants who stood to profit from lobbying in favor of prescription opioid use is a member of and/or participant in the PCF.[173] In 2012, membership and participating organizations included the HDA (of which all RICO Defendants are members), Endo, Purdue, Johnson & Johnson (the parent company for Janssen

---

[171] Matthew Perrone, Pro-Painkiller echo chamber shaped policy amid drug epidemic, The Center for Public Integrity (September 19, 2017, 12:01 a.m.), https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy-amid-drug-epidemic (emphasis added).

[172] Id.

[173] PAIN CARE FORUM 2012 Meetings Schedule, (last updated December 2011), https://assets.documentcloud.org/documents/3108982/PAIN-CARE-FORUM-Meetings-Schedule-amp.pdf

Pharmaceuticals), Actavis (*i.e.*, Allergan), and Teva (the parent company of Cephalon).[174] Each of the Manufacturer Defendants worked together through the PCF to advance the interests of the enterprise. But, the Manufacturer Defendants were not alone. The Distributor Defendants actively participated, and continue to participate in the PCF, at a minimum, through their trade organization, the HDA.[175] Plaintiff is informed and believes that the Distributor Defendants participated directly in the PCF as well.

359. The 2012 Meeting Schedule for the Pain Care Forum is particularly revealing on the subject of Defendants' interpersonal relationships. The meeting schedule indicates that meetings were held in the D.C. office of Powers Pyles Sutter & Verville on a monthly basis, unless otherwise noted. Local members were "encouraged to attend in person" at the monthly meetings. And, the meeting schedule indicates that the quarterly and year-end meetings included a "Guest Speaker."

360. The 2012 Pain Care Forum Meeting Schedule demonstrates that each of the Defendants participated in meetings on a monthly basis, either directly or through their trade organization, in a coalition of drugmakers and their allies whose sole purpose was to shape the national response to the ongoing prescription opioid epidemic, including the concerted lobbying efforts that the PCF undertook on behalf of its members.

361. The HDA -- or Healthcare Distribution Alliance --was a second means that led to the formation of interpersonal relationships and an organization between the RICO Defendants.

---

[174] *Id*. Plaintiff is informed and believes that Mallinckrodt became an active member of the PCF sometime after 2012.

[175] *Id*. The Executive Committee of the HDA (formerly the HDMA) currently includes the Chief Executive Officer, Pharmaceutical Segment for Cardinal Health, Inc., the Group President, Pharmaceutical Distribution and Strategic Global Source for AmerisourceBergen Corporation, and the President, U.S. Pharmaceutical for McKesson Corporation. Executive Committee, Healthcare Distribution Alliance (accessed on September 14, 2017), https://www.healthcaredistribution.org/about/executive-committee.

Although the entire HDA membership directory is private, the HDA website confirms that each of the Distributor Defendants and the Manufacturer Defendants named in the Complaint were members of the HDA.[176]  And, the HDA and each of the Distributor Defendants, eagerly sought the active membership and participation of the Manufacturer Defendants by advocating that one of the benefits of membership included the ability to develop direct relationships between manufacturers and distributors at high executive levels.

362.  In fact, the HDA touted the benefits of membership to the Manufacturer Defendants, advocating that membership included the ability to, among other things, "network one on one with manufacturer executives at HDA's members-only Business and Leadership Conference," "networking with HDA wholesale distributor members," "opportunities to host and sponsor HDA Board of Directors events," "participate on HDA committees, task forces and working groups with peers and trading partners," and "make connections."[177]  Plainly, the HDA and the Distributor Defendants believed that membership in the HDA was an opportunity to create interpersonal and ongoing organizational relationships between the Manufacturers and Defendants.

363.  The application for manufacturer membership in the HDA further indicates the level of connection that existed between the RICO Defendants.[178]  The manufacturer membership application must be signed by a "senior company executive," and it requests that the manufacturer applicant identify a key contact and any additional contacts from within its

---

[176] Manufacturer Membership, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/about/membership/manufacturer.

[177] Manufacturer Membership Benefits, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/~/media/pdfs/membership/manufacturer-membership-benefits.ashx?la=en.

[178] Manufacturer Membership Application, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/~/media/pdfs/membership/manufacturer-membership-application.ashx?la=en.

company.   The HDA application also requests that the manufacturer identify its current distribution information and its most recent year end net sales through any HDA distributors, including but not limited to, Defendants AmerisourceBergen, Cardinal Health, and McKesson.[179]

364.   After becoming members, the distributors and manufacturers were eligible to participate on councils, committees, task forces and working groups, including:

a.  Industry Relations Council: "This council, composed of distributor and manufacturer members, provides leadership on pharmaceutical distribution and supply chain issues."[180]

b.  Business Technology Committee: "This committee provides guidance to HDA and its members through the development of collaborative e-commerce business solutions.   The committee's major areas of focus within pharmaceutical distribution include information systems, operational integration and the impact of e-commerce."   Participation in this committee includes distributors and manufacturer members.[181]

c.  Health, Beauty and Wellness Committee: "This committee conducts research, as well as creates and exchanges industry knowledge to help shape the future of the distribution for health, beauty and wellness/consumer products in the healthcare supply chain."   Participation in this committee includes distributors and manufacturer members.[182]

d.  Logistics Operation Committee: "This committee initiates projects designed to help members enhance the productivity, efficiency and customer satisfaction within the healthcare supply chain. Its major areas of focus include process automation, information systems, operational integration, resource management and quality improvement."   Participation in this committee includes distributors and manufacturer members.[183]

e.  Manufacturer Government Affairs Advisory Committee: "This committee provides a forum for briefing HDA's manufacturer members on federal and state legislative and regulatory activity affecting the pharmaceutical distribution

---

[179] *Id.*

[180] Councils and Committees, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/about/councils-and-committees

[181] *Id.*

[182] *Id.*

[183] *Id.*

channel. Topics discussed include such issues as prescription drug traceability, distributor licensing, FDA and DEA regulation of distribution, importation and Medicaid/Medicare reimbursement." Participation in this committee includes manufacturer members.[184]

f.  Bar Code Task Force: Participation includes Distributor, Manufacturer and Service Provider Members.[185]

g.  eCommerce Task Force: Participation includes Distributor, Manufacturer and Service Provider Members.[186]

h.  ASN Working Group: Participation includes Distributor, Manufacturer and Service Provider Members.[187]

i.  Contracts and Chargebacks Working Group: "This working group explores how the contract administration process can be streamlined through process improvements or technical efficiencies. It also creates and exchanges industry knowledge of interest to contract and chargeback professionals." Participation includes Distributor and Manufacturer Members.[188]

365.  The councils, committees, task forces and working groups provided the Manufacturer and Distributor Defendants with the opportunity to work closely together in shaping their common goals and forming the enterprise's organization.

366.  The HDA also offers a multitude of conferences, including annual business and leadership conferences. The HDA, and the Distributor Defendants advertise these conferences to the Manufacturer Defendants as an opportunity to "bring together high-level executives, thought leaders and influential managers . . . to hold strategic business discussions on the most pressing

---

[184] *Id.*

[185] *Id.*

[186] *Id.*

[187] *Id.*

[188] *Id.*

industry issues."[189]   The conferences also gave the Manufacturer and Distributor Defendants "unmatched opportunities to network with [their] peers and trading partners at all levels of the healthcare distribution industry."[190]   The HDA and its conferences were significant opportunities for the Manufacturer and Distributor Defendants to interact at a high-level of leadership.  And, the Manufacturer Defendants embraced this opportunity by attending and sponsoring these events.[191]

367.   Third, the RICO Defendants maintained their interpersonal relationships by working together and exchanging information and driving the unlawful sales of their opioids through their contractual relationships, including chargebacks and vault security programs.

368.   The Manufacturer Defendants engaged in an industry-wide practice of paying rebates and/or chargebacks to the Distributor Defendants for sales of prescription opioids.[192]   As reported in the Washington Post, identified by Senator McCaskill, and acknowledged by the HDA, there is an industry-wide practice whereby the Manufacturers paid the Distributors rebates and/or chargebacks on their prescription opioid sales.[193]   On information and belief, these contracts were negotiated at the highest levels, demonstrating ongoing relationships between the

---

[189] Business and Leadership Conference – Information for Manufacturers, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/events/2015-business-and-leadership-conference/blc-for-manufacturers.

[190] Id.

[191] 2015 Distribution Management Conference and Expo, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/events/2015-distribution-management-conference.

[192] Lenny Bernstein & Scott Higham, The government's struggle to hold opioid manufacturers accountable, The Washington Post, (April 2, 2017), https://www.washingtonpost.com/graphics/investigations/dea-mallinckrodt/?utm_term=.b24cc81cc356; see also, Letter from Sen. Claire McCaskill, (July 27, 2017), https://www.mccaskill.senate.gov/imo/media/image/july-opioid-investigation-letter-manufacturers.png; Letter from Sen. Claire McCaskill, (July 27, 2017), https://www.mccaskill.senate.gov/imo/media/image/july-opioid-investigation-letter-manufacturers.png; Letters From Sen. Claire McCaskill, (March 28, 2017), https://www.mccaskill.senate.gov/opioid-investigation; Purdue Managed Markets, Purdue Pharma, (accessed on September 14, 2017), http://www.purduepharma.com/payers/managed-markets/.

[193] Id.

Manufacturer and Distributor Defendants.  In return for the rebates and chargebacks, the Distributor Defendants provided the Manufacturer Defendants with detailed information regarding their prescription opioid sales, including purchase orders, acknowledgements, ship notices, and invoices.[194]  The Manufacturer Defendants used this information to gather high-level data regarding overall distribution and direct the Distributor Defendants on how to most effectively sell the prescription opioids.

369.  The contractual relationships among the RICO Defendants also include vault security programs. The RICO Defendants are required to maintain certain security protocols and storage facilities for the manufacture and distribution of their opiates.  Plaintiff is informed and believes that manufacturers negotiated agreements whereby the Manufacturers installed security vaults for Distributors in exchange for agreements to maintain minimum sales performance thresholds.  Plaintiff is informed and believes that these agreements were used by the RICO Defendants as a tool to violate their reporting and diversion duties in order to reach the required sales requirements.

370.  Taken together, the interaction and length of the relationships between and among the Manufacturer and Distributor Defendants reflects a deep level of interaction and cooperation between two groups in a tightly knit industry.  The Manufacturer and Distributor Defendants were not two separate groups operating in isolation or two groups forced to work together in a closed system.  The RICO Defendants operated together as a united entity, working together on multiple fronts, to engage in the unlawful distribution and sale of prescription opioids.  The HDA and the Pain Care Forum are but two examples of the overlapping relationships, and concerted

---

[194]    Webinars,    Healthcare    Distribution    Alliance,    (accessed    on    September    14,    2017), https://www.healthcaredistribution.org/resources/webinar-leveraging-edi.

joint efforts to accomplish common goals and demonstrate that the leaders of each of the RICO

Defendants were in communication and cooperation.

371.   According to articles published by the Center for Public Integrity and The

Associated Press, the Pain Care Forum -- whose members include the Manufacturers and the

Distributors' trade association has been lobbying on behalf of the Manufacturers and Distributors

for "more than a decade."[195]   And, from 2006 to 2016 the Distributors and Manufacturers

worked together through the Pain Care Forum to spend over $740 million lobbying in the

nation's capital and in all 50 statehouses on issues including opioid-related measures.[196]

Similarly, the HDA has continued its work on behalf of distributors and manufacturers, without

interruption, since at least 2000, if not longer.[197]

372.   As described above, the RICO Defendants began working together as early as 2006

through the Pain Care Forum and/or the HDA to promote the common purpose of their

enterprise.  Plaintiff is informed and believes that the RICO Defendants worked together as an

ongoing and continuous organization throughout the existence of their enterprise.

## B.  CONDUCT OF THE OPIOID DIVERSION ENTERPRISE

373.   During the time period alleged in this Complaint, the RICO Defendants exerted

control over, conducted and/or participated in the Opioid Diversion Enterprise by fraudulently

failing to comply with their Federal and State obligations to identify, investigate and report

suspicious orders of opioids in order to prevent diversion of those highly addictive substances

---

[195]  Matthew Perrone, Pro-Painkiller echo chamber shaped policy amid drug epidemic, The Center for Public
Integrity (September 19, 2017, 12:01 a.m.), https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-
chamber-shaped-policy-amid-drug-epidemic.

[196]  Id.

[197]  HDA History, Healthcare Distribution Alliance, (accessed on September 14, 2017),
https://www.healthcaredistribution.org/about/hda-history.

into the illicit market, to halt such unlawful sales and, in doing so, to increase production quotas and generate unlawful profits, as follows:

374.   Defendants disseminated false and misleading statements to the public claiming that they were complying with their obligations to maintain effective controls against diversion of their prescription opioids.

375.   Defendants disseminated false and misleading statements to the public claiming that they were complying with their obligations to design and operate a system to disclose to the registrant suspicious orders of their prescription opioids.

376.   Defendants disseminated false and misleading statements to the public claiming that they were complying with their obligation to notify the DEA of any suspicious orders or diversion of their prescription opioids.

377.   Defendants paid nearly $800 million dollars to influence local, state and federal governments through joint lobbying efforts as part of the Pain Care Forum.   The RICO Defendants were all members of their Pain Care Forum either directly or indirectly through the HDA.  The lobbying efforts of the Pain Care Forum and its members, included efforts to pass legislation making it more difficult for the DEA to suspend and/or revoke the Manufacturers' and Distributors' registrations for failure to report suspicious orders of opioids.

378.   The RICO Defendants exercised control and influence over the distribution industry by participating and maintaining membership in the HDA.

379.   The RICO Defendants applied political and other pressure on the DOJ and DEA to halt prosecutions for failure to report suspicious orders of prescription opioids and lobbied

Congress to strip the DEA of its ability to immediately suspend registrations pending investigation by passing the "Ensuring Patient Access and Effective Drug Enforcement Act."[198]

380.  The RICO Defendants engaged in an industry-wide practice of paying rebates and chargebacks to incentivize unlawful opioid prescription sales.  Plaintiff is informed and believes that the Manufacturer Defendants used the chargeback program to acquire detailed high-level data regarding sales of the opioids they manufactured.  And, Plaintiff is informed and believes that the Manufacturer Defendants used this high-level information to direct the Distributor Defendants' sales efforts to regions where prescription opioids were selling in larger volumes.

381.  The Manufacturer Defendants lobbied the DEA to increase Aggregate Production Quotas, year after year by submitting net disposal information that the Manufacturer Defendants knew included sales that were suspicious and involved the diversion of opioids that had not been properly investigated or reported by the RICO Defendants.

382.  The Distributor Defendants developed "know your customer" questionnaires and files.  This information, compiled pursuant to comments from the DEA in 2006 and 2007 was intended to help the RICO Defendants identify suspicious orders or customers who were likely to divert prescription opioids.[199]  On information and belief, the "know your customer"

---

[198] *See* HDMA is now the Healthcare Distribution Alliance, Pharmaceutical Commerce, (June 13, 2016, updated July 6, 2016), http://pharmaceuticalcommerce.com/business-and-finance/hdma-now-healthcare-distribution-alliance/; Lenny Bernstein & Scott Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control*, Wash. Post, Oct. 22, 2016, https://www.washingtonpost.com/investigations/the-dea-slowed-enforcement-while-the-opioid-epidemic-grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-d7c704ef9fd9_story.html; Lenny Bernstein & Scott Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis*, Wash. Post, Mar. 6, 2017, https://www.washingtonpost.com/investigations/us-senator-calls-for-investigation-of-dea-enforcement-slowdown/2017/03/06/5846ee60-028b-11e7-b1e9-a05d3c21f7cf_story.html; Eric Eyre, *DEA Agent: "We Had no Leadership" in WV Amid Flood of Pain Pills*, Charleston Gazette-Mail, Feb. 18, 2017, http://www.wvgazettemail.com/news/20170218/dea-agent-we-had-no-leadership-in-wv-amid-flood-of-pain-pills-.

[199] Suggested Questions a Distributor should ask prior to shipping controlled substances, Drug Enforcement Administration (available at https://www.deadiversion.usdoj.gov/mtgs/pharm_industry/14th_pharm/levinl_ques.pdf); Richard Widup, Jr.,

questionnaires informed the RICO Defendants of the number of pills that the pharmacies sold, how many non-controlled substances are sold compared to controlled substances, whether the pharmacy buys from other distributors, the types of medical providers in the area, including pain clinics, general practitioners, hospice facilities, cancer treatment facilities, among others, and these questionnaires put the recipients on notice of suspicious orders.

383.  The RICO Defendants refused to identify, investigate and report suspicious orders to the DEA when they became aware of the same despite their actual knowledge of drug diversion rings.  The RICO Defendants refused to identify suspicious orders and diverted drugs despite the DEA issuing final decisions against the Distributor Defendants in 178 registrant actions between 2008 and 2012[200] and 117 recommended decision in registrant actions from The Office of Administrative Law Judges.  These numbers include 76 actions involving orders to show cause and 41 actions involving immediate suspension orders -- all for failure to report suspicious orders.[201]

384. Defendants' scheme had decision-making structure that was driven by the Manufacturer Defendants and corroborated by the Distributor Defendants.  The Manufacturer Defendants worked together to control the State and Federal Government's response to the manufacture and distribution of prescription opioids by increasing production quotas through a systematic refusal to maintain effective controls against diversion, and identify suspicious orders and report them to the DEA.

---

Kathleen H. Dooley, Esq. Pharmaceutical Production Diversion: Beyond the PDMA, Purdue Pharma and McQuite Woods LLC, (available at https://www.mcguirewoods.com/news-resources/publications/lifesciences/product_diversion_beyond_pdma.pdf).

[200] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, *The Drug Enforcement Administration's Adjudication of Registrant Actions* 6 (2014), https://oig.justice.gov/reports/2014/e1403.pdf.

[201] *Id.*

385.  The RICO Defendants worked together to control the flow of information and influence state and federal governments and political candidates to pass legislation that was pro-opioid.  The Manufacturer and Distributor Defendants did this through their participation in the Pain Care Forum and Healthcare Distributors Alliance.

386.  The RICO Defendants also worked together to ensure that the Aggregate Production Quotas, Individual Quotas and Procurement Quotas allowed by the DEA stayed high and ensured that suspicious orders were not reported to the DEA.  By not reporting suspicious orders or diversion of prescription opioids, the RICO Defendants ensured that the DEA had no basis for refusing to increase or decrease the production quotas for prescription opioids due to diversion of suspicious orders.  The RICO Defendants influenced the DEA production quotas in the following ways:

a.  The Distributor Defendants assisted the enterprise and the Manufacturer Defendants in their lobbying efforts through the Pain Care Forum;

b.  The Distributor Defendants invited the participation, oversight and control of the Manufacturer Defendants by including them in the HDA, including on the councils, committees, task forces, and working groups;

c.  The Distributor Defendants provided sales information to the Manufacturer Defendants regarding their prescription opioids, including reports of all opioids prescriptions filled by the Distributor Defendants;

d.  The Manufacturer Defendants used a chargeback program to ensure delivery of the Distributor Defendants' sales information;

e.  The Manufacturer Defendants obtained sales information from QuintilesIMS (formerly IMS Health) that gave them a "stream of data showing how individual doctors across the nation were prescribing opioids."[202]

f.  The Distributor Defendants accepted rebates and chargebacks for orders of prescription opioids;

g.  The Manufacturer Defendants used the Distributor Defendants' sales information and the data from QuintilesIMS to instruct the Distributor Defendants to focus their distribution efforts to specific areas where the purchase of prescription opioids was most frequent;

h.  The RICO Defendants identified suspicious orders of prescription opioids and then continued filling those unlawful orders, without reporting them, knowing that they were suspicious and/or being diverted into the illicit drug market;

i.  The RICO Defendants refused to report suspicious orders of prescription opioids despite repeated investigation and punishment of the Distributor Defendants by the DEA for failure to report suspicious orders; and

j.  The RICO Defendants withheld information regarding suspicious orders and illicit diversion from the DEA because it would have revealed that the "medical need" for and the net disposal of their drugs did not justify the production quotas set by the DEA.

387.  The scheme devised and implemented by the RICO Defendants amounted to a common course of conduct characterized by a refusal to maintain effective controls against

---

[202] Harriet Ryan, et al., More than 1 million OxyContin pills ended up in the hands of criminals and addicts. What the drugmaker knew, Los Angeles Times, (July 10, 2016), http://www.latimes.com/projects/la-me-oxycontin-part2/

diversion, and all designed and operated to ensure the continued unlawful sale of controlled substances.

## C.  PATTERN OF RACKETEERING ACTIVITY.

388.  The RICO Defendants conducted and participated in the conduct of the Opioid Diversion Enterprise through a pattern of racketeering activity as defined in 18 U.S.C. § 1961(1)(B), including mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343); and 18 U.S.C. § 1961(1)(D) by the felonious manufacture, importation, receiving, concealment buying selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substance Act), punishable under any law of the United States.

**1. The RICO Defendants Engaged in Mail and Wire Fraud.**

389.  The RICO Defendants carried out, or attempted to carry out, a scheme to defraud federal and state regulators, and the American public by knowingly conducting or participating in the conduct of the Opioid Diversion Enterprise through a pattern of racketeering activities within the meaning of 18 U.S.C. § 1961(1) that employed the use of mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

390.  The RICO Defendants committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years.  The multiple acts of racketeering activity that the RICO Defendants committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."  The racketeering activity was made possible by the RICO Defendants' regular use of the facilities, services, distribution channels, and employees of the Opioid Diversion Enterprise.  The RICO Defendants participated in the scheme to defraud by using mail, telephone and the Internet to transmit mailings and wires in interstate or foreign commerce.

391. The RICO Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments and material omissions regarding their compliance with their mandatory reporting requirements and the actions necessary to carry out their unlawful goal of selling prescription opioids without reporting suspicious orders or the diversion of opioids into the illicit market.

392. In devising and executing the illegal scheme, the RICO Defendants devised and knowingly carried out a material scheme and/or artifice to defraud by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts. For the purpose of executing the illegal scheme, the RICO Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

393. The RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

    a. Mail Fraud: The RICO Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

    b. Wire Fraud: The RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

394. The RICO Defendants' use of the mail and wires includes, but is not limited to, the transmission, delivery, or shipment of the following by the Manufacturer Defendants, Distributor

Defendants, or third parties that were foreseeably caused to be sent as a result of the RICO

Defendants' illegal scheme, including but not limited to:

    a.  The prescription opioids themselves;

    b.  Documents and communications that facilitated the manufacture, purchase and unlawful sale of prescription opioids;

    c.  Defendants' DEA registrations;

    d.  Documents and communications that supported and/or facilitated Defendants' DEA registrations;

    e.  Documents and communications that supported and/or facilitated Defendants' request for higher aggregate production quotas, individual production quotas, and procurement quotas;

    f.  Defendants' records and reports that were required to be submitted to the DEA pursuant to 21 U.S.C. § 827;

    g.  Documents and communications related to the Defendants' mandatory DEA reports pursuant to 21 U.S.C. § 823 and 21 C.F.R. § 1301.74;

    h.  Documents intended to facilitate the manufacture and distribution of Defendants' prescription opioids, including bills of lading, invoices, shipping records, reports and correspondence;

    i.  Documents for processing and receiving payment for prescription opioids;

    j.  Payments from the Distributor Defendants to the Manufacturer Defendants;

    k.  Rebates and chargebacks from the Manufacturer Defendants to the Distributor Defendants;

    l.  Payments to Defendants' lobbyists through the Pain Care Forum;

    m.  Payments to Defendants' trade organizations, like the HDA, for memberships and/or sponsorships;

    n.  Deposits of proceeds from Defendants' manufacture and distribution of prescription opioids; and

    o.  Other documents and things, including electronic communications.

395.  On information and belief, the RICO Defendants (and/or their agents), for the purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or received) by mail or by private or interstate carrier, shipments of prescription opioids and related documents by mail or by private carrier affecting interstate commerce.

396.  Purdue manufactures multiple forms of prescription opioids, including, but not limited to: OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER.  Purdue manufactured and shipped these prescription opioids to the Distributor Defendants in this jurisdiction.

397.  The Distributor Defendants shipped Purdue's prescription opioids throughout this jurisdiction.

398.  Cephalon manufactures multiple forms of prescription opioids, including, but not limited to: Actiq and Fentora.  Cephalon manufactured and shipped these prescription opioids to the Distributor Defendants in this jurisdiction.

399.  The Distributor Defendants shipped Teva's prescription opioids throughout this jurisdiction.

400.  Janssen manufactures prescription opioids known as Duragesic.  Janssen manufactured and shipped its prescription opioids to the Distributor Defendants in this jurisdiction.

401.  The Distributor Defendants shipped Janssen's prescription opioids throughout this jurisdiction.

402.  Endo manufactures multiple forms of prescription opioids, including, but not limited to: Opana/Opana ER, Percodan, Percocet, and Zydone.  Endo manufactured and shipped its prescription opioids to the Distributor Defendants in the State.

403.  The Distributor Defendants shipped Janssen's prescription opioids throughout this jurisdiction.

404.  Actavis manufactures multiple forms of prescription opioids, including, but not limited to: Kadin and Norco, as well as generic versions of the drugs known as Kadian, Duragesic and Opana.  Actavis manufactured and shipped its prescription opioids to the Distributor Defendants in this jurisdiction.

405.  The Distributor Defendants shipped Actavis' prescription opioids throughout this jurisdiction.

406.  Mallinckrodt manufactures multiple forms of prescription opioids, including, but not limited to: Exalgo and Roxicodone.

407.  The Distributor Defendants shipped Mallinckrodt's prescription opioids throughout this jurisdiction.

408.  The RICO Defendants also used the internet and other electronic facilities to carry out their scheme and conceal the ongoing fraudulent activities.  Specifically, the RICO Defendants made misrepresentations about their compliance with Federal and State laws requiring them to identify, investigate and report suspicious orders of prescription opioids and/or diversion of the same into the illicit market.

409.  At the same time, the RICO Defendants misrepresented the superior safety features of their order monitoring programs, ability to detect suspicious orders, commitment to preventing diversion of prescription opioids and that they complied with all state and federal regulations regarding the identification and reporting of suspicious orders of prescription opioids.

138

410.  Plaintiff is also informed and believes that the RICO Defendants utilized the internet and other electronic resources to exchange communications, to exchange information regarding prescription opioid sales, and to transmit payments and rebates/chargebacks.

411.  The RICO Defendants also communicated by U.S. Mail, by interstate facsimile, and by interstate electronic mail and with various other affiliates, regional offices, regulators, distributors, and other third-party entities in furtherance of the scheme.

412.  The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive regulators and the public that Defendants were complying with their state and federal obligations to identify and report suspicious orders of prescription opioids all while Defendants were knowingly allowing millions of doses of prescription opioids to divert into the illicit drug market.  The RICO Defendants' scheme and common course of conduct was intended to increase or maintain high production quotas for their prescription opioids from which they could profit.

413.  Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Defendants' books and records.  But, Plaintiff has described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred.  They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

414.  The RICO Defendants did not undertake the practices described herein in isolation, but as part of a common scheme.  These actions violate 18 U.S.C. § 1962(c).  Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, may have contributed to and/or participated in the scheme with the

RICO Defendants in these offenses and have performed acts in furtherance of the scheme to increase revenues, increase market share, and /or minimize the losses for the RICO Defendants.

415.  The RICO Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

416.  The RICO Defendants hid from the general public, and suppressed and/or ignored warnings from third parties, whistleblowers and governmental entities, about the reality of the suspicious orders that the RICO Defendants were filling on a daily basis -- leading to the diversion of a tens of millions of doses of prescriptions opioids into the illicit market.

417.  The RICO Defendants, with knowledge and intent, agreed to the overall objective of their fraudulent scheme and participated in the common course of conduct to commit acts of fraud and indecency in manufacturing and distributing prescription opioids.

418.  Indeed, for the Defendants' fraudulent scheme to work, each of the Defendants had to agree to implement similar tactics regarding marketing prescription opioids and refusing to report suspicious orders.

419.  As described herein, the RICO Defendants engaged in a pattern of related and continuous predicate acts for years.  The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from the sale of their highly addictive and dangerous drugs.  The predicate acts also had the same or similar results, participants, victims, and methods of commission.  The predicate acts were related and not isolated events.

420.  The predicate acts all had the purpose of generating significant revenue and profits for the RICO Defendants while Plaintiff was left with substantial injury to its business through the damage that the prescription opioid epidemic caused. The predicate acts were committed or

140

caused to be committed by the RICO Defendants through their participation in the Opioid Diversion Enterprise and in furtherance of its fraudulent scheme.

421.   The pattern of racketeering activity alleged herein and the Opioid Diversion Enterprise are separate and distinct from each other.  Likewise, Defendants are distinct from the enterprise.

422.   The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future unless enjoined by this Court.

423.   Many of the precise dates of the RICO Defendants' criminal actions at issue here have been hidden and cannot be alleged without access to Defendants' books and records. Indeed, an essential part of the successful operation of the Opioids Addiction and Opioid Diversion Enterprise alleged herein depended upon secrecy.

424.   Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including consumers in this jurisdiction and Plaintiff. Defendants calculated and intentionally crafted the Opioid Diversion Enterprise and their scheme to increase and maintain their increased profits, without regard to the effect such behavior would have on consumers in this jurisdiction, its citizens or Plaintiff.  In designing and implementing the scheme, at all times Defendants were cognizant of the fact that those in the manufacturing and distribution chain rely on the integrity of the pharmaceutical companies and ostensibly neutral third parties to provide objective and reliable information regarding Defendants' products and their manufacture and distribution of those products.  Defendants were also aware that Plaintiff and the citizens of this jurisdiction rely on the Defendants to maintain a closed system

141

and to protect against the non-medical diversion and use of their dangerously addictive opioid drugs.

425.  By intentionally refusing to report and halt suspicious orders of their prescription opioids, Defendants engaged in a fraudulent scheme and unlawful course of conduct constituting a pattern of racketeering activity.

426.  It was foreseeable to Defendants that refusing to report and halt suspicious orders, as required by the CSA and Code of Federal Regulations, would harm Plaintiff by allowing the flow of prescriptions opioids from appropriate medical channels into the illicit drug market.

427.  The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

## 2.  The RICO Defendants Manufactured, Sold and/or Dealt in Controlled Substances and Their Crimes Are Punishable as Felonies.

428.  The RICO Defendants conducted and participated in the conduct of the affairs of the Opioid Diversion Enterprise through a pattern of racketeering activity as defined in 18 U.S.C. § 1961(D) by the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substance Act), punishable under any law of the United States.

429.  The RICO Defendants committed crimes that are punishable as felonies under the laws of the United States.  Specifically, 21 U.S.C. § 483(a)(4) makes it unlawful for any person to knowingly or intentionally furnish false or fraudulent information in, or omit any material information from, any application, report, record or other document required to be made, kept or filed under this subchapter.  A violation of section 483(a)(4) is punishable by up to four years in jail, making it a felony.  21 U.S.C. § 483(d)(1).

430.   Each of the RICO Defendants qualify as registrants under the CSA.  Their status as registrants under the CSA requires that they maintain effective controls against diversion of controlled substances in schedule I or II, design and operate a system to disclose to the registrant suspicious orders of controlled substances, and inform the DEA of suspicious orders when discovered by the registrant.  21 U.S.C. § 823; 21 C.F.R. § 1301.74(b).

431.   Pursuant to the CSA and the Code of Federal Regulations, the RICO Defendants were required to make reports to the DEA of any suspicious orders identified through the design and operation of their system to disclose suspicious orders.

432.   The RICO Defendants knowingly and intentionally furnished false or fraudulent information in their reports to the DEA about suspicious orders, and/or omitted material information from reports, records and other document required to be filed with the DEA including the Manufacturer Defendants' applications for production quotas.  Specifically, the RICO Defendants were aware of suspicious orders of prescription opioids and the diversion of their prescription opioids into the illicit market, and failed to report this information to the DEA in their mandatory reports and their applications for production quotas.

433.   For example, the DEA and DOJ began investigating McKesson in 2013 regarding its monitoring and reporting of suspicious controlled substances orders.  On April 23, 2015, McKesson filed a Form-8-K announcing a settlement with the DEA and DOJ wherein it admitted to violating the CSA and agreed to pay $150 million and have some of its DEA registrations suspended on a staggered basis.  The settlement was finalized on January 17, 2017.[203]

---

[203] McKesson, McKesson Finalizes Settlement with U.S. Department of Justice and U.S. Drug Enforcement Administration to Resolve Past Claims, About McKesson / Newsroom / Press Releases, (January 17, 2017(), http://www.mckesson.com/about-mckesson/newsroom/press-releases/2017/mckesson-finalizes-settlement-with-doj-and-dea-to-resolve-past-claims/.

434.  Purdue's experience in Los Angeles is another striking example of Defendants' willful violation of the CSA and Code of Federal Regulations as it relates to reporting suspicious orders of prescription opioids.  In 2016, the Los Angeles Times reported that Purdue was aware of a pill mill operating out of Los Angeles yet failed to alert the DEA.[204]  The LA Times uncovered that Purdue began tracking a surge in prescriptions in Los Angeles, including one prescriber in particular.  A Purdue sales manager spoke with company officials in 2009 about the prescriber, asking "Shouldn't the DEA be contacted about this?" and adding that she felt "very certain this is an organized drug ring."[205]  Despite knowledge of the staggering amount of pills being issued in Los Angeles, and internal discussion of the problem, "Purdue did not shut off the supply of highly addictive OxyContin and did not tell authorities what it knew about Lake Medical until several years later when the clinic was out of business and its leaders indicted.  By that time, 1.1 million pills had spilled into the hands of Armenian mobsters, the Crips gang and other criminals."[206]

435.  Finally, Mallinckrodt was recently the subject of a DEA and Senate investigation for its opioid practices.  Specifically, in 2011, the DEA targeted Mallinckrodt arguing that it ignored its responsibility to report suspicious orders as 500 million of its pills ended up in Florida between 2008 and 2012.[207]  After six years of DEA investigation, Mallinckrodt agreed to a settlement involving a $35 million fine.  Federal prosecutors summarized the case by saying

---

[204] Harriet Ryan, et al., More than 1 million OxyContin pills ended up in the hands of criminals and addicts. What the drugmaker knew, Los Angeles Times, (July 10, 2016), http://www.latimes.com/projects/la-me-oxycontin-part2/.

[205] Id.

[206] Id.

[207] Lenny Bernstein & Scott Higham, The government's struggle to hold opioid manufacturers accountable, The Washington Post, (April 2, 2017), https://www.washingtonpost.com/graphics/investigations/dea-mallinckrodt/?utm_term=.b24cc81cc356.  This number accounted for 66% of all oxycodone sold in the state of Florida during that time.

that Mallinckrodt's response was that everyone knew what was going on in Florida but they had no duty to report it.[208]

436.  Plaintiff is informed and believes that the foregoing examples reflect the RICO Defendants' pattern and practice of willfully and intentionally omitting information from their mandatory reports to the DEA as required by 21 C.F.R. § 1301.74.  This conclusion is supported by the sheer volume of enforcement actions available in the public record against the Distributor Defendants.[209]  For example:

    a.  On April 24, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the AmerisourceBergen Orlando, Florida distribution center ("Orlando Facility") alleging failure to maintain effective controls against diversion of controlled substances.  On June 22, 2007, AmerisourceBergen entered into a settlement that resulted in the suspension of its DEA registration;

    b.  On November 28, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Auburn, Washington Distribution Center ("Auburn Facility") for failure to maintain effective controls against diversion of hydrocodone;

    c.  On December 5, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of hydrocodone;

    d.  On December 7, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Swedesboro, New Jersey Distribution Center ("Swedesboro Facility") for failure to maintain effective controls against diversion of hydrocodone;

    e.  On January 30, 2008, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Stafford, Texas Distribution Center ("Stafford Facility") for failure to maintain effective controls against diversion of hydrocodone;

---

[208] *Id.*

[209] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, *The Drug Enforcement Administration's Adjudication of Registrant Actions* 6 (2014), https://oig.justice.gov/reports/2014/e1403.pdf.

f.  On May 2, 2008, McKesson Corporation entered into an *Administrative Memorandum of Agreement* ("2008 MOA") with the DEA which provided that McKesson would "maintain a compliance program designed to detect and prevent the diversion of controlled substances, inform DEA of suspicious orders required by 21 C.F.R. § 1301.74(b), and follow the procedures established by its Controlled Substance Monitoring Program";

g.  On September 30, 2008, Cardinal Health entered into a *Settlement and Release Agreement and Administrative Memorandum of Agreement* with the DEA related to its Auburn Facility, Lakeland Facility, Swedesboro Facility and Stafford Facility.  The document also referenced allegations by the DEA that Cardinal failed to maintain effective controls against the diversion of controlled substances at its distribution facilities located in McDonough, Georgia ("McDonough Facility"), Valencia, California ("Valencia Facility") and Denver, Colorado ("Denver Facility");

h.  On February 2, 2012, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of oxycodone;

i.  On December 23, 2016, Cardinal Health agreed to pay a $44 million fine to the DEA to resolve the civil penalty portion of the administrative action taken against its Lakeland, Florida Distribution Center; and

j.  On January 5, 2017, McKesson Corporation entered into an *Administrative Memorandum Agreement* with the DEA wherein it agreed to pay a $150,000,000 civil penalty for violation of the 2008 MOA as well as failure to identify and report suspicious orders at its facilities in Aurora CO, Aurora IL, Delran NJ, LaCrosse WI, Lakeland FL, Landover MD, La Vista NE, Livonia MI, Methuen MA, Santa Fe Springs CA, Washington Courthouse OH and West Sacramento CA.

437.  These actions against the Distributor Defendants confirm that the Distributors knew they had a duty to maintain effective controls against diversion, design and operate a system to disclose suspicious orders, and to report suspicious orders to the DEA.  These actions also demonstrate, on information and belief, that the Manufacturer Defendants were aware of the enforcement against their Distributors and the diversion of the prescription opioids and a corresponding duty to report suspicious orders.

438.  The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future unless enjoined by this Court.

439.  Many of the precise dates of Defendants' criminal actions at issue herein were hidden and cannot be alleged without access to Defendants' books and records.  Indeed, an essential part of the successful operation of the Opioid Diversion Enterprise depended upon the secrecy of the participants in that enterprise.

440.  Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including consumers in this jurisdiction and Plaintiff. Defendants calculated and intentionally crafted the diversion scheme to increase and maintain profits from unlawful sales of opioids, without regard to the effect such behavior would have on this jurisdiction, its citizens or the Plaintiff.  Defendants were aware that Plaintiff and the citizens of this jurisdiction rely on Defendants to maintain a closed system of manufacturing and distribution to protect against the non-medical diversion and use of their dangerously addictive opioid drugs.

441.  By intentionally refusing to report and halt suspicious orders of their prescription opioids, Defendants engaged in a fraudulent scheme and unlawful course of conduct constituting a pattern of racketeering activity.

442.  It was foreseeable to Defendants that refusing to report and halt suspicious orders, as required by the CSA and Code of Federal Regulations would harm Plaintiff by allowing the flow of prescriptions opioids from appropriate medical channels into the illicit drug market.

443. The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

### D. DAMAGES

444. The RICO Defendants' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiff injury in its business and property because Plaintiff paid for costs associated with the opioid epidemic, as described above in allegations expressly incorporated herein by reference.

445. Plaintiff's injuries, and those of her citizens, were proximately caused by Defendants' racketeering activities. But for the RICO Defendants' conduct, Plaintiff would not have paid the health-related services and expenditures and law enforcement services and expenditures required as a result of the plague of drug-addicted residents.

446. Plaintiff's injuries and those of her citizens were directly caused by the RICO Defendants' racketeering activities.

447. Plaintiff was most directly harmed and there is no other Plaintiff better suited to seek a remedy for the economic harms at issue here.

448. Plaintiff seeks all legal and equitable relief as allowed by law, including, *inter alia*, actual damages, treble damages, equitable relief, forfeiture as deemed proper by the Court, attorney's fees and all costs and expenses of suit and pre- and post-judgment interest.

### COUNT III
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### 18 U.S.C. 1962(d), *et seq.*
### (Against All Defendants)

449. Plaintiff hereby incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows.

450.  Plaintiff brings this claim on its own behalf against all RICO Defendants.  At all relevant times, the RICO Defendants were associated with the Opioid Diversion Enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), that is, they agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the Opioid Diversion Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).  Under Section 1962(d) it is unlawful for "any person to conspire to violate" Section 1962(d), among other provisions.  18 U.S.C. § 1962(d).

451.  Defendants conspired to violate Section 1962(c), as alleged more fully above, by conducting the affairs of the Opioid Diversion Enterprise through a pattern of racketeering activity, as incorporated by reference below.

### A.  THE OPIOID DIVERSION ENTERPRISE.

452. For efficiency and avoiding repetition, for purposes of this claim, Plaintiff incorporates by reference the paragraphs set out above concerning the "Opioid Diversion Enterprise."

### B.  CONDUCT OF THE OPIOID DIVERSION ENTERPRISE.

453. For efficiency and avoiding repetition, for purposes of this claim, Plaintiff incorporates by reference the paragraphs set out above concerning the "Conduct of the Opioid Diversion Enterprise."

### C.  PATTERN OF RACKETEERING ACTIVITY.

454. For efficiency and avoiding repetition, for purposes of this claim, Plaintiff incorporates by reference the paragraphs set out above concerning the "Pattern of Racketeering Activity."

### D.  DAMAGES.

455.  The RICO Defendants' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiff injury in its business and property because Plaintiff paid for costs associated with the opioid epidemic, as described above in allegations expressly incorporated herein by reference.

456.  Plaintiff's injuries were proximately caused by the RICO Defendants' racketeering activities.  But for the RICO Defendants' conduct, Plaintiff would not have paid the health-related services and expenditures and law enforcement services and expenditures required as a result of the plague of drug-addicted residents.

457.  Plaintiff's injuries were directly caused by the RICO Defendants' racketeering activities.

458.  Plaintiff was most directly harmed and there is no other Plaintiff better suited to seek a remedy for the economic harms at issue here.

459.  Plaintiff seeks all legal and equitable relief as allowed by law, including, *inter alia*, actual damages, treble damages, equitable relief, forfeiture as deemed proper by the Court, attorney's fees and all costs and expenses of suit and pre- and post-judgment interest.

## COUNT IV
## NEGLIGENCE AND NEGLIGENT MISREPRESENTATION
### (Against All Defendants)

460.  Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth here, and further alleges as follows.

461.  Plaintiff seeks economic damages which were the foreseeable result of Defendants' intentional and/or unlawful actions and omissions.

462.  Under State law, to establish actionable negligence, one must show in addition to the existence of a duty, a breach of that duty, and injury resulting proximately therefrom and/or was substantially caused thereby.  All such essential elements exist here.

150

463.  Further, as Section 302B of the Restatement of Torts provides: "An act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal."

464.  Each Defendant had an obligation to exercise reasonable care in manufacturing, marketing, selling, and distributing highly dangerous opioid drugs to the State and Plaintiff's Community.

465.  Each Defendant had an obligation to exercise due care in manufacturing, marketing, selling, and distributing highly dangerous opioid drugs in the State and Plaintiff's Community.

466.  Each Defendant owed a duty to Plaintiff, and to the public in the Plaintiff's Community, because the injury was foreseeable, and in fact foreseen, by Defendants.

467.  Reasonably prudent manufacturers and distributors of prescription opioids would have anticipated that the scourge of opioid addiction would wreak havoc on communities, and the significant costs which would be imposed upon the governmental entities associated with those communities.  The closed system of opioid distribution whereby wholesale distributors are the gatekeepers between manufacturers and pharmacies, and wherein all links in the chain have a duty to prevent diversion, exists for the purpose of controlling dangerous substances such as opioids and preventing diversion and abuse.

468.  Reasonably prudent manufacturers of pharmaceutical products would know that aggressively pushing highly addictive opioids for chronic pain would result in the severe harm of addiction, foreseeably causing patients to seek increasing levels of opioids, frequently turning to

the illegal drug market as a result of a drug addiction that was foreseeable to the Manufacturer Defendants.

469. Moreover, Defendants were repeatedly warned by law enforcement of the unlawfulness and consequences of their actions and omissions.

470. The escalating amounts of addictive drugs flowing through Defendants' businesses, and the sheer volume of these prescription opioids, further alerted Defendants that addiction was fueling increased consumption and that legitimate medical purposes were not being served.

471. As described above in allegations expressly incorporated herein, the Distributor Defendants breached their duties to exercise due care in the business of wholesale distribution of dangerous opioids, which are Schedule II Controlled Substances, by failing to monitor for, failing to report, and filling highly suspicious orders time and again. Because the very purpose of these duties was to prevent the resulting harm – misuse and/or diversion of highly addictive drugs for non-medical purposes – the causal connection between Defendants' breach of duties and the ensuing harm was entirely foreseeable.

472. As described elsewhere in the Complaint in allegations expressly incorporated herein, the Distributor Defendants misrepresented their compliance with their duties under the law and concealed their noncompliance and shipments of suspicious orders of opioids to Plaintiff's Community and destinations from which they knew opioids were likely to be diverted into Plaintiff's Community, in addition to other misrepresentations alleged and incorporated herein.

473. As described elsewhere in the Complaint in allegations expressly incorporated herein, the Manufacturer Defendants breached their duties to exercise due care in the business of pharmaceutical manufacturers of dangerous opioids, which are Schedule II Controlled

152

Substances, and by misrepresenting the nature of the drugs and aggressively promoting them for chronic pain for which they knew the drug were not safe or suitable, upon which the Plaintiff's Community, its residents, and Plaintiff reasonably relied.

474.  The Manufacturer Defendants misrepresented and concealed the addictive nature of prescription opioids and its lack of suitability for chronic pain, in addition to other misrepresentations alleged and incorporated herein.

475.  All Defendants breached their duties to prevent diversion and report and halt suspicious orders, and all Defendants misrepresented their compliance with their legal duties.

476.  Defendants' breaches were intentional and/or unlawful, and Defendants' conduct was willful, wanton, malicious, reckless, oppressive, and/or fraudulent.

477.  The causal connection between Defendants' breaches of duties and misrepresentations and the ensuing harm was entirely foreseeable.

478.  As described above in allegations expressly incorporated herein, Defendants' breaches of duty and misrepresentations caused, bears a causal connection with, and/or proximately resulted in the damages sought herein.

479.  Defendants were selling dangerous drugs statutorily categorized as posing a high potential for abuse and severe dependence.  Defendants knowingly traded in drugs that presented a high degree of danger if prescribed incorrectly or diverted to other than medical, scientific, or industrial channels.  However, Defendants breached their duties to monitor for, report, and halt suspicious orders, breached their duties to prevent diversion, and, further, misrepresented what their duties were and their compliance with their legal duties.

480.  Defendants failed to disclose the material facts that *inter alia* they were not in compliance with laws and regulations requiring that they maintain a system to prevent diversion,

protect against addiction and severe harm, and specifically monitor, investigate, report, and refuse suspicious orders.  But for these material factual omissions, Defendants would not have been able to sell opioids.

481.  As alleged herein, each Manufacturer Defendant wrongfully represented that the opioid prescription medications they manufactured, marketed, and sold had characteristics, uses, or benefits that they do not have.  The Manufacturer Defendants also wrongfully misrepresented that the opioids were safe and effective when such representations were untrue, false, and misleading.

482.  Because of the dangerously addictive nature of these drugs, which the Manufacturer Defendants concealed and misrepresented, they lacked medical value, and in fact caused addiction and overdose deaths.

483.  The Manufacturer Defendants made deceptive representations about the use of opioids to treat chronic non-cancer pain.  Each Manufacturer Defendant also omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the risks and benefits of opioids.  Each Defendant's omissions rendered even their seemingly truthful statements about opioids deceptive, and the Plaintiff's Community, its residents, and Plaintiff reasonably relied upon said misrepresentations.

484.  Defendants' unlawful and/or intentional actions create a rebuttable presumption of negligence under State law.

485.  Plaintiff seeks economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' actions and omissions.  Plaintiff does not seek damages for physical personal injury or any physical damage to property caused by Defendants' actions.

486.  Plaintiff seeks all legal and equitable relief as allowed by law, other than such damages disavowed herein, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre- and post-judgment interest.

### COUNT V
### NEGLIGENCE *PER SE*
### (Against All Defendants)

487.  Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth here, and further alleges as follows.

488.  Violations of statutes and regulations support a cause of action for negligence *per se* where the plaintiff is within the class protected, the harm sustained is the type sought to be prevented, and that the violations proximately caused the plaintiff's injuries.

489.  Defendants violated the minimum requirements for controlled substance manufacture and wholesale drug distribution to comply with all applicable local, state and federal laws and regulations and all applicable state and federal DEA regulations.

490.  The federal laws and requirements which the State incorporates into its own laws require Defendants to act as gatekeepers guarding against the diversion of the highly addictive, dangerous opioid drugs.

491.  The federal mandates incorporated into State law require that Defendants must maintain "effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels." 21 U.S.C. §§ 823(a)(1), (b)(1).  These federal regulations impose a non-delegable duty upon both manufacturers and distributors to "design and operate a system to disclose to the registrant suspicious orders of controlled substances.  The registrant [distributor or manufacturer] shall inform the Field Division Office of

the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. § 1301.74(b).

492. In addition to reporting all suspicious orders, distributors must also stop shipment on any order which is flagged as suspicious and only ship orders which were flagged as potentially suspicious if, after conducting due diligence, the distributor can determine that the order is not likely to be diverted into illegal channels. *See Southwood Pharm., Inc.*, 72 Fed. Reg. 36,487, 36,501 (Drug Enf't Admin. July 3, 2007); *Masters Pharm., Inc. v. Drug Enf't Admin.*, 861 F.3d 206 (D.C. Cir. 2017). Regardless, all flagged orders must be reported. *Id.*

493. Each Defendant was further required to register with the DEA, pursuant to the federal Controlled Substance Act, as incorporated into State law. *See* 21 U.S.C. § 823(b), (e); 28 C.F.R. § 0.100. Each Defendant is a "registrant" as a wholesale distributor and/or manufacturer in the chain of distribution of Schedule II controlled substances with a duty to comply with all security requirements imposed under that statutory scheme.

494. Defendants violated requirements prohibiting the manufacture and/or distribution of controlled substances, where such manufacturer and/or distribution does not comply with the requirements of State and federal law.

495. Defendants do not qualify for the authorized by law exceptions to the applicable law because Defendants did not comply with the mandatory terms of the licenses, registrations, and/or permits issued to them by the State or with federal requirements incorporated by reference, as further detailed in this Complaint.

496. Plaintiff is within the class intended to be protected by the public safety statutes and regulations concerning controlled substances.

497.  Defendants' violations of these public safety laws are prima facie evidence of negligence *per se*.  Each Defendant had a duty under, *inter alia,* these laws to maintain effective controls against diversion of prescription opioids and to guard against, prevent, and report suspicious orders of opioids.  Defendants' violations of the law constitute negligence per se.  Defendants breached mandatory, non-delegable legal duties and did not act reasonably under the circumstances.

498.  As described above in allegations expressly incorporated herein, Defendants breached their duties to maintain effective controls against diversion of dangerously addictive opioids, including violating public safety statutes and regulations requiring that as wholesale drug distributors, Defendants could only distribute these dangerous drugs under a closed system – a system Defendants were responsible for guarding.

499.  As described above in allegations expressly incorporated herein, Defendants' breach of statutory and regulatory duties caused, bears a causal connection with, is and was a substantial factor contributing to, and/or proximately resulted in, harm and damages to Plaintiff.

500.  The injuries and damages sustained are those which the State and federal statutes and regulations were designed to prevent.

501.  Defendants' violations of the State and federal statutes and public safety regulations cited herein were and are a substantial factor in the injuries and damages sustained.

502.  It was foreseeable that Defendants' breach of statutory and regulatory duties described herein would result in the damages sustained.

503.  Plaintiff seeks economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' negligence *per se*.  Plaintiff does not seek damages for physical personal injury or any physical damage to property caused by Defendants' actions.

157

504.  Plaintiff seeks all legal and equitable relief as allowed by law, except as expressly disavowed herein, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by Defendants, attorney fees and costs, and pre- and post-judgment interest.

**COUNT VI
VIOLATIONS OF MASSACHUSETTS GENERAL LAWS,
CHAPTER 93A, SECTIONS 2 AND 11
(Against All Defendants)**

505.  Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth here, and further alleges as follows.

506.  Defendants engaged in deceptive trade practices in this State, in violation of State law.

507.  Defendants were engaged in "trade" and "commerce" as defined by Massachusetts General Laws, Chapter 93A, Section 1.

508.  Plaintiff was engaged in "trade" and "commerce" as defined by Massachusetts General Laws, Chapter 93A, Section 1.

509.  The transactions, actions or inaction of Defendants constitute unfair and deceptive acts and practices as defined by, and in violation of, Massachusetts General Laws, Chapter 93A, Sections 2 and 11.

510.  Defendants committed committing repeated and willful unfair or deceptive acts or practices, and unconscionable trade practices, in the conduct of commerce.

511.  As alleged herein, each Manufacturer Defendant wrongfully represented that the opioid prescription medications they manufactured, marketed, and sold had characteristics, uses, or benefits that they do not have.

512.   The Manufacturer Defendants also wrongfully misrepresented that the opioids were safe and effective when such representations were untrue, false, and misleading.

513.   The Manufacturer Defendants used exaggeration and/or ambiguity as to material facts and omitted material facts, which tended to deceive and/or did in fact deceive.

514.   The Manufacturer Defendants made deceptive representations about the use of opioids to treat chronic non-cancer pain.   Each Manufacturer Defendant also omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the risks and benefits of opioids.  Each Defendant's omissions rendered even their seemingly truthful statements about opioids deceptive.

515.  Because of the dangerously addictive nature of these drugs, which the Manufacturer Defendants concealed and misrepresented, they lacked medical value, and in fact caused addiction and overdose deaths; therefore, Defendants' sales and marketing of opioids constituted a violation of State law.

516.   In addition, each Manufacturer and Distributor Defendant engaged in unfair and/or deceptive trade practices by failing to report suspicious orders of opioids and/or prevent the diversion of highly addictive prescription drugs to illegal sources.

517.   Defendants were required to comply with the reporting requirements under federal law and maintain distribution records pursuant to M.G.L., 94C, § 15 and the Code of Massachusetts Regulations 7.04, Minimum Requirements for the Storage and Handling of Prescription Drugs and for the Establishment and Maintenance of Prescription Drug Distribution Records, Section 9.

518.   Defendants failed to disclose the material facts that, *inter alia*, they were not in compliance with laws and regulations requiring that they maintain a system to prevent diversion,

protect against addiction and severe harm, and specifically monitor, investigate, report, and refuse suspicious orders.  But for these material factual omissions, Defendants would not have been able to sell or distribute opioids, and the Distributor Defendants would not have been able to receive and renew licenses to sell opioids.

519.  Because of the dangerously addictive nature of these drugs, the Defendants' unfair and or deceptive trade practices unlawfully caused an opioid and heroin plague and epidemic in the State and Plaintiff's Community.

520.  Each Defendant had a non-delegable duty to guard against and prevent the misuse and/or diversion of prescription opioids to other than legitimate medical, scientific, and industrial channels.

521.  Defendants also omitted material facts, causing confusion or misunderstanding as to approval or certification of goods or services.

522.  The Defendants failed to disclose the material facts that *inter alia* they were not in compliance with laws and regulations requiring that they maintain a system to prevent diversion, protect against addiction and severe harm, and specifically monitor, investigate, report, and refuse suspicious orders.  But for these material factual omissions, Defendants would not have been able to sell opioids, and the Distributor Defendants would not have been able to receive and renew licenses to sell opioids.

523.  Defendants' unfair, deceptive, and unconscionable representations, concealments, and omissions were reasonably calculated to deceive the State, the public, Plaintiff's Community, and Plaintiff.

524.  As described more specifically above, Defendants' representations, concealments, and omissions constitute a willful course of conduct which continues to this day.

160

525. The damages that Plaintiff seeks to recover were sustained as a direct and proximate cause of the Manufacturer and Distributor Defendants' intentional and/or unlawful actions and omissions.

526. Defendants' actions and omissions in the course of marketing, selling, and distributing prescriptions opioids constituted deceptive trade practices under State law and the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the Commonwealth.

527. State law prohibits representing that goods or services have sponsorship, approval, characteristics, uses, or benefits that they do not have. State law further prohibits representing that goods are of a standard, quality, or grade if they are of another.

528. Defendants committed committing repeated and willful unfair or deceptive acts or practices, and unconscionable trade practices, in the conduct of commerce in this State.

529. Each Defendant failed to report and/or prevent the diversion of highly addictive prescription drugs.

530. Because of the dangerously addictive nature of these drugs, the Distributor Defendants' manufacturing, marketing, sales, and distribution practices unlawfully caused an opioid and heroin plague and epidemic in the State and Plaintiff's Community. Each Defendant had a non-delegable duty to guard against and prevent the diversion of prescription opioids to other than legitimate medical, scientific, and industrial channels.

531. The Defendants also omitted material facts, causing confusion or misunderstanding as to approval or certification of goods or services.

532. The Defendants failed to disclose the material facts that *inter alia* they were not in compliance with laws and regulations requiring that they maintain a system to prevent diversion,

protect against addiction and severe harm, and specifically monitor, investigate, report, and refuse suspicious orders. But for these material factual omissions, Defendants would not have been able to sell opioids, and the Distributor Defendants would not have been able to receive and renew licenses to sell opioids.

533.  As alleged herein, each Manufacturer Defendant wrongfully represented that the opioid prescription medications they manufactured, marketed, and sold had characteristics, uses, or benefits that they do not have.

534.  The Manufacturer Defendants also wrongfully misrepresented that the opioids were safe and effective when such representations were untrue, false, and misleading.

535.  The Manufacturer Defendants also used exaggeration and/or ambiguity as to material facts and omitted material facts, which had a tendency to deceive and/or did in fact deceive.

536. Because of the dangerously addictive nature of these drugs, which the Manufacturer Defendants concealed and misrepresented, they lacked medical value, and in fact caused addiction and overdose deaths; therefore, Defendants' sales and marketing of opioids constituted a violation of State law.

537.  The Manufacturer Defendants made deceptive representations about the use of opioids to treat chronic non-cancer pain. Each Manufacturer Defendant also omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the risks and benefits of opioids. Each Defendant's omissions rendered even their seemingly truthful statements about opioids deceptive.

538.  Defendants acted knowingly, intentionally and/or unlawfully.

539.  Plaintiff seeks economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' deceptive trade practices.  Plaintiff does not seek damages for physical personal injury or any physical damage to property caused by Defendants' actions.

540.  Plaintiff seeks all legal and equitable relief as allowed by law, except as expressly disavowed herein, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by Defendants, attorney fees and costs, and pre- and post-judgment interest.

**COUNT VII**
**CIVIL CONSPIRACY**
**(Against All Defendants)**

541.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth here, and further alleges as follows.

542.  As set forth herein, Defendants engaged in a civil conspiracy to create a public nuisance in conjunction with their unlawful marketing, sale, distribution and/or diversion of opioids into the State and Plaintiff's Community.

543.  As set forth herein, Defendants engaged in a civil conspiracy to commit fraud and misrepresentation in conjunction with their unlawful distribution and diversion of opioids into the State and Plaintiff's Community.

544.  Distributor and Manufacturer Defendants unlawfully failed to act to prevent diversion and failed to monitor for, report, and prevent suspicious orders of opioids.

545.  The Manufacturer Defendants further unlawfully marketed and promoted opioids in the State and Plaintiffs' Community in furtherance of that conspiracy.

546.  Defendants acted tortuously in agreement and/or in concert with each other and/or in pursuit of a common design, and/or Defendants knew each other's conduct constituted a

163

breach of their legal duties and provided substantial assistance and/or encouragement in the conduct.

547.  Defendants conspiracy is a continuing conspiracy, and the overt acts performed in compliance with the conspiracy's objective(s) are ongoing and/or have occurred within the last year.

548.  Defendants' conspiracy and acts in furtherance thereof are alleged in greater detail earlier in the Complaint, including, without limitation, in Plaintiff's federal and state law racketeering allegations.  Such allegations are incorporated herein.

549.  Defendants acted with agreement and a common understanding or design to commit unlawful acts and/or lawful acts unlawfully, as alleged herein, and acted purposely, without a reasonable or lawful excuse, to create the injuries alleged herein.

550.  Defendants acted with malice, purposely, intentionally, unlawfully, and without a reasonably or lawful excuse.

551.  Defendants' conspiracy, and Defendants' actions and omissions in furtherance thereof, proximately caused and/or substantially contributed to the direct and foreseeable losses alleged herein.

552.  Plaintiff seeks economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' civil conspiracy.  Plaintiff does not seek damages for physical personal injury or any physical damage to property caused by Defendants' actions.

553.  Plaintiff seeks all legal and equitable relief as allowed by law, except as expressly disavowed herein, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by Defendants, attorney fees and costs, and pre- and post-judgment interest.

## COUNT VIII
## FRAUD AND FRAUDULENT MISREPRESENTATION
### (Against All Defendants)

554.  Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth here, and further alleges as follows.

555.  Defendants violated their general duty not to actively deceive and not to make knowingly false statements and have omitted and/or concealed information which made statements by Defendants knowingly false.  Defendants acted intentionally and/or unlawfully.

556.  As alleged herein, Defendants knowingly and/or intentionally made representations that were false.  Defendants had a duty to disclose material facts and concealed them.  These false representations and concealed facts were material to the conduct and actions at issue.  Defendants made these false representations and concealed facts with knowledge of the falsity of their representations, and did so with the intent of misleading Plaintiff, Plaintiff's community, the public, and persons on whom Plaintiff relied.

557.  As alleged herein, the Manufacturer Defendants engaged in false representations and concealments of material fact regarding the use, safety and effectiveness of opioids to treat chronic non-cancer pain.

558.  As alleged herein, all Defendants made false statements regarding their compliance with state and federal law regarding their duties their duties to monitor, report and halt suspicious orders and to prevent diversion, and/or they concealed their noncompliance with these requirements.

559.  Defendants' false representations and concealments were reasonably calculated to deceive Plaintiff, Plaintiff's Community, and the physicians who prescribed and the patients who

165

took opioids in Plaintiff's Community, were  made with the intent to deceive, and did in fact deceive these persons, Plaintiff, and Plaintiff's Community.

560.   Plaintiff, Plaintiff's Community, the physicians and the patients who prescribed opioids reasonably relied on these false representations and concealments of material fact.

561.   Plaintiff justifiably relied on Defendants' representations and/or concealments, both directly and indirectly.  Plaintiff's injuries were proximately caused by this reliance.

562.   The injuries alleged by Plaintiff herein were sustained as a direct and proximate cause of Defendants' fraudulent conduct.

563.   Plaintiff seeks economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' fraudulent activity, including fraudulent misrepresentations and fraudulent concealment.  Plaintiff does not seek damages for physical personal injury or any physical damage to property caused by Defendants' actions.

564.   Plaintiff seeks all legal and equitable relief as allowed by law, except as expressly disavowed herein, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by Defendants, attorney fees and costs, and pre- and post-judgment interest.

## COUNT IX
## UNJUST ENRICHMENT
### (Against All Defendants)

565.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth here, and further alleges as follows.

566.   Plaintiff conferred a benefit upon the Manufacturing Defendants by making payments, directly or indirectly, for opioids manufactured by each such Defendant that were sold or used in Plaintiff's Community, which payments Defendants accepted without protest or defect and retained, profited and benefitted from them.

166

567. The Manufacturing Defendants' retention of such payments would be inequitable based on the circumstances set forth herein, including their false and deceptive marketing and promotion campaign and their omissions of and failure to state material facts in connection with their marketing of opioids as well as their failure to report suspicious orders. The Manufacturing Defendants have thus been unjustly enriched by their actions which contributed to the Plaintiff's Community's opioid epidemic.

568. Plaintiff conferred a benefit upon the Distributor Defendants by making payments, directly or indirectly, for opioids distributed or otherwise provided by each such Defendant that were sold or used in Plaintiff's Community, which payments Defendants accepted without protest or defect and retained, profited and benefitted from them.

569. The Manufacturing Defendants' retention of such payments would be inequitable based on the circumstances set forth herein, including their failure to comply with their reporting duties under state and federal law. The Manufacturing Defendants have thus been unjustly enriched by their actions which contributed to the Plaintiff's Community's opioid epidemic.

570. Defendants had an appreciation or knowledge of the benefit.

571. Defendants knew of such payments received by them.

572. Defendants have unlawfully and in bad faith knowingly retained the benefit of such payments for themselves.

573. As a direct and proximate result of Defendants' actions, as hereinabove set forth, Defendants are, and continue to be, unjustly enriched and Plaintiff demands it be made whole.

**COUNT X**
**AIDING AND ABETTING (Tortious and Statutory)**
**(Against All Defendants)**

574. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth here, and further alleges as follows.

167

575.  Each Defendant provided substantial assistance or encouragement to the other Defendants in committing the primary causes of action alleged herein, and did so with unlawful intent and knowledge that such parties were perpetuating an illegal marketing and promotion scheme to wrongfully increase sales of opioids beyond legitimate medical purposes and were failing to comply with mandated reporting requirements yet continuing to substantially assist each other in their wrongful actions.

576.  Each Defendant also provided substantial assistance to the other Defendants in committing the violations of M.G.L. c. 93A alleged herein, and did so with unlawful intent and knowledge that such parties were perpetuating an illegal marketing and promotion scheme to wrongfully increase sales of opioids beyond legitimate medical purposes and were failing to comply with mandated reporting requirements, and yet continued to substantially assist each other in their wrongful conduct.

577.  Each Defendant rendered substantial assistance despite their knowledge that the marketing, promotional and distribution-related activities were unlawful, unfair, deceptive and fraudulent and violated M.G.L. c. 93A.

578.  By each Defendant's actions alleged above, each said Defendant aided and abetted the commission of the causes of action alleged herein.

579.  As a direct and proximate result of Defendants' unlawful marketing and promotion scheme and failure to comply with mandated reporting requirements and all the activities performed in connection therewith, to which Defendants provided substantial assistance, Plaintiff sustained damages and losses and demands to be made whole.

**PUNITIVE DAMAGES**

580.  Plaintiff re-alleges all paragraphs of this Complaint as if set forth fully herein.

581.  By engaging in the above-described intentional and/or unlawful acts or practices, Defendants acted with actual malice, wantonly, and oppressively.

582.  Defendants acted with conscious disregard to the rights of others and/or in a reckless, wanton, willful, or gross manner and in a manner that had a great probability of causing substantial harm.

583.  Defendants acted with a prolonged indifference to the adverse consequences of their actions and/or omissions.

584.  Defendants were manufacturing, marketing, promoting, distributing and/or selling dangerous drugs statutorily categorized as posing a high potential for abuse and severe dependence.  Thus, Defendants knowingly traded in drugs that presented a high degree of danger if prescribed incorrectly or diverted to other than legitimate medical, scientific, or industrial channels.  Because of the severe level of danger posed by, and indeed visited upon the State and Plaintiff's Community by, these dangerous drugs, Defendants owed a high duty of care to ensure that these drugs were only used for proper medical purposes.  Defendants chose profit over prudence, and the safety of the community, and an award of punitive damages is appropriate, as punishment and a deterrence.

585.  By engaging in the above-described wrongful conduct, Defendants also engaged in willful misconduct and exhibited an entire want of care that would raise the presumption of a conscious indifference to consequences.

## **RELIEF**

**WHEREFORE,** Plaintiff respectfully prays that this Court grant the following:

A.      Entering Judgment in favor of Plaintiff in a final order against each Defendant;

B.      Enjoining Defendants and their employees, officers, directors, agents, successors, assignees, merged or acquired predecessors, parent or controlling entities, subsidiaries, and all

other persons acting in concert or participation with them, from engaging in unfair or deceptive practices in violation of law and ordering temporary, preliminary or permanent injunctive relief;

C.     Order that Defendants compensate Plaintiff for past and future costs to abate the ongoing public nuisance caused by the opioid epidemic;

D.     Order Defendants to fund an "abatement fund" for the purposes of abating the opioid nuisance;

E.     Awarding actual damages, treble damages, injunctive and equitable relief, forfeiture as deemed proper by the Court, and attorney fees and all costs and expenses of suit pursuant to Plaintiff's racketeering claims;

F.     Awarding the Plaintiff the damages caused by Defendants' unlawful conduct, including (A) costs for providing medical care, additional therapeutic treatments, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (B) costs for providing treatment, counseling, and rehabilitation services; (C) costs for providing treatment of infants born with opioid-related medical conditions; (D) costs for providing care for children whose parents suffer from opioid-related disability or incapacitation; and (E) costs associated with law enforcement and public safety relating to the opioid epidemic.

G.     Awarding judgment against Defendants requiring Defendants to pay punitive damages; and

H.     Granting Plaintiff the cost of investigation, reasonable attorneys' fees, and all costs and expenses; pre-judgment and post-judgment interest; and, all other relief as provided by law and/or as the Court deems appropriate and just.

Dated: May 15, 2018

Respectfully Submitted,

Town of Leicester
Plaintiff

/s/ Richard M. Sandman

Richard M. Sandman, BBO# 440940
**RODMAN, RODMAN & SANDMAN**
442 Main Street
Malden, MA 02148
Tel.: 781-322-3720
Fax.: 781-324-6906
rsandman@rrslaw.net

Thomas T. Merrigan, BBO# 343480
Peter M. Merrigan, BBO# 673272
Jonathan Tucker Merrigan, BBO# 681627
**SWEENEY MERRIGAN LAW**
268 Summer Street, LL
Boston, MA 02210
Tel.: 617-391-9001
Fax.: 617-357-9001
tom@sweeneymerrigan.com
peter@sweeneymerrigan.com
tucker@sweeneymerrigan.com

Jonathan M. Silverstein, BBO# 630431
**KP LAW, P.C.**
101 Arch Street, 12th Floor
Boston, MA 02110
Tel.: 617-654-1729
Fax.: 617-654-1735
jsilverstein@k-plaw.com

Anthony J. Majestro (*pro hac pending*)
**POWELL & MAJESTRO, PLLC**
405 Capitol Street, Suite P-1200
Charleston, WV 25301
Tel.: 304-346-2889
Fax: 304-346-2895
amajestro@powellmajestro.com

Peter J. Mougey (*pro hac pending*)
**LEVIN, PAPANTONIO, THOMAS, MITCHELL,**
**RAFFERTY & PROCTOR, P.A.**
316 S. Baylen Street, Suite 600
Pensacola, FL 32502-5996
Tel.: 850-435-7068
Fax: 850-436-6068
pmougey@levinlaw.com

Paul T. Farrell, Jr. (*pro hac pending*)
**GREENE, KETCHUM, FARRELL,**
**BAILEY & TWEEL, LLP**
419 - 11th Street (25701)/ P.O. Box 2389
Huntington, WV 25724-2389
Tel.: 800-479-0053 or 304-525-9115
Fax: 304-529-3284
paul@greeneketchum.com

Michael J. Fuller, Jr. (*pro hac pending*)
**MCHUGH FULLER LAW GROUP, PLLC**
97 Elias Whiddon Rd.
Hattiesburg, MS  39402
Tel.: 601-261-2220
Fax: 601-261-2481
mike@mchughfuller.com

J. Burton LeBlanc, IV (*pro hac pending*)
**BARON & BUDD, P.C.**
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Tel.: 214-521-3605
Fax: 214-520-1181
bleblanc@baronbudd.com

James C. Peterson (*pro hac pending*)
**HILL, PETERSON, CARPER,**
  **BEE & DEITZLER, PLLC**
NorthGate Business Park
500 Tracy Way
Charleston, WV  25311
Tel.: 304-345-5667
Fax: 304-345-1519
jcpeterson@hpcbd.com